IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF CONNECTICUT

| In re | BK. NO. 19-21619-006 |
| | (Chapter 11) |
| John Alan Sakon | |
| | Date:    February 21, 2020 |
| Debtor and | |
| Debtor-in-Possession. | Judge:  Hon. James J. Tancredi |

## DEBTOR'S OBJECTION TO A&F MAIN STREET ASSOCIATES MOTION FOR RELIEF FROM STAY

John Alan Sakon, debtor and debtor-in-possession herein (the "Debtor"),

hereby OBJECTS to A&F Main Street Associates Motion for Relief from Stay

("A&F") as the motion is without merit.  The existing 98-year Ground Lease

represents a significant asset in the Chapter 11 reorganization and movant has

misconstrued the facts in his motion.  In support of the Objection, the Debtor

respectfully represents as follows:

### SHORT SUMMARY

Movant's claim that the Lease has been terminated is wholly without merit.

The existence of the Ground Lease was affirmed by the parties in a Stipulation

granted by the Superior Court of Hartford. The Stipulation, which was entered into

on August 14, 2019, creates a pre-petition personal extension of credit to John

1

Sakon by A&F in the amount of $97,500 in settlement of all claims to December 31, 2019. Since Bankruptcy was filed on September 19, 2019, the $97,500 is a pre-petition debt. A&F has made no claims of Post-Petition Debt or claims for failure to pay rent in its filings. Therefore, there is no merit to A&F's motion for Relief from Stay at this time.

As to the claim that the debtor has no equity in the property and the property is not necessary for Reorganization, the debtor directs this court to *the Shoppes at Avalon Plan of Development* and to *The Shoppes at Avalon Grading and Drainage Plan. Attached hereto as Exhibit L (at the end of the document).* These plans graphically demonstrate that for the Highest and Best Use of the property for purposes of value, they must be developed as a unit.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELEVANT FACTUAL BACKGROUND

3.    The factual background as to the present issue before the court can be summarized in the following documents and no other documents are relevant:

a. Ground Lease by and between Mary Randazzo, Trustee and John Alan Sakon dated February 11, 1999. ("Lease") *See Movants Motion for Relief from Stay Exhibit A.*

b. Assignment of Ground Lease from Mary Randazzo, Trustee to A&F Main Street Associates, LLC. dated December 6, 2011. ("Assignment") *See Movants Motion for Relief from Stay Exhibit B.*

c. Complaint to the Connecticut Superior Court by A&F Main Street Associates, LLC vs John Sakon dated *A&F* December 28, 2018. HFH-CV19-6011720-S. ("Complaint") *See Movants Motion for Relief from Stay Exhibit F.*

d. Defendant's 2nd Answer and Special Defense to the Complaint to the Connecticut Superior Court by A&F Main Street Associates, LLC vs John Sakon dated *A&F* January 23, 2019. HFH-CV19-6011720-S. ("Answer and Special Defenses") *Attached hereto as Exhibit A.*

e. Stipulation by and between A&F Main Street Associates, LLC vs. John Sakon dated August 14, 2019. ("Stipulation") HFH-CV19-6011720-S. *Attached hereto as Exhibit B.*

f. Restricted Appraisal Report of an Entitled Land Development

(13.55+/- acres of developable commercial land) Main Street and Griswold Street, Glastonbury, CT 06033; Prepared by Adam J. Hardej, Jr., MAI, President & Chief Appraiser BAAR REALTY ADVISORS; BAAR File No: 07-16-0398. ("Appraisal"). *Attached hereto as Exhibit C.*

g. The Shoppes at Avalon Investment Summary and Opinion of Value dated January 18, 2019. (Upon which the Preliminary Plan of Reorganization by the Debtor will be based). ("Plan"). *Attached hereto as Exhibit D.*

## **GENERAL BACKGROUND OF CHAPTER 11 REORGANIZATION**

4. The Debtor's primary asset of 13.5459 Surveyed Acres of real property (entitled the "The Shoppes at Avalon" or "property") located in Glastonbury, Connecticut shown on the Survey Map prepared by Dutton & Johnston, LLC, Land Surveyors & Civil Engineers, attached hereto as Exhibit E and further described as follows:

> a. 131 Griswold Street, Glastonbury, Connecticut a parcel of land with improvements thereon of 3.3904 acres identified on the Glastonbury Land Records at Volume 404 and Page 1080.
>
> b. #N2B Griswold Street, Glastonbury, Connecticut a parcel of

4

vacant land of 1.8576 acres identified on the Glastonbury Land Records at Volume 102 and Page 237.

c. #E8A Main Street, Glastonbury, Connecticut a parcel of land with improvements thereon of 4.9493 acres identified on the Glastonbury Land Records at Volume 920 and Page 209.

d. Area Subject to Lease in Favor of John Alan Sakon known as #2980 Main Street, Glastonbury, Connecticut being a parcel of land of 2.5597 acres identified on the Glastonbury Land Records at Volume 1245 Page 177.

e. Together with all rights and easements as shown in said aforementioned survey which can be found hereto in Exhibit E.

5.     The assembled properties known as *The Shoppes at Avalon* received Special Permit Approvals by the Glastonbury Town Plan and Zoning Commission on April 4, 2013, again on March 17, 2015, again on November 25, 2015, again on April 4, 2017 and again on February 6, 2018 *"authorizing the construction and operation of the Shoppes at Avalon Phases I and II – 94,640 square feet of retail and restaurant uses…"*.

> a. That said approvals provided that no certificate of occupancy for the 94,640 square feet of construction would issue *"until the House Street/Harris Street/Griswold Street intersection improvements as*

5

*well as the Main street corridor traffic signal coordination improvements between Welles Street and Putnam Boulevard are operational. "* (hereinafter **"Town Road Improvements").**

b. That in the 2012-2013 Annual Report of the Town of Glastonbury, Stewart Beckett III Chairman, Glastonbury Town Council announced the Town Road Improvements would be completed in 2014.

> This will combine with the scheduled
> reconstruction in 2014 of the House/
> Harris/Griswold St. intersection to
> greatly decrease traffic congestion in
> our entire downtown corridor.

c. That in the 2013-2014 Annual Report of the Town of Glastonbury, Stewart Beckett III Chairman, Glastonbury Town Council announced the Town Road Improvements "will be completed during the 2015 season."

> and now, construction. We anticipate
> construction will be completed during
> the 2015 season.

d. That actual construction on the Town Road Improvements did not commence until 2016 and the provision that no certificate of occupancy for the 94,640 square feet of construction would issue until the Town Road Improvements was not removed as a condition of approval of *The Shoppes at Avalon* until April 4,

6

2017.

e. That the debtor, in good faith, did rely upon the representations of the town to his detriment. And by its actions, the creditor town of Glastonbury sought to inversely condemn the debtor's property by levying excessive taxes upon the property while denying any productive use of the property. Further, this is a pattern of action within the town whereby over 100 acres of commercial lands have been taken by the town for back taxes while granting permits with conditions outside the control of the landowner and within control of the town and when the landowner cannot make a productive use of his property, taking the property for back taxes.

6.    In addition to its claim of reliance, the defenant will show by uncontested evidence that the Glastonbury zoning regulations provide no uses as of right in the zone, so there was no alternative uses to which the properties could generate income in the interim. Mr. Mark Branse Esq. was an expert witness in zoning law called by the plaintiff in the matters CV05-4006620-S and CV05-4003783-S.[1]  In direct questioning,

---

[1] Mark Branse, Esq., was recognized as an expert witness in zoning law by the court without objection by the defendants. Mr. Branse testified that he was the former Assistant Town Manager for Planning and Community Development for the Town of Glastonbury; the former Town Planner for the Town of Glastonbury; and the former Director of Community Development for the Town of Glastonbury. Mr. Branse then testified that he left the employ of the town to become a practicing attorney and served as counsel to the Glastonbury Redevelopment Agency; served as a member of the Glastonbury Redevelopment Agency; and served on the Glastonbury Town Plan and Zoning Commission as a commissioner for seven years. In his law practice, Mr. Branse testified he has represented the towns of Andover, Cromwell, Middlefield, Westbrook,

7

Mr. Branse provided the following testimony:[2]

a.
```
12      Q    Mr. Branse, what can you do with this property, under
11   the regulations, without a special permit?
14      A    Nothing.
15      Q    Nothing?
16      A    Nothing.
```

    i. Exhibit F - Transcript Page 38

b.
```
9       Q    Okay.  And in your expert opinion, is it possible that
10   the commission may deem it appropriate not to approve any use
11   on this property requiring a special permit in the foreseeable
12   future?
13      A    It is possible.
14      Q    And they certainly would have the legal authority to do
15   that?
16      A    Yes, they would.
```

    i. Exhibit F - Transcript Page 50

---

Old Saybrook, Old Lyme, East Haddam, Enfield, Oxford, Willington, Eastford, Bolton, and Scotland in the areas of land use law; and was also past Chairman of the Planning and Zoning Section of the Connecticut Bar Association; and regularly teaches courses in Land Use Law for the Connecticut Bar Association.

2 See Transcript, Testimony Mark Branse; Sakon v. Town of Glastonbury. CV05-4006620-S and CV05-4003783-S (Attached hereto as Exhibit F).

```
 9    Q    Is there any other of those 20 municipalities that have
10    such restrictive zoning regulations as this one?
11    A    I've never seen -- I've never seen one where arguably
12    there are no special, no uses permitted as of right or at best
13    a farm and a park as permitted as of right.  All the
14    regulations allow something as of right.
15    Q    What can a landowner do with this property?
16    A    Keep applying for special permits.
17    Q    And hope the town changes its mind?
18    A    Hope that you can present something that they will --
19    are willing to approve.
```

c.

## i. Exhibit F - Transcript Page 51

```
 8    Q    Okay.  Now you've testified that you had worked on the
 9    development of the regulations --
10    A    That's correct.
11    Q    -- that now include the Plan Travel Zone.  And what was,
12    do you recall what the Plan and Zoning Commission's
13    intention -- well, was with respect to those regulations?
14    A    With respect to the Plan Travel Zone regulations?
15    Q    Yes.
16    A    Yes, I do.
17    Q    And what was its intention?
18    A    Its intention was to effectively prevent development in
19    the entire Plan Travel Zone area in order to allow the
20    Glastonbury Redevelopment Project, which was approved in 1969,
21    to proceed without competition from the north part of the
22    town.  That is, I fear, the truthful answer to your question.
```

d.

## i. Exhibit F - Transcript Page 67

9

```
13          THE COURT:  Well, let me just ask a follow-up.
14     Mr. Branse, did I understand you that the -- understand
15     you to say that the planned travel regulation was
16     designed to prevent a development of property that
17     would be in competition with some other planned
18     development?
19          THE WITNESS:  Yes, Your Honor, you understood me
20     correctly.  That's the truthful answer, I'm afraid.
21          THE COURT:  It sounds like some constitutional
22     issues involved, but apparently nobody raised them.
23          THE WITNESS:  No, they didn't.
```

e.

    i. Exhibit F - Transcript Page 68

    f. Since the presentation of this uncontested evidence and testimony as to the use of the police power to discriminate and prevent development in favor of other developments, the town of Glastonbury has made no effort to correct or revise its use of the Special Permit Process.

7.    When debtor made clear his intentions to bring claims against the town of Glastonbury for inverse condemnation of his properties and a 42 U.S.C. § 1983 Civil Rights action, the town of Glastonbury retaliated by falsely arresting the debtor five times. In his prior 63 years, the debtor had no criminal record. The town of Glastonbury Police Department then falsely arrested the debtor on 11 felonies and 3 misdemeanors. See Summary Arrest Sheet attached hereto as Exhibit G. The debtor was facing a total of 126.75 years in prison:

10

a. The town of Glastonbury arrested the debtor and issued a Protective Order prohibiting the debtor from returning to this Glastonbury Home.

b. The town of Glastonbury Police stood by while parties illegally and without color of law broke into the offices of the debtor in his own Glastonbury Office building, entered said offices, committed burglary and other assorted felonies and removed the debtor's entire possessions from the town. The Glastonbury Police refused to investigate or prosecute these felonies.

c. On March 17, 2019, before the Appellate Court of the State of Connecticut, the debtor made the claim "that the town of Glastonbury and its police department was corrupt and he knew were the bodies were buried *literally.*" The debtor asked the court to use its powers to convene a grand jury investigation.

d. On March 28, 2019, while participating in Memorial day bicycle rally with 70 + other bicyclists, a Dodge Durango Truck, driven by a sworn officer of the town of Glastonbury, came up upon the debtor from the rear, and ran the debtor off the road. The debtor suffered severe injuries.

e. The town of Glastonbury Police Department not only refused to

arrest or tickets the driver of the truck; on April 28, 2018 the town of Glastonbury arrested the debtor for Breach of Peace (for saying that truck hit me!) and False Statement (for saying that truck hit me!).

f.  That these actions by the creditor town of Glastonbury have been divisive to prevent the debtor from bringing the inverse condemnation claims and discrimination claims arising out of the Branse Testimony.

8.  That in 2008, the debtor planned to demolish a 12,000 square foot commercial building located at 131 Griswold Street to make way for a development of a higher and better use.

a.  That in 2008, a 250+ member congregation known as the New Life Christian Fellowship of Connecticut, Inc. approved the debtor to use his building as a church as they had lost their home after 20 years of residency in Glastonbury.

b.  That Sakon, a minister in his own right, agreed to lend his building to be used as a church.

c.  That Sakon agreed to lease the building to New Life, which had been rented in the prior year for $16,000 a month NNN, for the token sum of $3,875 per month to partially cover out of pocket

operating expenses.

d. That Sakon did apply for and was granted a use variance to allow the property to be used as a place of worship in the Planned Travel Zone due to the hardship that there is a lack of available space for worship for growing congregations I the town of Glastonbury. Said variance is attached hereto as Exhibit H.

e. That despite the change of use of the property to a church, which is a tax-exempt use under the law, the town of Glastonbury refused to recognize the change of use and continued to tax the property consistent with its prior use as a commercial retail building.

f. That from 2008 to the present time, the only approved use in zoning of 131 Griswold Street is as a place of worship.

g. That the actions of the town of Glastonbury are devised to take the property the debtor by inverse condemnation.

h. That the debtor intends to take a tax appeals and a 42 U.S.C. § 1983 Civil Rights action, against the town of Glastonbury for placing a tax upon a place of worship which is exempt from taxation under Connecticut and Federal Law.

i. That the current debt the town of Glastonbury claims in this bankruptcy proceeding is primarily the taxes imposed upon a place

13

of worship.

9. That in the Spring of 2016, the debtor did "*commence substantial construction*" pursuant to Section 12.7 of the Glastonbury Building-Zone Regulations for the sole purpose of preserving the validity of his Special Permits into perpetuity. And further, the debtor openly and in full view of the public highway continued construction activities on the property from 2016 to the present 2019 construction season without complaint, obstruction or hindrance from the Glastonbury Zoning Enforcement Officer.

a. That on July 26, 2016, Century Capital Partners LLC did offer debtor a Letter of Intent to finance construction for *the Shoppes at Avalon.* Attached hereto as Exhibit I.

b. October 6, 2016, debtor did receive a commitment letter from Century Capital Partners LLC for a mortgage in the amount of $3,400,000. Attached hereto as Exhibit I.

c. That as a direct result of the nine felony arrests of the debtor by the town of Glastonbury on August 23, 2016 and the felony larceny arrest of the debtor by the town of Glastonbury on October 2, 2016, the debtor lost his commitment with Century to refinance his properties. The debtor has subsequently been found innocent of all claims made in these ten felony arrests. Prior to August 2016,

14

debtor had no criminal record.

d. That on April 17, 2019, K.G.A.K. Financial Group, Inc. ("KGAK") issued a Letter of Intent to provide *The Shoppes at Avalon* $4,800,000 in financing subject to an appraisal and confirmation that the Special Permits were current. Attached hereto as Exhibit J.

e. That KGAK commissioned Adam J. Hardej, Jr. to prepare an appraisal of the property. Said appraisal entitled: Restricted Appraisal Report of an Entitled Land Development (13.55+/- acres of developable commercial land) Main Street and Griswold Street, Glastonbury, CT 06033; Prepared by Adam J. Hardej, Jr., MAI, President & Chief Appraiser BAAR REALTY ADVISORS; BAAR File No: 07-16-0398. ("Appraisal"). *Attached hereto as Exhibit C.*

f. That on August 30, 2019, KGAK issued a commitment letter to the debtor to proceed with the funding with a projected closing date of September 3rd, 2019. Attached hereto as Exhibit J.

g. That on or about September 2019, John Mullen the Town Planner of Glastonbury contacted Alan Levine of KGAK and advised him that the permits for *The Shoppes at Avalon* were no longer valid.

15

That Mr. Mullen had no legal authority to render such an opinion and Mr. Mullen acted outside his duties as the Glastonbury Town Planner. Further that Mr. Mullen conveyed hearsay conversations he had with Zoning Enforcement Officer Peter R. Carey to Mr. Levine. To date, Mr. Carey has neither confirmed nor denied these conversations and has taken no enforcement action for the construction activities of the debtor on the site.

h. The debtor contacted Mr. Mullen and demanded a retraction, but Mr. Mullen and the town of Glastonbury took no action. Attached hereto as Exhibit K.

i. That the creditor town of Glastonbury has actively frustrated and undermined the reorganization of the Chapter 11 estate.

10. That said appraisal was ordered by and prepared for K.G.A.K. Financial Group, Inc. in anticipation of a funding take-out financing in the amount of $4.8 million to remove the instant case from Chapter 11 Bankruptcy.

a. That on November 27, 2019, KGAK did issue a confirmation letter that if the Special Permits for the project were in good standing, they would be willing to go forward with the funding the the take-0ut loan in bankruptcy. Attached hereto as Exhibit H.

b. That on the creditor, town of Glastonbury, made slanderous

16

statements to the underwriter of KGAK claiming the Special Permits for *The Shoppes at Avalon* had expired despite the fact that actual construction has commenced.

c. That the debtor has appealed the actions of the town staff to the Glastonbury Zoning Board of Appeals and said action is pending.

## LAW AND ARGUMENT

The main trust of the movant's argument is the claim that the Lease had terminated pre-petition. In fact, the movant claims his position is "unequivocally" (sic). If looked at in the context of the underlying lawsuit and the Stipulation, the representations of the movant cannot be justified.

The movant offers no *admissible* evidence that the Lease has terminated. First, the movant has presented to this court many documents (of its own making) that as *parol evidence* cannot be considered by this court. The Stipulation is the written contract of settlement that is intended to be the complete and final expression of the parties' 2019 agreement to modify the lease.

The only relevant documents are the Lease, the Assignment, the Complaint, the Answer and Special Defenses and the Stipulation entered into by the parties. The appraisal submitted by the debtor, is also relevant to defeat the absurd claim

that the debtor has no equity in the Leasehold and that the ground Lease property is not necessary for reorganization. The reader should also review Exhibit L for a graphic representation.

There is no argument that the Lease and the Assignment are relevant. The ruling document as to whether the Lease is still in existence is the Stipulation. The Complaint, the Answer and Special Defenses are relevant as they go to what issues the Stipulation intended to address and these documents are referred to in the Stipulation.

In the underlying complaint in Re: A&F Main Street Associates, LLC vs John Sakon, HFH-CV19-6011720-S, dated December 28, 2018, the movant sought the following relief:

---

### DEMAND FOR RELIEF

WHEREFORE, the plaintiff claims:

1. Judgment for immediate possession of the premises;

2. Forfeiture of the possessions and personal effects of the defendant on the premises pursuant to Conn. Gen. Stat. §47a-42a.

3. Attorney's fees pursuant to the lease.

---

In response to the complaint, the debtor filed a 2nd Amended Answer and Special Defense. *Attached hereto as Exhibit D.* And so were the issues joined.

A Stipulation was entered into by the parties on August 14, 2019 to settle the issues joined. In said stipulation, the following issues were resolved:

1) The amount of monies owed where agreed to in Paragraph 1.

2) An amendment of the ground lease was agreed to in Paragraph 2 to allow non-institutional mortgages (KGAK). And the area upon which what real estate taxes were the tenant's responsibility were resolved.

3) The amended lease was to be held in escrow pending payment as per Paragraph 3. Without the interference of the town, the payment would have been made on time.

4) The defendant agreed to waive all counterclaims and special defenses made by the defendant in the instant case. Paragraph 4.

5) The plaintiff agreed to cooperate with any refinancing of the property. Paragraph 5.

6) If the defendant failed to pay the sums then an immediate execution of the relief claimed (possession and forfeiture) shall enter. Paragraph 6.

7) *"Notwithstanding any of the language above, if the defendant files for bankruptcy in the Federal Court prior to December 2, 2019, then this agreement shall not be construed as a judgment of possession. "*

8)

19

## 11. *The Lease has never Terminated!!!!!!!!!!!!!!!*

In its motion, the movant makes the bold claim that the lease has terminated! However, when viewed in the context of the Stipulation, this claim is absurd. The Stipulation was signed by all parties. The Stipulation clearly states that the lease shall be amended. That very statement destroys the movant's claim as you cannot amend a Lease that has been terminated. If the parties agreed that the Lease had been terminated (which they did not), then the obvious language Attorney Moriarty should have used when he authored the Stipulation would have been "The Lease is hereby reinstated." There is no language whatsoever in the Stipulation that implies the Lease had been terminated.

If the lease had been terminated, then the movant could not advanced any claims for any rent, imposition, attorney fees or the like under Section 32.01 of the Lease. However, the movant has advanced these claims, so the Lease was not terminated.

The sole purpose of Paragraph 7 of the Stipulation was the protection of the debtor and the creditor A&F in case other creditors refused to play nice in the sandbox.[3] The appraisal was in. The value of the property was known. The debtor had substantial equity in the estate and offered to extend the protections of that equity to A&F in exchange for credit.

---

[3] Those were the exact words used in the discussion.

20

## *12. The Stipulation is an Pre-Petition Extension of Credit*

The Stipulation created a pre-petition extension of credit by the movant to the debtor. By evidence of its own filing in Official Form 410, the movant state the amount of claim is $97,500 and acknowledges the claim is unsecured. By evidence of its own filing in the RELIEF FROM STAY WORKSHEET – REAL ESTATE, **the movant acknowledges there are no claims of monies for any Alleged Post-Petition Default.**

If the Lease had terminated, as the movant claims, the subsequent claims the movant now makes in this proceeding could not sustain under Section 32.01 of the Lease which clearly states that upon a termination, "the Tenant's obligation to pay Basic Rent and Impositions as provided hereunder shall cease...." Therefore, by advancing the claim of $97,500, the movant confirms the monies represent a pre-petition extension of credit for payment of the modification of an existing Lease. To claim otherwise, would extinguish any claim for the $97,500.

The Stipulation goes beyond the simple claim of payment for rent. The Stipulation clearly states the monies were paid, at least in part, for the modification of the ground Lease. The Stipulation creates a personal liability to John Sakon in the amount of $97,500 which did heretofore exist. And as a personal liability, it comes under the jurisdiction of this Bankruptcy Court. And it would appear, the movant seeks to collect upon the personal liability created whether the lease is

21

terminated or not. Therefore, the movant clearly extended credit.

To further understand the Stipulation, this court must look to the relief claimed by the movant in the State Court. The relief claimed was for *possession*. If Sakon failed to pay the $97,500 and did not file bankruptcy, A&F could move for possession and A&F would still have a claim against John Sakon for the $97,500 in addition to possession. That is the key here. If payment was not made and Sakon did not file for bankruptcy, then A&F would be entitled to both possession and could still seek enforcement of the monies owed despite the provision found in Section 32.01 of the Lease extinguishing all claims upon termination.

However, the parties agreed to a special clause if bankruptcy was filed. If bankruptcy was filed, the failure of Sakon to pay the $97,500 under the Stipulation could not be construed in considering a Judgment of Possession.  The only way this statement could be construed is A&F extended personal credit to Sakon which would come due on December 31, 2019. The debt of $97,500 would make A&F a creditor in the bankruptcy proceeding. Therefore the Stipulation had the effect of settling the issues between the parties (such as the Special Defense) and if Sakon did file for bankruptcy, the Stipulation had the effect of extending the collateral for the $97,500 debt to the entire bankruptcy estate.  Since, at the time of the Stipulation on August 14, 2019, both A&F and Sakon had reason to know *the*

22

*Shoppes at Avalon* appraisal completed on July 18, 2019 had come in with a value
of $11,430,000, A&F was provided additional collateral sufficient to enforce
payment of its extension of credit of $97,500. By the same reasoning, Sakon
agreed to undertake the burden of the credit so as to take the appropriate action to
protect his estate in bankruptcy if anticipated financing was delayed. Paragraph 7
of the Stipulation could not be construed in any other fashion.

At the time of the Stipulation, Sakon had secured financing with KGAK
Financial in the amount of $4,800,000. In fact, the aforementioned appraisal was
commissioned by KGAK Financial in its due diligence efforts. However, that
financing did not go forward when the town of Glastonbury advised KGAK that
the Special Permits for *The Shoppes at Avalon* had expired. This was the very fear
Sakon contracted with A&F at a cost of $97,500 to guard against.

Since the debtor has filed for bankruptcy, the stipulation is not operative as
to possession. Since the debtor did not raise the issue of a substantial leasehold
equity as a Special Defense, the debtor has not waived all his rights in equity.

The stipulation resolved many issues. The amount of monies contested and
claimed have been resolved. The ability of the debtor to place a non-institutional
mortgage on the ground lease has been resolved. This paved the day for future
DIP financing. The requirement that the landlord cooperate with any refinancing
of the property has been resolved.

The Special Defense of the debtor all revolved around his inability to place a leasehold mortgage on the property. And the debtor only agreed to waive those claims made in his answer. The statement by movant's counsel that the debtor has waived all possible counterclaims and defenses is patiently untrue.

## 13. *The Claim that Debtor has no Equity in the Property and the Property is not Necessary for Reorganization is absurd!*

The appraisal of KGAK values the entitled value of the property at $11,430,000. Remove from the property the 98-year ground Lease and the property is no longer entitled as the ground Lease is integral to the development of the whole. See Exhibit L.

The ground lease has a 98-year term and the landlord has been paid well over $300,000 in rent for a vacant piece of land in anticipation of development. The Stipulation that $97,500 was to be paid in settlement of all current claims is a pre-petition debt. The ground lease is for approximately 2.56 acres of land which adds very significant value to the Chapter 11 estate. The appraisal, values the land near $1 million per acre. The Leasehold interest of 2.5 acres can be valued around $2,500,000. The maximum rental under the approvals of $21,312,50 for the next 70 years under the terms of the lease creates a substantial equity in the property. The debtor is an inactive Licensed General Certified Appraiser in Connecticut and

served as an expert witness as to Real Estate Valuation in many courts. As such the debtor can represent that the Lease Fee value can be quickly estimated by taking the $21,312.50 of rent the landlord can expect under the terms of the lease and divide that rent by a market return of 10%. This provides a value of approximately $210,000 more or less (any reversion value of a property 70 years in the future is not-significant). Therefore the value of the Leasehold estate of the debtor is in the millions and the value of the Leased Fee estate is significantly less. It would appear the movant seeks a windfall to take advantage of the debtor and the other creditors.

The leasehold property is integral to the reorganization of the Chapter 11 estate. Without the leasehold property any reorganization is impossible. See Exhibit L. The value of the property is the value in assemblage. Even if the debtor has to get his Special Permits re-approved to re-establish value, the permits have already been approved in 2010, 2013, 2014, 2015, 2016, 2017 and 2018. There is no reason to believe an application would fail in reorganization if required to overcome the delaying tactics of the creditor town of Glastonbury. There is no question the town of Glastonbury seeks to acquire the property for its own corrupt purposes.

To substantiate the equity in the Lease and the necessity of the Lease in the Reorganization, the debtor hereby submits The Shoppes at Avalon Investment

Summary and Opinion of Value dated January 18, 2019. (Upon which the Preliminary Plan of Reorganization by the Debtor will be based). ("Plan"). *Attached hereto as Exhibit D.*

## *14. The Movant has made no Section 365(d)(3) of 365(d)(5) claim.*

By evidence of its own filing in the RELIEF FROM STAY WORKSHEET – REAL ESTATE, **the movant acknowledges there are no claims of monies for any alleged Post-Petition Default.** However, even if such claim was made, the failure to comply with Section 365(d)(3) of 365(d)(5) is not, by itself, sufficient ground to deny an extension of the time to assume of reject a lease. *In re* Southwest Aircraft Servs., Inc. 831 F.2d 848, 17 C.B.C.2d 976 (9th Cir. 1987), *cert. denied,* 487 U.S. 1206, 108 S. CT. 2848, (1988).

The factors to be considered by the court in exercising the discretion to grant and Extension of Time to Assume or Reject a Lease include:

- whether the rent has been or is being paid;
- whether the lease is a primary asset of the estate;
- potential prejudice to the landlord from noncompensable damages:
- whether the landlord would receive a windfall;
- whether the case is unusually large or complex:
- whether the trustee has had a reasonable period of time to analyze the

26

estate and formulate a plan.

- See South Street Seaport Ltd. Partnership v. Burger Boys, Inc. (*In re*
  Burger Boys, Inc.), 94 F.3d 755, 761 (2d Cir. 1996).

In the instant case there is no claim that the post-petition rent is not being paid.
The lease is a primary asset of the estate. There is no prejudice to the landlord as
before the stipulation his collateral for default was non-existent and now his
collateral is the entire estate. If the extension is not granted, the landlord would
receive a windfall. The case is somewhat complex. And the debtor in possession
has not had a reasonable time to analyze the estate and formulate a plan due to
extenuating circumstances. The extension should be granted.

## 15. *Even if a default is claimed, a lease may be assumed.*

To assume a lease in default, a debtor must:

- cure the default of provide adequate assurance that the default will be
  promptly cured,
- provide adequate assurance that the debtor will compensate the other
  party for any pecuniary lost resulting from the default,
- provide adequate assurance of future performance under the lease.
- Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309-
  10, 12 C.B.C.2d 1202, 1207-08 (5th Cir. 1085).

27

The debtor has agreed to personally assume the $97,500 of debt and extend the obligation of its payment to the entire estate. Prior to the Stipulation, no such obligation existed under Section 32.01 of the lease. This provides adequate assurance of future performance of the lease. Certainly, the movant was aware the property appraisal was valued at $11,430,000, and it was part of his consideration to extend the credit to the debtor pre-petition. Adequate assurance that the action will be taken is a substitute for the immediate taking of the action. *See, e.g., In re Martin Paint Stores*, 1996 WL 450273 (Bankr. S.D.N.Y. August 6, 1996). With the ability to mortgage the Leasehold Estate under the terms of the Stipulation, DIP financing to assure future performance of the lease can be readily obtained.

Without the interference of the town of Glastonbury as to the Special Permits, it was reasonable for the debtor to assume he would be able to go forward with the KGAK Financing as early as last November. If the debtor is able to confirm the validity of the Special Permits in the March ZBA meeting, then that path may be clear.4

However, with the Stipulation and the assumption of the Lease, the path is clear to place a DIP Loan on the Leasehold interest to bring the Lease current and to pay off the $97,500 in debt. The DIP Loan on the Leasehold interest will be

---

4 The debtor has appealed to the Glastonbury Zoning Board of Appeals for relief of the interference of Mr. Mullen in establishing the current status of the Special Permits. However, the debtor cannot represent the mind of KGAK to proceed at this time, but they have expressed continued interest.

subordinate to the Leased Fee estate, however, there is adequate equity to entice a DIP Lender to place a first mortgage loan on the Leasehold of around $250,000. The other creditors, the town of Glastonbury and Cyhani Ventures, Inc. have no claim to object to a First Mortgage on the Leasehold Estate. However, with the assumption of the Lease into the Bankruptcy Estate, the security for the claims of the town and Cyhani are greatly enhanced. With the excess funds, the debtor can then go forward with any re-application to re-approve the Special Permits for *The Shoppes at Avalon* to execute a successful reorganization plan in bankruptcy.

The Code provides a broad right to cure regardless of whether the agreement itself would permit cure. *See In. re* Waterkist Corp., 775 F.2 D 1089 (9th Cir. 1985); *In re* Fontainbleau Hotel Corp., 515 F.2d 913, 914 (5th Cir. 1975) (court observed that under Louisiana law cancellation for nonpayment of rent is not effective until the court has ordered termination and granted possession). It is believed that Connecticut is similar to Louisiana Law as Connecticut Courts require Judgment to terminate a lease and evict a tenant. Similarly, the automatic stay prohibits any non-debtor party to a lease from unilaterally terminating the agreement. Therefore any claim of post-petition termination of the lease is not valid. Computer Communications, INc. v. Codex Corp. *(In re* Computer Communications, Inc.). 824 F.2d 725, 17 C.B.C/2d 556 (9th Circ. 1987).

29

Finally, the movant has claimed no post-petition default in his Relief from Stay Worksheet – Real Estate. Therefore, this becomes an issue of equity in the leasehold estate, a claim that has not been raised or waived by the debtor in the stipulation.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court deny the Motion of A&F Main Street Associates LLC for relief form Stay.

Further, the debtor respectfully requests that this Court grant the debtor-in-possession the Assumption of the Lease into the bankruptcy estate.

DATED:    February 21, 2010.

John Alan Sakon

Debtor and
Debtor-in-Possession

## CERTIFICATION

I hereby certify that on the date above stated, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email and to all parties by operation of the Court's electronic filing system. Parties my access this filing through the Court's CM/ECF System. The foregoing was also served on the date above stated by first class mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing, and to the Debtor by email as well as first class mail as indicated below.

John Alan Sakon
82 Folly Brook Lane
Manchester, CT 06040
Email: johnsakon@yahoo.com

Steven E. Mackey
Office of the U.S. Trustee
The Giaimo Federal Building
150 Court Street, Room 302
New Haven, CT 06510

Synchrony Bank
c/o PRA Receivables Management, LLC
P.O. Box 41021
Norfolk, VA 23541

John Sakon

_____
John Sakon

30

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF CONNECTICUT

In re

John Alan Sakon

      Debtor and
      Debtor-in-Possession.

BK. NO. 17-00611
(Chapter 11)



DECLARATION OF John Alan Sakon IN SUPPORT OF MOTION

I, John Alan Sakon (Debtor"), hereby declare that, if called as a

witness in this action, I could and would testify competently of my own personal

knowledge as follows:

1.    I am over the age of 18 years, and I am competent to make this

declaration and do so based on personal knowledge, except as otherwise indicated.

2.    I make this Declaration in support of the DEBTOR'S
OBJECTION TO A&F MAIN STREET ASSOCIATES MOTION FOR RELIEF
FROM STAY (the "Objection"). Terms used herein and not otherwise defined
shall have the meanings given to them in the Objection.

3.    I have reviewed the facts set forth in the Objection regarding

the Debtor and they are true to the best of my knowledge and belief.

4.    The attached exhibits filed with my objection are true and

correct copies to the best of my knowledge and belief.

5..    I believe that there is more than sufficient equity in the property

to provide security for the outstanding creditors if the Lease is assumed. I do not

believe there is sufficient equity in the remaining properties to provide the

satisfaction of outstanding creditors if the Lease is not assumed by the Bankruptcy

estate.

DATED: Hartford, Connecticut, February 21, 2020.

John Alan Sakon

## CERTIFICATION

I hereby certify that on the date above stated, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email and to all parties by operation of the Court's electronic filing system. Parties my access this filing through the Court's CM/ECF System. The foregoing was also served on the date above stated by first class mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing, and to the Debtor by email as well as first class mail as indicated below.

John Alan Sakon
82 Folly Brook Lane
Manchester, CT 06040
Email: johnsakon@yahoo.com

Steven E. Mackey
Office of the U.S. Trustee
The Giaimo Federal Building
150 Court Street, Room 302
New Haven, CT 06510

Synchrony Bank
c/o PRA Receivables Management, LLC
P.O. Box 41021
Norfolk, VA 23541

John Sakon

_____
John Sakon

- 2 -