DOCKET NO.  19-21619

RE: JOHN ALAN SAKON

:
:
:
:
:
:
:
:
:
:

UNITED STATES
BANKRUPCY COURT

DISTRICT OF
CONNECTICUT
at Hartford

March 9, 2020

## MOTION FOR RELIEF FROM INTENTIONAL OBSTUCTION OF A PLAN OF REORGANIZATION

## MOTION FOR RELIEF FROM VIOLATION OF STAY OF PROCEEDINGS

## MOTION FOR PROTECTIVE ORDER AND DAMAGES

## MOTION TO RECONSIDER THE COURT'S RULING OF MARCH 2ND, 2020 AS TO RELIEF FROM STAY OF PROCEEDINGS.

The debtor John Alan Sakon hereby seeks relief, an order of

protection and damages arising from post-petition actions by the creditor

town of Glastonbury and its legal counsel.  The debtor also asks the court

to reconsider its ruling of March 2nd, 2020 as to the relief from stay.

These motions are combined herein as they arise from the same fact set.

The debtor also seeks an extension of time of 10 days to file a notice of

appeal or a Motion to Reconsider the court's ruling of March 2nd, 2020.

The basis for the appeal and/or Motion to Reconsider will be the violation

of the Stay of Proceedings and active and intentional sabotage by the creditor town of Glastonbury and its legal counsel.

## Summary Plan of Reorganization

After defeating multiple efforts of the town of Glastonbury[1] to arrest, to incarcerate the debtor and foreclose on debtor's properties, the debtor worked his way out of prison,[2] was found innocent, and developed a simple Plan of Reorganization of his business interests.

In the fall of 2018, the debtor hired messenger Bryan Pereyo to contact the existing lenders to the project known as *The Shoppes at Avalon* to negotiate terms for a takeout refinancing of the project. Mr. Pereyo contacted Adam Erlich of the firm Fuller LLP who was the Canadian Receiver for Cyhani Ventures, LLC and appeared to rough out

---

[1] As this document references, the Police Department of the creditor town of Glastonbury arrested the debtor in his home for "ripping up a piece of paper", issued an order of protection for the debtor not to return to his home; condoned and stood by while the debtor's offices in debtor's commercial building was ransacked and emptied of its contents without any color of law; and finally stood by and ultimately arrested the debtor when a sworn officer of the town driving a Dodge Durango truck hit the debtor from the rear while debtor was riding his bicycle in a bike rally.

[2] The debtor literally worked his way out of prison by successfully negotiating a real estate deal using prison phones and then using the income to make bail.

suitable (non-binding) terms conditioned upon a commitment for a mortgage and the approval of the Canadian Courts.

On April 17, 2019, the debtor signed a Proposed Letter of Intent with KGAK Financial Group for a $4,800,000 Loan to refinance The Shoppes at Avalon. See Exhibit A.    The amount of money appeared sufficient to refinance the project.  The Letter of Intent was signed and monies to cover due diligence costs of the lender were wired.    An appraisal was ordered by KGAK and completed by Adam J. Hardej, Jr. MAI, President and Chief Appraiser of BAAR REALTY ASSOCIATES. The appraisal valued the "Entitled Land Development" of the project known as The Shoppes at Avalon for an "as-is" value of $11,430,000 as of July 18, 2019. See Appraisal already filed with this court.

An obstacle arose when the creditor A&F Main Street Associates refused to approve a 1st mortgage on the Leasehold interest of the debtor, even though that 1st mortgage was subordinate to the Lease Fee interest of A&F and a lender wishing to prevent any default in the lease would enhance A&F's security.    Litigation ensued.    The debtor shared the appraisal information with A&F.    Further discussions resulted in a Stipulation signed by the Debtor and A&F Main Street Associates and entered into as an order in the Connecticut Housing Court on August 14,

2019.   For value exchanged, the Stipulation granted the debtor the authority to place a 1st mortgage loan on the Leasehold interest to secure the pending loan with KGAK.  See Stipulation Exhibit D.

By email of August 17, 2019, KGAK forwarded a signed commitment letter to Sakon, subject only to the receipt of an underwriter's report.[3] A target date for closing was set for September 3rd, 2019.   See Exhibit C.

Despite a sharing of information on the pending refinancing, the town of Glastonbury aggressively proceeded in foreclosure proceedings in the Connecticut Superior Court and a foreclosure sale was scheduled for September 21, 2019.  As a result, the debtor filed for a Chapter 11 Bankruptcy for protection on September 19, 2019.

The Plan was to complete the loan with KGAK, pay off the creditors and remove the project from the Chapter 11 filing by a Motion to Dismiss.

However, this plan was thwarted by the efforts of the creditor town of Glastonbury when on October 1, 2019 town staff talked to the underwriter and made libelous and slanderous statements as to the Status of the debtor's entitlements by falsely claiming they had expired.

---

[3] By verbal discussion, the underwriter Alan Levine would be confirming the entitlements.

Said Staff, by the name of Jonathan Mullen, was the town planner and is not statutorily authorized to render such opinions. Mr. Mullen admitted to advising KGAK that the Wetlands Permit approved in 2001 for the project had expired. However, the Wetlands permit which was approved in 2006 had not expired.[4]   However, only the Wetlands Enforcement Officer and the Wetlands Commission has statutory authority to make such a determination.

Mr. Carey has refused to confirm or deny that he ever talked to Mr. Levin and refused to confirm or deny the hearsay remarks of Mr. Levin as to any conversation.[5]   On the other hand, Mr. Mullen has admitted he

---

[4] The existing Shoppes at Avalon (then called Victoria Square) Wetlands permit, granted in August 10, 2006 expires on August 10, 2020 by passage of Public Act No. 11-5 of the Connecticut State Legislature. The expiration date was established automatically from the cited regulation. See Exhibit A.

[5] The debtor did try to appeal the hearsay remarks of Peter Carey. However, upon advice of counsel Shipman & Goodwin, Mr. Carey refused to answer any questions as to the alleged comments, refused to verify that any conversation did take place and refused to answer any questions from the members of the Zoning Board of Appeals as to whether Mr. Carey made any decision as to the validity of the permits. The lawyer from Shipman & Goodwin then advised the ZBA that they had to dismiss the appeal as the hearsay comments of the ZEO could not be verified and are therefore not appealable. On March 2, 2020, the ZBA dismissed the appeal of Sakon.

advised KGAK the Special Permits for the project had expired. However, the debtor had posted the necessary construction bond on June 13th, 2016 and had commenced substantial construction in the summer of 2016 for The Shoppes at Avalon thereby preserving the permits under Section 12.7 of the Glastonbury Building and Zoning Code.[6] Construction was undertaken by the Creditor Red Door Construction. Materials were supplied by the Creditor Superior Products. Still, any statements made by Mr. Mullen had no legal authority and thus are not appealable. However, there is no way a Florida Lender would understand the nuance and the statements admitted by Mr. Mullen were sufficient to derail the refinancing and stop the reorganization.

By email of November 27, 2019, the Fund Manager of KGAK issued a letter that if he had a "*legal project with all permits in good standing, yes I would be willing to fund your project at the following rates:*"

On October 2, 2019, the debtor made demand upon the Community Development Office of the town for Mr. Carey and Mr. Mullen to retract

---

[6]In order to preserve his permits, the debtor posted a construction Bond June 13th, 2016 (See Exhibit J) and commenced substantial construction at the site in the summer of 2016 and has continued work on the site to the present day. Pursuant to Section 12.7 of the Glastonbury Zoning Regulations, once substantial construction on a Special Permit has commenced, the Special Permits never expire.

said statements.   In the alternative, to have the proper statutorily appointed authorities[7] issue opinions as to the status of the debtor's Wetlands and Special Permits.  Any negative opinion by the Wetlands Enforcement Officer can be appealed to the Wetlands Commission.  Any negative opinion of the Zoning Enforcement Officer can be appealed to the Zoning Board of Appeals. Usually, such appeals would only take one month.  However, the Wetlands Enforcement Officer and the Zoning Enforcement Officer have refused to make any statement or issue any written opinion confirming Mr. Mullen's statements on October 1, 2019 or thereafter, but have chosen (been instructed) not to do so. This is a violation of the debtor's due process rights.[8]  If either enforcement officer happen to rule negatively against the debtor, the debtor could have appealed these decisions to their respective board and the debtor still

---

[7] Wetlands Enforcement Officer Tom Mocko and the Zoning Enforcement Officer Peter Carey.

[8] Here is the trust of debtor's complaint against the creditor town.  Had the Enforcement officers acted properly and ruled against the debtor, the debtor still had sufficient time to appeal their decisions; close on the KGAK loan and pay A&F Main Street Associates and the debtor's due process rights would have been preserved.  Instead, the creditor Town of Glastonbury instructed their employees not to say anything thereby violating the Stay of Proceedings and the bankruptcy code by interfering with the debtor's reorganization.

could have had opportunity to meet his deadline to pay off A&F Main Street Associates any monies due under the Stipulation on or before December 1, 2019. However, upon information and belief, a "gag" order was placed upon Mr. Mocko and Mr. Carey by the town administration and by the town attorney to force the Bankruptcy into a Chapter 7. The town of Glastonbury not only declined said request, upon information and belief, the law firm of Shipman and Goodwin instructed the Wetlands Enforcement Officer and the Zoning Enforcement Officer to refuse any comment.

## **Specific Facts and Documents by Exhibit.**

1.    The debtor hereby adopts the Specific Facts and Argument in the document entitled **MOTION FOR RELIEF AS TO SCHEDULING MATTERS AND TIME TO FILE RESPONSIVE PLEADINGS** filed with this court on March 9, 2020 and incorporates them herein.

2.    The debtor is pro se.

3.    The debtor offers into evidence his Wetlands Permit approved by the Conservation Commission and Inland Wetlands & Watercourses Agency on August 10, 2006. Attached hereto as Exhibit A.

4.    The debtor offers his Special Permits with Design Review as approved by the Town Plan and Zoning Commission in 2013, reapproved in 2014, reapproved in 2015, reapproved in 2016, reapproved in 2017 and reapproved in 2018 as Exhibit B.

5.    The debtor offers the April 17, 2019 Proposed Letter of Intent with KGAK Financial Group for a $4,800,000 as Exhibit C.

6.    The debtor hereby adopts by reference, the appraisal ordered by KGAK and completed by Adam J. Hardej, Jr. MAI, President and Chief Appraiser of BAAR REALTY ASSOCIATES.   (This lengthy exhibit has already been filed with the court in two other filings).

7.    The debtor hereby offers the email of August 17, 2019 to John Sakon and its attached signed KGAK commitment letter to Sakon for the Avalon Loan.  Attached hereto as Exhibit C1.

8.    The debtor hereby offers the Stipulation of 8/14/2019 by and between A&F Main Street Associates and the debtor John Sakon. Attached hereto as Exhibit D.

9.    The debtor hereby offers the Project Examination Report of October 1, 2019 prepared by Levine & Associates for Tony J. Ruggiero of KGAK.  Attached hereto as Exhibit E

10. The debtor hereby offers the email Letter of Demand for Retraction from John Sakon to Khara Dodds, dated October 2, 2019. Attached hereto as Exhibit F.

11. The debtor hereby offers the email reply of Khara Dodds to Letter of Demand for Retraction from John Sakon to Khara Dodds, dated October 3, 2019. Attached hereto as Exhibit G.

12. The debtor hereby offers the email form Tony J. Ruggiero to John Sakon of November 27, 2019. Attached hereto as Exhibit H. (Redacted as to key interest and terms).

13. The debtor hereby offers the construction bond of June 13, 2016 filed with the town of Glastonbury as a condition before the commencement of construction as Exhibit I.

14. The debtor hereby offers appraisal (Affidavit and Cover Letter only) for 2B Griswold Street and E8A Main Street dated April 4, 2019 as prepared by Sean Hagearty on behalf of the creditor town of Glastonbury as Exhibit J.

15. The debtor hereby offers appraisal (Affidavit and Cover Letter only) for 131 Griswold Street 2B Griswold Street and E8A Main Street dated March 3, 2019 as prepared by Sean Hagearty on behalf of the creditor town of Glastonbury as Exhibit K.

## LAW AND ARGUMENT

The aggressive and active sabotage of the debtor's efforts and denial of due process rights during the Stay of Proceedings by the creditor Town of Glastonbury has prevented the debtor from raising funds to retain counsel and to protect the bankruptcy estate.  These violations have been committed by the Community Development Office of the creditor town of Glastonbury by the making of false and slanderous statements to representatives of KGAK Financial on October 1, 2019 after the September 19, 2019 bankruptcy filing.  KGAK had agreed to finance a $4.8 million loan to take the estate out of bankruptcy prior to these active and vicious violations of the creditor town of Glastonbury and its legal counsel of the Stay of Proceedings.  Such violations are in and of themselves tortious by falsely representing the status of debtor's permits to third parties by people not authorized by Connecticut Statue to do so.

The KGAK Financial Financing was predicated upon an appraisal of The Shoppes at Avalon as a fully entitled asset.  It is debtor's claim that Jonathan Mullen, the Glastonbury Town Planner has openly admitted advising KGAK Financial on October 1, 2019 that the debtor's Wetlands Permits and Special Permits had expired, thereby undermining debtor's $4.8 million refinancing of the debtor estate.    However, under the

Connecticut General Statues, a town Planner is not authorized to opine on such topics. Only the Wetlands Enforcement Officer (Tom Mocko) is statutorily authorized to speak as to the status of any Wetlands Permit granted by the Wetlands Commission. And only the Zoning Enforcement Officer (Peter Carey) is statutorily authorized to speak as to the status as to the validity of a Special Permit granted by the Town Plan and Zoning Commission. Mr. Mocko and the Wetlands Commission have made no claims that the debtor's Wetlands Permits have expired. Mr. Carey has refused to confirm or deny (even after explicit request by the members of the Zoning Board of Appeals in public hearing (with counsel Shipman and Goodwin sitting next to him and advising him to remain silent)) that he has advised anybody as to whether the debtor's Special Permits have expired.

Any adverse ruling of the Wetlands Enforcement Officer is immediately appealable to the Wetlands Commission. Any adverse ruling of the ZEO is immediately appealable to the Zoning Board of Appeals. Since neither Mocko nor Carey has made any such ruling, there is nothing for the debtor to appeal. Therefore, the statements of Mullen, who has no statutory authority, were libelous and slanderous, derailed the ability of the debtor to raise financing in the bankruptcy estate and are an open violation of the court's stay of proceedings as the creditor town of Glastonbury took

aggressive adverse steps to collect a debt by means of foreclosure and has now moved to convert the Chapter 11 bankruptcy to a Chapter 7,  Mr. Mullen's comments have also denied the debtor his due process rights under the law which could have been exercised in a timely fashion before deadlines (such as meeting the claimed A&F Main Street Associates deadline) were breached.   The debtor is requesting a full evidentiary hearing with witnesses on this breach of the Stay of Proceedings and active sabotage of the reorganization by the creditor town of Glastonbury.

It is the debtor's position that the aggressive and unfair trade practices and violations of the debtor's civil rights by the creditor town of Glastonbury is delaying this action.   In 2016, the creditor town of Glastonbury asserted foreclosure proceedings against the debtor's real estate holdings.   That after the debtor filed claims of discrimination and inverse condemnation against the town[9], based upon the testimony of a

---

[9] These claims were brought as counter-claims in the foreclosure action. They were dismissed at the Connecticut Court ruled they must be brought as separate actions and are not allowable as counter-claims in a foreclosure action.  However, the claims are based upon actual testimony by former town officials as to the intent of the town to use its zoning regulations to discriminate.  In addition, it is the debtor's contention that the town has taken many properties by inverse condemnation as a direct result of its discriminatory zoning laws and made a self-reported profit of tens of millions of dollars on properties foreclosed on for less than $750,000 in taxes.

former town official and author of the regulations that they were designed to discriminate, that is has been the objective of the creditor Town of Glastonbury to seize control of the property known as The Shoppes at Avalon from the debtor by use of its Police Power and to stop the debtor from pursuing discrimination and inverse condemnation legal actions (causing possible numerous potential copycat suits) with potentially devastating impacts on the town. A detail of the divisive actions of the town, which include throwing the debtor out of his home, throwing the debtor out of his office building and hitting the debtor with a truck while the debtor was riding his bicycle cannot be easily dismissed. The debtor refers this court the recently filed **MOTION FOR RELIEF AS TO SCHEDULING MATTERS AND TIME TO FILE RESPONSIVE PLEADINGS** filed with this court on March 9, 2020 as to the incredible story the debtor has suffered at the hands of local authorities.

On May 17, 2018, in the foreclosure case town of Glastonbury v. Sakon, before the Appellate Court of the State of Connecticut, the debtor stated "the town of Glastonbury and its police department are corrupt and I know where the bodies are buried, *literally."* The debtor asked the Appellate court to convene a grand jury investigation of the town of Glastonbury. This court cannot ignore the fact that a mere eleven days

later, the debtor, while riding his bicycle in a Glastonbury Memorial day bike rally, was struck by a black truck driven by a sworn officer of the creditor town of Glastonbury!

To understand how divisive and potential corrupt the local zoning practices are, while denying the debtor an approval to build a 65,000 square foot supermarket on his lands in 2004, the town approved the construction of a Stop & Shop on New London Turnpike. The alarming difference is a supermarket was an underlying approved use in the subject properties Planned Travel Zone while a supermarket was a prohibited use in the Industrial zone where the new Stop & Shop was located. The town approved a zone change of the New London Stop & Shop nearly one year after the store opened for business. (The debtor has not had sufficient time to pull records from the clerk's office to validate this statement, but stands by and will defend this assertion).

Now let us examine the potentially profits from undermining the Chapter 11 reorganization. The town appraiser Sean Hagearty appraised the parcels of land known as E8A Griswold Street and 2B Griswold Street for a value of $1,350,000 in the foreclosure proceeding. See Exhibit J. Hagearty then appraised the parcel of land known as 131 Griswold Street for $1,320,000. The combined value for the town parcels is a mere

$2,670,000.[10] If taken as true, these values do not satisfy the creditors in the bankruptcy estate. Compare this value with the appraisal of Adam J. Hardej, Jr. MAI which values the entire property with its entitlements at $11,430,000.[11] This is a difference in value of $8,760,000! The debtor is reminded of the Sopranos Episode where it was said you can make a lot of money with one corrupt town official and one corrupt appraiser.

So who would profit from the sabotage of the Chapter 11 reorganization? Normally, one would think the local town would be anxious to support a reorganization of a development which would potentially put $42,000,000 of increased assessments on the tax rolls and add 200 jobs to the town.[12] However, this is not the case. Rather the town has actively cast a dark shadow on the property making any potential bidder at auction most reluctant to pay a market rate. And with a zoning code designed to

---

[10] The debtor, who holds an inactive General Certified Appraisers License, will testify that these values are absurd and that Mr. Hagearty had many recent local Glastonbury comparables he did not use or rely upon. Including two major comparables a mere 500 feet from the subject property

[11] Mr. Hadej used all recent local Glastonbury comparables in his report.

[12] The Shoppes at Avalon, at 13.55 acres, approved for 94,640 square feet and a potential build-out of 115,000 square feet, is nearly identical to the existing Shoppes at Somerset which is 13.613 acres and 115,000 square feet. The Shoppes at Somerset sold on 10/16/2016 for a reported $42,000,000.

discriminate, this is a very real shadow.  This gives the town insiders the golden opportunity to score a substantial profit.  The same goes for A&F Main Street Associates to make a huge windfall and explains their present motivations.[13]  The four parcels of land must be united to maximize the potential value.    $500,000 of prior approved architectural and site design plans are sitting on the public land records.  This presents a golden opportunity to acquire $8,760,000 of profit by any alliance of A&F Main Street Associates and the high bidder of the remaining lands at auction. This raises the question.  Did A&F Main Street Associates know the town was going to sabotage the debtor when it entered into the Stipulation?

Add to the above analysis the fear of a town being sued for discrimination, inverse condemnation and false arrests.    Better to impoverish the potential claimant and drive him from town with abusive tactics.  This debtor is an inactive General Certified Appraiser intimately familiar with the prior doings of the town of Glastonbury.  In the 1980's, investors in the privately held Glastonbury Industrial Park proposed industrial development on 110 commercially zoned lands off of Eastern Boulevard in Glastonbury, Connecticut.    Normally, any town would

---

[13] The current rent for the ground lease is less than $15,000 per year.  The potential windfall profit to A&F Main Street Associates would be in the multi-millions

welcome a privately held industrial park developer.[14] However, the town denied application after application. Ultimately, the town granted a Special Permit for a large office building. However, when the State DOT required the developer to connect Eastern Boulevard with Addison Road as a condition of its approval, the town denied the application to do so. As a result, the town acquired the entire 110 acres for back taxes. The town then proceeded to approve its own application to connect Eastern Boulevard to Addison Road a short time later (using the very same design as the prior owners) and then proceeded to subdivide and sell the acquired lands for a profit in the tens of millions.[15] Many "insiders" were able to purchase fully developed lots improved with State funded roads. Now with the testimony of Mark Branse that the zoning scheme was designed to discriminate between developments, the potential for an inverse condemnation claim by the prior owners is very real.

---

[14] In 1980 to 1983, the debtor was Sales Manager for the FIP Corporation, the largest private industrial park developer in the State of Connecticut with developments known as the Avon Industrial Park, the Farmington Industrial Park, the Cheshire Industrial Park, the Medway Industrial Park and the Barnes Industrial Park. The debtor did an analysis of the potential acquisition of the Glastonbury Industrial Park and is intimate with its history.

[15] The actual profits were reported in the Annual Report of the town.

## Summary.

The debtor does not have the opportunity to do the necessary legal research on this complicated legal issue.  Presently, this fact set places an impossible burden on the debtor.  The debtor cannot physically comply with the current scheduling orders and cannot properly prepare for this hearing on March 10th, 2020.

The debtor can only restate the arguments made in its February 21, 2020 brief for this court to reverse its ruling of March 3rd, 2020 on the grounds that a creditor actively sabotaged the Chapter 11 Bankruptcy reorganization with malice.  With its present ruling, A&F Main Street Associates will gain an incredible windfall and the creditors will take a substantial loss.  Aside from the fact that the debtor will lose over $6 million in equity, which represents his life's work.

The failure to comply with Section 365(d)(3) of 365(d)(5) is not, by itself, sufficient ground to deny an extension of the time to assume of reject a lease.  *In re* Southwest Aircraft Servs., Inc. 831 F.2d 848, 17 C.B.C.2d 976 (9th Cir. 1987), *cert. denied,* 487 U.S. 1206, 108 S. CT. 2848, (1988).

The factors to be considered by the court in exercising the discretion to grant and Extension of Time to Assume or Reject a Lease include:

- whether the rent has been or is being paid;

- whether the lease is a primary asset of the estate;

- potential prejudice to the landlord from noncompensable damages:

- # whether the landlord would receive a windfall;

- # whether the case is unusually large or complex:

- whether the trustee has had a reasonable period of time to analyze the estate and formulate a plan.

- See South Street Seaport Ltd. Partnership v. Burger Boys, Inc. (*In re* Burger Boys, Inc.), 94 F.3d 755, 761 (2d Cir. 1996).

This court should adjourn to an evidentiary hearing as to possible sanctions against the creditor town of Glastonbury. And the debtor asks for scheduling relief from this court and an extension of time of 10 days to file a notice of appeal or a Motion to Reconsider the court's ruling of March 2nd, 2020.

It is 11.30 PM on March 9th, 2020 and the debtor has had less than 6 hours sleep in the last two days. The debtor needs to print this out (warts and all) and go to bed.

By: _John Saxton_

John Alan Sakon, Pro Se
82 Folly Brook Lane
Manchester, CT 06040
Tel: (860) 793-1000
Fax: (860) 675-4600
Email: johnsakon@sakon.biz

## AFFIDAVIT

I, John Alan Sakon, do hereby solemnly affirm and state as follows:

a.  I am the defendant in this case.

b.  I am over 18 years of age.

c.  That the statements made in this Motion and Memorandum are true statements made to the best of my ability and belief.

Dated this the 9th day of March, 2020

JOHN ALAN SAKON

BY:_____
        John Alan Sakon, Pro Se
        82 Folly Brook Lane
        Manchester, CT 06040
        Tel. (860) 793-1000
        johnsakon@sakon.biz

Subscribed and sworn to me this 9th day of March, 2020.

BY:_____
        Notary

My commission expires on:

### AFFIDAVIT

I, John Alan Sakon, do hereby solemnly affirm and state as follows:

a.  I am the defendant in this case.

b.  I am over 18 years of age.

c.  That the statements made in this Motion and Memorandum are true statements made to the

    best of my ability and belief.

Dated this the 9th day of March, 2020

                                    JOHN ALAN SAKON

BY: _____

                      John Alan Sakon, Pro Se
                      82 Folly Brook Lane
                      Manchester, CT 06040
                      Tel. (860) 793-1000
                      johnsakon@sakon.biz

Subscribed and sworn to me this 9th day of March, 2020.

                      BY: _____
                            Notary

My commission expires on:

ARIEL GARCIA
Notary Public, State of Connecticut
My Commission Expires Dec. 31, 2021

## **CERTIFICATION**

I hereby certify that on the date above stated, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email and to all parties by operation of the Court's electronic filing system. Parties my access this filing through the Court's CM/ECF System. The foregoing was also served on the date above stated by first class mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing, ~~and to the Debtor by email~~ as well as first class mail as indicated below.

~~John Alan Sakon~~
~~82 Folly Brook Lane~~
~~Manchester, CT 06040~~
~~Email: johnsakon@yahoo.com~~

~~Steven E. Mackey~~    Notice provided by email
~~Office of the U.S. Trustee~~
~~The Giaimo Federal Building~~
~~150 Court Street, Room 302~~
~~New Haven, CT 06510~~

Synchrony Bank
c/o PRA Receivables Management, LLC
P.O. Box 41021
Norfolk, VA 23541

_John Sakon_

_John Sakon_

_____
John Sakon

25

# Exhibit A



# *Town of Glastonbury*

**2155 MAIN STREET · P.O. BOX 6523 · GLASTONBURY, CONNECTICUT 06033-6523**

August 22, 2006

CONSERVATION COMMISSION AND INLAND
WETLANDS & WATERCOURSES AGENCY

John Sakon
Sakon Development, LLC
126 Craigemore Circle
Avon, Connecticut 06001

Re: Wetlands Permit Extension & Amendment - The Shoppes at Avalon

Dear John:

At its Regular Meeting of August 10, 2006, the Conservation Commission/Inland Wetlands & Watercourses Agency approved an extension and amendment to an Inland Wetlands and Watercourses Permit, in accordance with the plans and conditions cited in the **attached** motion.

Please read the conditions of approval carefully and comply with them. Some of the conditions may require interacting with the Environmental Planner (e.g. inspection of soil erosion and sediment control); it will be your responsibility to schedule such interactions. Any questions you may have about the stated conditions can be directed to the Office of Community Development at 652-7511.

This Permit:

- requires that the approved regulated activities be completed within one (1) year from commencement of said activities;
- shall be extended to September 26, 2012, the maximum time period currently allowed by law; and
- may not be transferred unless authorized by the Inland Wetlands & Watercourses Agency

This Permit may be revoked if you exceed the conditions or limitations of this Permit or have secured this Permit through inaccurate information.

Once again should you have any questions, please do not hesitate to contact this office.

Sincerely,

Tom Mocko
Environmental Planner

TM:gfm
Attachment

cc:  Daniel Pennington, Town Engineer
     Edward P. Pietrycha, Building Official
     Cubellis Associates, Inc., C.E. & Architects
     Dutton & Johnston, LLC, C.E.
     Carol R. Johnson Associates, Inc., Landscape Architects

## APPROVED WETLANDS PERMIT MOTION

MOVED, that the Inland Wetlands and Watercourses Agency amends the inland wetlands and watercourses permit previously issued to John Sakon and Victoria Square LLC, thus approving the proposed activities within wetlands regulated areas as represented in the pending application's materials, including site plans and details, on file in the Office of Community Development for The Shoppes At Avalon retail development project, in accordance with said plans and in compliance with the following conditions:

1.  With respect to this amended permit any construction that is to occur for The Shoppes At Avalon shall be subject to planning elements that appear in both the wetlands-approved Victoria Square site plans and details and the site plans and details submitted for an amended permit for The Shoppes At Avalon proposal. Any wetlands-related conflict that becomes apparent between the site plans and details for the two projects shall be completely resolved to the satisfaction of the Town's Environmental Planner and/or the Inland Wetlands and Watercourses Agency.

2.  The size of the reinforced concrete pipe proposed to pipe the brook shall be 36 inches in diameter and installed at a 0.3 percent slope. A Professional Engineer shall provide certification to the Office of Community Development that the pipe was installed as designed.

3.  The Permittee shall be recognized to be John Sakon and Sakon Development, LLC.

4.  The expiration of this wetlands permit shall be extended to September 26, 2012, the maximum time period currently allowed by law.

5.  Prior to any action by the Town Plan and Zoning Commission, the comments within the Town Engineer's memorandum of June 19, 2002 shall be addressed to his satisfaction.

6.  The site plans shall be revised and/or reevaluated to indicate: that the proposed catch basins feeding into detention pond #7 be hooded structures with at least 3-foot sumps; that the proposed outlet pipe from pond #7 be redesigned to reduce water conflicts into the existing 33-inch pipe and to provide more head; and that the methods/treatment for permanent stabilization of the stormwater detention structures may be modified in consultation with the Town's Environmental Planner during construction based upon the actual conditions experienced.

7.  Prior to holding a pre-construction meeting and the start of construction:
    a.  A caveat, acceptable to the Town's Environmental Planner, shall be placed on the land records relative to the subject parcel that explains the importance and necessity of adherence to the operations, inspection and maintenance plan for the water quality mitigation and stormwater detention structures and that non-adherence to said plan shall constitute a wetlands violation with the Town; and

    b.  A bond pursuant to Section 12 of the wetlands regulations in the amount of $50,000, and in the form of cash or a letter of credit, shall be posted to ensure compliance to all of the wetlands related work (e.g., water quality mitigation and stormwater detention structures, soil erosion and sediment control, wetlands planting plans). Of said bond, the sum of $30,000 dollars will be retained for one (1) year following the completion of the construction of all drainage structures and impervious surfaces. Said bond shall insure the implementation of any modifications or adjustments required in the storm drainage system in accordance with the "Critical Maintenance Items" Notes on Sheet A 98-080-SM-1, Storm Sewer System Maintenance Plan.

8. Qualified individuals, acceptable to the Town's Environmental Planner, shall, at the expense of the Permittee, provide on-site consultations to the site contractor(s) to ensure adherence to the plans during construction of the water quality mitigation and stormwater detention structures and other wetlands mitigation measures, including the planting plans. Such qualified individuals shall certify (providing as-built drawings and statements as requested by the Town's Environmental Planner) that performance has met all designed aspects and goals upon completion.

9. A pre-construction meeting shall be held with the Permittee, his qualified consulting individuals and site contractor(s), and appropriate Town staff in attendance in order to discuss the numerous issues surrounding the construction of this project.

10. Healthy mature trees shall be preserved and saved when possible. Said trees shall be protected with the use of high visibility construction fence during construction or otherwise protected as required by staff.

11. Installation of soil erosion and sedimentation control and stabilization measures shall be the Permittee's responsibility. Once installed these measures shall then be inspected by the Environmental Planner prior to land disturbance activities. Afterwards it then shall be the Permittee's responsibility to inspect these control measures during, and immediately following, substantial storm events and maintain and/or replace the control measures, when needed, on a regular basis until the site is vegetatively stabilized. Hay bales shall be replaced every 60 days. The Environmental Planner is hereby authorized to require additional soil erosion and sediment controls and stabilization measures to address situations that arise on the site.

12. Tree stumps and blasted rock material shall not be buried at the site.

13. Construction activities involving the piping of the north-to-south flowing brook shall be restricted to time periods of low flow and to "fair weather" time windows as determined by the Town's Environmental Planner.

14. Metal waste containers shall be provided at the site to facilitate the collection of refuse material generated from construction activities. Such material shall not be buried or burned at the site.

15. Underground fuel storage tanks shall be prohibited to reduce the potential of contamination to wetlands, watercourses, and groundwater resources.

16. Certain drainage-related structures and final grades critical to water quality mitigation and stormwater management, as determined by the Town's Environmental Planner, shall have "as-built" drawings and/or statements provided to the Town prior to the issuance of any certificate of occupancy.

17. After activation of the project's drainage system, all maintenance items, inspections, and observations relevant to the maintenance plan for the project's drainage system shall be documented by written reports prepared by the appropriate professional (engineer, environmental consultant, property manager) and maintained by Applicant or its successor in interest. At least semiannually the Applicant or its successor in interest shall provide to the Environmental Planner copies of any or all of the written reports required to be maintained by the above maintenance program. Where such reports, or observations made by the Environmental Planner, indicate that additional maintenance or measures are required in order to meet the design specifications and Statement of Purpose set forth above, the Environmental Planner may specify the deficiency observed, such additional maintenance or measures required, and a reasonable time frame for the completion thereof. Any such additional maintenance or measures shall be deemed to form a condition of the Inland Wetlands and Watercourses Permit and shall be enforceable as such. For the purpose of enforcing this Permit, the Environmental Planner shall have reasonable access to the permit premises.

18. There shall be no increase in the wattage of the lighting fixtures proposed for the property until the wildlife impacts of such increase have been evaluated in a written report by a qualified professional and such increase has been approved by the Environmental Planner. There shall be no spotlights aimed at or toward the wetlands or watercourses on the site.

19. The Permittee shall be fully responsible for damages caused by all activities undertaken pursuant to this permit that may have a detrimental effect on wetlands and/or watercourses, and all such activities that cause erosion and sedimentation problems.

20. Any and all future landowners of this retail development project shall be required to appear before the Inland Wetlands and Watercourses Agency for a transfer of this wetlands permit and a discussion that proper maintenance of the project's water quality and stormwater management/drainage systems is a critical element of this approval.

21. Snow disposal on the site shall be in general accordance with the "Snow Removal Notes" appearing on the Storm Sewer System Maintenance Plan, plan no. A-98-080-SM-1, dated 07/22/2002. Snow disposal shall not occur within certain wetlands-regulated areas or certain detention ponds as determined by the Environmental Planner.

22. The details for piping a section of the brook shall be revised to provide an appropriate filter fabric where the stone bedding interfaces with the surrounding soil on the sides of the trench.

23. Three observation wells shall be installed in the area of the proposed underground stormwater detention structure and monitored for a September through June time period prior to its installation. Location of said wells shall be as directed by the Agency during the meeting of August 10, 2006. Monitoring of the groundwater elevations shall be to one-hundredth (0.01) of a foot.

The bases for issuance of this amended permit are as stated within the feasible and prudent alternative finding provided for the Victoria Square project by the Agency on September 26, 2002.

# Exhibit B



# *Town of Glastonbury*

**2155 MAIN STREET • P.O. BOX 6523 • GLASTONBURY, CONNECTICUT 06033-6523**

TOWN PLAN AND
ZONING COMMISSION

**REAPPROVAL OF SECTION 12
SPECIAL PERMIT WITH DESIGN REVIEW**

APPLICANT/
OWNER:    JOHN ALAN SAKON
          C/O SAKON, LLC
          74 NEW LONDON TPKE
          GLASTONBURY, CT 06033

FOR:      131 GRISWOLD STREET,
          ASSESSORS LOT 8E MAIN
          STREET (REAR), 2960/2980 MAIN
          STREET & ASSESSORS LOT
          N2B GRISWOLD STREET (REAR)

MOVED, that the Town Plan and Zoning Commission reapprove the application of John Alan Sakon for a Special Permit with Design Review – The Shoppes at Avalon retail development – 56,090± square feet of new construction & renovation of an existing 11,600 square feet building for a total of 67,690± square feet – north of Griswold Street & east of Main Street at 131 Griswold Street, Assessors Lot 8E Main Street (rear), 2960/2980 Main Street & Assessors Lot N2B Griswold Street (rear) – Planned Travel Zone, in accordance with the following plans:

"THE SHOPPES AT AVALON COVER SHEET SITE DEVELOPMENT PLANS MAIN STREET & GRISWOLD STREET GLASTONBURY, CONNECTICUT DATE: 07.07.07 REVISED: 08.10.10 PROPERTY OWNER: JOHN ALAN SAKON 74 NEW LONDON TURNPIKE GLASTONBURY, CT 06033 T(860)675-4000 F(860)675-4600 APPLICANT: JOHN ALAN SAKON C/O SAKON LLC 74 NEW LONDON TURNPIKE GLASTONBURY, CT 06033 T(860)675-4000 F(860)675-4600 CIVIL ENGINEERS/SURVEYORS: DUTTON & JOHNSTON 67 EASTERN BOULEVARD GLASTONBURY, CT 06033 T(860) 633-9401 F(860) 633-8851 KRATZERT, JONES & ASSOCIATES, INC. 1755 MERIDEN WATERBURY TURNPIKE SOUTHINGTON, CT 06467-0337 T(860) 621-3638 F(860) 621-9609 WWW.KRATZERTJONES.COM ARCHITECT: PHASE ZERO DESIGN, INC. ONE PHELPS LANE SIMSBURY, CT 06070 T(860) 264-1624 F(860) 264-1628 TRAFFIC CONSULTANT: TIGHE & BOND 1000 BRIDGEPORT AVENUE, STE. 320 SHELTON, CONNECTICUT 06484 T(203) 712-1100 REVISION NO. 1 REVISION DATE 08.10.10 REVISION MODIFICATIONS TO PLAN BY MG"

"THE SHOPPES AT AVALON PLAN OF DEVELOPMENT MAIN STREET & GRISWOLD STREET GLASTONBURY, CONNECTICUT DATE: 07/07/07 REVISED 08/10/10 GRAPHIC SCALE 1 INCH = 60 FT. PHASE ZERO DESIGN SHEET 1 OF 23"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079BND01.DWG PROJECT NO.

051079BRE SCALE 1"=40' SHEET TITLE: PROPERTY BOUNDARY SURVEY APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 2 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW PLAN PROVIDED BY: DUTTON & JOHNSTON, LLC LAND SURVEYORS & CIVIL ENGINEERS 67 EASTERN BOULEVARD, GLASTONBURY, CONNECTICUT 06033 PHONE: (860)-633-9401 FAX: (860)-633-8851"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079BND01.DWG PROJECT NO. 051079BRE SCALE 1"=40' SHEET TITLE: PROPERTY BOUNDARY SURVEY APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 3 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW PLAN PROVIDED BY: DUTTON & JOHNSTON, LLC LAND SURVEYORS & CIVIL ENGINEERS 67 EASTERN BOULEVARD, GLASTONBURY, CONNECTICUT 06033 PHONE: (860)-633-9401 FAX: (860)-633-8851"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079EX01.DWG PROJECT NO. 051079BRE SCALE 1"=40' SHEET TITLE: EXISTING CONDITIONS PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 4 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW PLAN PROVIDED BY: DUTTON & JOHNSTON, LLC LAND SURVEYORS & CIVIL ENGINEERS 67 EASTERN BOULEVARD, GLASTONBURY, CONNECTICUT 06033 PHONE: (860)-633-9401 FAX: (860)-633-8851"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079EX01.DWG PROJECT NO. 051079BRE SCALE 1"=40' SHEET TITLE: EXISTING CONDITIONS PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 5 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW PLAN PROVIDED BY: DUTTON & JOHNSTON, LLC LAND SURVEYORS & CIVIL ENGINEERS 67 EASTERN BOULEVARD, GLASTONBURY, CONNECTICUT 06033 PHONE: (860)-633-9401 FAX: (860)-633-8851"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079LZ01.DWG PROJECT NO. 051079BRE SCALE 1"=40' SHEET TITLE: LAYOUT & ZONING PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 6 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079LZ01.DWG PROJECT NO. 051079BRE SCALE 1"=40' SHEET TITLE: LAYOUT & ZONING PLAN APPROVED BY

MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 7 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079GD01.DWG PROJECT NO. 051079BRE SCALE 1"= 60' SHEET TITLE: GRADING & DRAINAGE PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 8 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079GD01.DWG PROJECT NO. 051079BRE SCALE 1"= 60' SHEET TITLE: GRADING & DRAINAGE PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 9 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079EX01.DWG PROJECT NO. 051079 SCALE 1"=40' SHEET TITLE: UTILITY PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 10 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079UT01.DWG PROJECT NO. 051079 SCALE 1"=40' SHEET TITLE: UTILITY PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 11 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079LZ01.DWG PROJECT NO. 051079BRE SCALE 1"=40' SHEET TITLE: LANDSCAPE PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 12 OF 23 REVISIONS NO 2 DATE 08.10.10 REVISED PLANTING MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079LZ01.DWG PROJECT NO. 051079BRE SCALE 1"=40' SHEET TITLE: LANDSCAPE PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 13 OF 23 REVISIONS NO 2 DATE 08.10.10 REVISED PLANTING MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079DS01.DWG PROJECT NO. 051079BRE SCALE AS NOTED SHEET TITLE: LIGHTING PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 14 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079EC01.DWG PROJECT NO. 051079BRE SCALE 1"=60' SHEET TITLE: EROSION AND SEDIMENTATION CONTROL PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 15 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079DS01.DWG PROJECT NO. 051079BRE SCALE N.T.S. SHEET TITLE: DETAIL SHEET & NOTES APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 16 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079DS01.DWG PROJECT NO. 051079BRE SCALE N.T.S. SHEET TITLE: DETAIL SHEET & NOTES APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 17 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079DS01.DWG PROJECT NO. 051079BRE SCALE N.T.S. SHEET TITLE: DETAIL SHEET APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 18 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079SSM01.DWG PROJECT NO. 051079BRE SCALE 1"=60' SHEET TITLE: STORM SEWER MAINTENANCE PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 19 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079AP01 PROJECT NO. 051079 SCALE N.T.S. SHEET TITLE: APPROVALS APPROVED BY DLS CHECKED BY ZLB DRAWN BY CA DATE 07.07.07 CUBELLIS ARCHITECTS INTERIOR DESIGNERS ENGINEERS 97 LIBBEY INDUSTRIAL PARKWAY WEYMOUTH, MA 02189 1 781 803 9100 1 781 337 0827 WWW.CUBELLIS.COM 20 OF 23"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FIGURE TITLE: LANDSCAPING PLAN FOR PROPOSED DETENTION BASINS 1, 2, AND 3 SHOWING APPROXIMATE LOCATIONS FOR PROPOSED PLANTS JOB NO: 01540GLA2 SCALE: 1" = ± 25' (AT 11' BY 17" FORMAT) REMA ECOLOGICAL SERVICES, LLC 164 EAST CENTER STREET, SUITE 8 MANCHESTER, CONNECTICUT (860) 649-7362 FIGURE 1 DATE: APRIL 4, 2002 REVISED 4/14/06 RES SHEET 21 OF 23"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. RW12362701.DWG PROJECT NO. 051079BRE SCALE 1"= 40' SHEET TITLE: ROADWAY IMPROVEMENT PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 22 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT TITLE: THE SHOPPES AT AVALON GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. RW12362701.DWG PROJECT NO.051079BRE SCALE 1"= 40' SHEET TITLE: ROADWAY IMPROVEMENT PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 07.07.07 08.10.10 PHASE ZERO DESIGN 23 OF 23 REVISIONS NO 1 DATE 08.10.10 REVS PER UPDATED PLAN OF DEVELOPMENT MADE BY MSG CHECKED BY MDW"

"PROJECT: THE SHOPPES AT AVALON MAIN STREET & GRISWOLD STREET GLASTONBURY, CONNECTICUT PHASE ZERO DESIGN ONE PHELPS LANE SIMSBURY, CONNECTICUT T 860.264.4624 F 860.264.1628 DRAWING SCALE: AS NOTED DATE ISSUED: AUGUST 24, 2009 BUILDING 300 REVISIONS: 2/16/10 TOWN STAFF COMMENTS 8/10/10 TP&Z SUBMISSION"

"PROJECT: THE SHOPPES AT AVALON MAIN STREET & GRISWOLD STREET GLASTONBURY, CONNECTICUT PHASE ZERO DESIGN ONE PHELPS LANE SIMSBURY, CONNECTICUT T 860.264.4624 F 860.264.1628 DRAWING SCALE: AS NOTED DATE ISSUED: AUGUST 24, 2009 BUILDING 400 REVISIONS: 2/16/10 TOWN STAFF COMMENTS 8/10/10 TP&Z SUBMISSION"

"PROJECT: THE SHOPPES AT AVALON MAIN STREET & GRISWOLD STREET GLASTONBURY, CONNECTICUT PHASE ZERO DESIGN ONE PHELPS LANE SIMSBURY, CONNECTICUT T 860.264.4624 F 860.264.1628 DRAWING SCALE: AS NOTED DATE ISSUED: AUGUST 24, 2009 BUILDING 500A REVISIONS: 2/16/10 TOWN STAFF COMMENTS 8/10/10 TP&Z SUBMISSION"

"PROJECT: THE SHOPPES AT AVALON MAIN STREET & GRISWOLD STREET GLASTONBURY, CONNECTICUT PHASE ZERO DESIGN ONE PHELPS LANE SIMSBURY, CONNECTICUT T 860.264.4624 F 860.264.1628 DRAWING SCALE: AS NOTED DATE ISSUED: AUGUST 24, 2009 BUILDING 500B REVISIONS: 2/16/10 TOWN STAFF COMMENTS 8/10/10 TP&Z SUBMISSION"

"BUILDING '600' THE SHOPPES AT AVALON GLASTONBURY, CT SAKON DEVELOPMENT, LLC CUBELLIS ASSOCIATES, INC. ARCHITECTURE INTERIORS ENGINEERING 711 ATLANTIC AVENUE BOSTON, MA 02111 TEL: 617-338-0009 FAX: 617-338-0088 WWW.CUBELLIS.COM DATE: 08.04.06 SCALE: 1/8" = 1'0'""

and in compliance with the following conditions:

1. Compliance with standards contained in a report from the Fire Marshal, file #10-082, plans reviewed 10-29-10, **revised file #12-097, plans reviewed 11-27-12**.

2. Compliance with comments 1-8 contained in a memorandum dated October 25, 2010 from the Police Department and the Town Engineer. Additionally, traffic signal improvements shall include time clock based coordination between existing signals at the House, Harris and Griswold Street intersection and the Route 2 off-ramp and Griswold Street intersection.

3. The final design for any ground signs/entryway signs, and lighting for buildings signs, shall be subject to Section 12.9 minor change approval. Building sign illumination shall be consistent throughout the development.

4. Prior to issuance to a Certificate of Occupancy, certification from a professional engineer shall be required to confirm that all aspects of the stormwater management system were installed/constructed in accordance with the approved design.

5. Prior to the issuance of a Certificate of Occupancy, certification from a professional landscape architect shall be required to confirm compliance with the approved landscape design. Upon written agreement from the Brewster Condominium Association, landscaping shall be provided upon their property in accordance with the plan submitted at the November 3, 2010 public hearing. Said landscaping shall be installed in conjunction with landscaping on the project site prior to issuance of a Certificate of Occupancy.

6. Subject to consultation with, and approval by the Police Department, a portion of the site's lighting shall be operated by timers, shutting off after business hours.

7. Details for outdoor site amenities (i.e. benches, chairs, trash receptacles, etc.) shall be subject to Section 12.9 minor change approval.

8. Expansion of restaurant use within the approved retail space shall be permitted contingent upon a supportive parking scenario.

9. Details relative to lighting, dumpster enclosures and planting specifications shall be included on final plans for filing. The construction of refuse disposal/dumpster stations in locations other than as depicted on approved plans, shall be subject to Section 12.9 minor change approval.

10. Internal signage shall be installed in a manner acceptable to the Town Engineer, directing truck traffic to exit the site via Main Street.

11. The most westerly 33 parking spaces shall be deferred. The 38 parking spaces to the north of buildings 300/400 shall be constructed. Final plans for the filing shall reflect this modification. All deferred spaces within the site shall be grassed/landscaped. Parking lot lighting associated with deferred spaces just north of the Brewster Condominiums shall also be deferred.

12. Future construction of deferred parking spaces shall be subject to Section 12.9 minor change approval contingent upon a supportive parking analysis.

13. Final site plans for filing shall indicate: that the proposed catch basins feeding into detention pond #7 be hooded structures with at least 3-foot sumps; that the proposed outlet pipe from pond #7 be redesigned to reduce water conflicts into the existing 33-inch pipe and to provide more head; and that the methods/treatment for permanent stabilization of the stormwater detention structures may be modified in consultation with the Town's Environmental Planner during construction based upon the actual conditions experienced.

14. Prior to holding a pre-construction meeting and the start of construction a caveat, acceptable to the Town's Environmental Planner, shall be placed on the land records relative to the subject parcel(s) that explains the importance and necessity of adherence to the operations, inspection and maintenance plan for the water quality mitigation and stormwater detention structures and that non-adherence to said plan shall constitute a zoning violation with the Town.

15. Qualified individuals, acceptable to the Town's Environmental Planner, shall, at the expense of the Permittee, provide on-site consultations to the site contractor(s) to ensure adherence to the plans during construction of the water quality mitigation and stormwater detention structures and other wetlands mitigation measures, including the planting plans. Such qualified individuals shall certify (providing as-built drawings and statements as requested by the Town's Environmental Planner) that performance has met all designed aspects and goals upon completion.

16. A pre-construction meeting shall be held with the Permittee, his qualified consulting individuals and site contractor(s), and appropriate Town staff in attendance in order to discuss the numerous issues surrounding the construction of this project.

17. Installation of soil erosion and sedimentation control and stabilization measures shall be the Permittee's responsibility. Once installed these measures shall then be inspected by the Environmental Planner prior to land disturbance activities. Afterwards it then shall be the Permittee's responsibility to inspect these control measures during, and immediately following, substantial storm events and maintain and/or replace the control measures, when needed, on a regular basis until the site is vegetatively stabilized. Hay bales shall be replaced every 60 days. The Environmental Planner is hereby authorized to require

additional soil erosion and sediment controls and stabilization measures to address situations that arise on the site.

18. Tree stumps and blasted rock material shall not be buried at the site.

19. Metal waste containers shall be provided at the site to facilitate the collection of refuse material generated from construction activities. Such material shall not be buried or burned at the site.

20. Underground fuel storage tanks shall be prohibited to reduce the potential of contamination to wetlands, watercourses, and groundwater resources.

21. Certain drainage-related structures and final grades critical to water quality mitigation and stormwater management, as determined by the Town's Environmental Planner, shall have "as-built" drawings and/or statements provided to the Town prior to the issuance of any certificate of occupancy.

22. After activation of the project's drainage system, all maintenance items, inspections, and observations relevant to the maintenance plan for the project's drainage system shall be documented by written reports prepared by the appropriate professional (engineer, environmental consultant, property manager) and maintained by Applicant or its successor in interest. At least semiannually the Applicant or its successor in interest shall provide to the Environmental Planner copies of any or all of the written reports required to be maintained by the above maintenance program. Where such reports, or observations made by the Environmental Planner, indicate that additional maintenance or measures are required in order to meet the design specifications and Statement of Purpose set forth above, the Environmental Planner may specify the deficiency observed, such additional maintenance or measures required, and a reasonable time frame for the completion thereof. Any such additional maintenance or measures shall be deemed to form a condition of the Inland Wetlands and Watercourses Permit and shall be enforceable as such. For the purpose of enforcing this Permit, the Environmental Planner shall have reasonable access to the permit premises.

23. There shall be no increase in the wattage of the lighting fixtures proposed for the property until the wildlife impacts of such increase have been evaluated in a written report by a qualified professional and such increase has been approved by the Environmental Planner. There shall be no spotlights aimed at or toward the wetlands or watercourses on the site.

24. Prior to issuance of a Certificate of Occupancy (Certificate of Zoning Compliance) for the use of any building or portion thereof, the Applicant shall submit to the Environmental Planner a list of Hazardous Substances which are to be generated or stored on the subject premises, the method(s) of containment, and the emergency spill response protocol to be employed. No such Hazardous Substances shall be stored outside of a building or covered area. As used in this paragraph, the term "Hazardous Substances" shall be as defined in Conn. Gen. Stats. § 22a-134p, "Regulations re storage of hazardous substances near a watercourse," which defines "Hazardous Substances" by reference to Section 302 of the Emergency Planning and Community Right-to-Know Act,

42 U.S.C. § 11002. No change in the storage or production of Hazardous Substances shall be made for any premises without the filing of a revised document with the Environmental Planner.

25. Active solar and other alternative energy sources shall be further explored and considered for the design of the buildings.

26. A comprehensive snow removal plan shall be devised and submitted for review and approval by the Office of Community Development. Said approved snow removal plan shall be filed on the land records for any approval of the project.

27. Written verification shall be provided to the Office of Community Development confirming the legal rights of the Permittee to use the easement along the southerly side of Friendly's for the purpose of an access drive to the project site. Said verification shall be provided prior to start of construction and issuance of a building permit.

28. Conditions of all tenant leases shall include the requirement that Griswold Street shall not be used by delivery trucks except for those trucks exiting Route 2 Eastbound on to Griswold Street and immediately turning right into the site. Delivery trucks shall not be allowed to travel easterly on Griswold Street from Main Street. Signed copies of the lease confirming this requirement shall be provided to the Office of Community Development. Lease agreements shall also indicate that delivery trucks shall be prohibited from leaving the site from the Griswold Street exit.

29. It is recommended to the State Traffic Commission that directional signage identifying westbound access to Route 2 from Maple Street be installed on Main Street in East Hartford.

30. The second floor of building '600' shall remain unfinished and unoccupied. Conversion of the second floor to provide for occupancy shall be subject to Section 12 Special Permit with Design Review (SPDR) approval. Exterior finishes for building '600' shall be consistent with those specified for the remaining buildings in the 11/29/10 Section 12 SPDR approval.

31. Truck traffic routes and hours of restrictions related to site preparation work shall be subject to approval by the Office of Community Development and the Police Department (Legal Traffic Authority).

and based upon the fact that no plans changes have been made and no new development activity has occurred, the following findings remain germane:

1. The professional testimonies of the Town Engineer, Police Department and the applicants Traffic Engineer have concluded that the Town's roadway system will not be overburdened by this development.

2. Proposed restrictions on automobile and truck traffic on Griswold Street will allow for an acceptable level of service during peak hours based upon testimony, evidence and reports provided to the Commission.

3. The proposed site drives function satisfactorily as private roadways.

4. Overall site layout, architectural details, landscaping and site lighting are acceptable and meet the standards of Section 12 of the Building Zone Regulations.

5. All necessary environmental permits have been approved for the project as proposed.

6. The project conforms to policy recommendations of the adopted 2007-2017 Plan of Conservation and Development and is supported by the public hearing record.

APPROVED: TOWN PLAN AND ZONING COMMISSION
FEBRUARY 5, 2013


ERIC W. SCHAEFER, ACTING CHAIRMAN

November 29, 2012

MEMORANDUM

To:     Town Plan and Zoning Commission
        Kenith E. Leslie, Community Development Director

From:   Daniel A. Pennington, Town Engineer/Manager of Physical Services
        David A. Caron, Chief of Police

Re:     Shoppes at Avalon – Re-approval

This will confirm that the Engineering Division and the Police Department have no new comments relative to the above-referenced re-approval application.  Previously forwarded memoranda on this proposal continue to apply in their entirety.

DAP/ce



TOWN OF GLASTONBURY
# FIRE MARSHAL'S OFFICE
## SITE PLAN/SUBDIVISION REVIEW

**PROJECT:** The Shoppes at Avalon      **LOCATION: Main & Griswold/Avalon Way**

**DEVELOPER: John Alan Sakon**

__xx__ NEW CONSTRUCTION    ____CHANGE OF USE ____SUBDIVISION    __xx__ COMMERCIAL

OCCUPANCY CLASSIFICATION: Group M & R      F.M.O. FILE # 12-097

**PROPOSED FIRE PROTECTION: via MDC water main/Full auto fire sprinkler& GVFD**

**ENGINEER'S PLAN # 205186**      INITIAL PLAN____      REVISED PLAN_8-24-09__

**ENGINEER: Phase Zero Design- Dutton Associates**

DATE PLANS RECEIVED: 9-09-10      DATE PLANS REVIEWED: 10-29-10-Revised 11-27-12

COMMENTS: The location of hydrants within the complex will need to be at intervals not to exceed five hundred feet and spaced such that the distance from a fire hydrant to any fire department connection that services the automatic sprinkler system(s)  does not exceed 50 feet.

Fire lanes will need to be established at locations determined by this office. Fire lane locations will need to be designated on the permanent drawings of record ( mylars ) submitted to the Town of Glastonbury.

Traffic signalization will be required to meet the emergency pre-emption standards of the Town of Glastonbury.

The buildings will require rapid entry vaults.

An exterior mounted flashing device will be required on each building with a fire alarm.

Rear doors of the retail tenant spaces will need to be marked with the address numerals and tenant name.

REVIEWED BY: _____  PAGE _/_ OF _/_      File

October 25, 2010

MEMORANDUM

To:     Town Plan and Zoning Commission
        Kenith E. Leslie, Community Development Director

From:   Daniel A. Pennington, Town Engineer/Manager of Physical Services
        Captain David Caron, Glastonbury Police Department

Re:     Shoppes at Avalon

The Engineering Division and Police Department have reviewed plans and pertinent reports submitted with the above-referenced application and offer the following comments for consideration:

1.  The proposed Griswold Street/Site Drive intersection calls for left-turn prohibitions for both entering and exiting traffic. In order to best encourage motorist compliance with this restriction, a raised, flared island is recommended. The geometry and specific configuration of the raised island should be one that maximizes the angle of entrance/exit while simultaneously allowing delivery trucks to access/exit safely. The plans as currently proposed do not sufficiently address this issue. A condition requiring the applicant to submit a revised plan to the described effect is suggested. Said plan is to be subject to approval by the Town Engineer and the Police Department.

2.  The existing traffic conditions on Griswold Street during peak hour periods have been well documented by the Police Department. Assuming adequate resolution of items described in Item #1 above, the right in/right out Griswold Street access/exit condition will not be expected to exacerbate existing congestion problems.

3.  On-site signage informing motorists of the Griswold Street left-turn prohibition will require supplemental installation beyond that proposed. The applicant should be required to submit such a plan for approval by the Town Engineer and the Police Department.

4.  The storm drainage scheme remains unchanged from prior applications of much greater developmental intensity. The Engineering Division has no objection to retaining the previous scheme. It is noted, however, that any desire to correspondingly reduce the scope of storm drainage installation due to reduced development scope will require a plan/report revision and subsequent review by the Engineering Division.

5.  The proposed traffic signal at the Main Street (north) entrance must be incorporated into the future closed-loop traffic signal coordination scheme to be implemented for the Main Street corridor. Emergency vehicle pre-emption, signal battery back-up, and video detection technology are to be incorporated as directed by the Town Engineer. Approval of the traffic signal installation by the State Traffic Commission will be required. The applicant shall be responsible for obtaining said approval.

6.  Plan Sheet #23 depicts signage installation. The corresponding legend does identify the type of sign associated with the letter "H" as shown on the plan. Clarification is required.

7.  Comments offered on past applications of a similar nature have noted concerns associated with the size and configuration of the Main Street north entrance/exit condition. The design of this intersection remains essentially unchanged. However, the manner of vehicular utilization has been revised. The Main Street north drive was formerly proposed as one that would be owned and maintained as a private drive. In practice, however, it was clear that due to the then proposed major reconfiguration of the Route 2 off ramp, the drive would function as a public roadway that did not meet public roadway standards. The current application proposes the drive as one that truly functions as a private drive to a privately-owned development. As such, it is not reasonable to impose public roadway design standards to the northerly Main Street drive. The designed configuration remains less than ideal in terms of lane widths, general geometry, and other aspects, but can be considered acceptable as a private driveway. The drive as proposed can operate safely. Although it is recognized that a sidewalk link to Main Street is proposed along the southerly (Friendly's) Main Street access drive, it is strongly recommended that an additional connection be made adjacent to the northerly Main Street access drive should expanded right-of-way become available in the future.

8.  A condition of approval requiring delivery trucks to exit via the northerly Main Street driveway is recommended. Delivery truck entrance via the right turn in on Griswold Street is permissible provided that an acceptable design is submitted in response to Item #1 of this memorandum.

DAP/DC/ce

INSTR # 2013002185 VOL 3122Pgs 165-175 RECD 07/24/2013 12:40:04 PM
JOYCE P. MASCENA, TOWN CLERK GLASTONBURY, CT



*Town of Glastonbury*

**2155 MAIN STREET  •  P.O. BOX 6523  •  GLASTONBURY, CONNECTICUT 06033-6523**

TOWN PLAN AND
ZONING COMMISSION

SECTION 12 SPECIAL PERMIT WITH
DESIGN REVIEW

APPLICANT/
OWNER:    JOHN ALAN SAKON
C/O SAKON, LLC
74 NEW LONDON TPKE
GLASTONBURY, CT 06033

FOR:  **THE SHOPPES AT AVALON PHASE II**
131 GRISWOLD STREET, ASSESSORS
LOT 8E MAIN STREET (REAR),
2960/2980 MAIN STREET  &
ASSESSORS LOT N2B GRISWOLD
STREET (REAR)

MOVED, that the Town Plan and Zoning Commission approve the application of John Alan
Sakon for a Special Permit with Design Review – The Shoppes at Avalon Phase II retail
development – 26,950 square feet of new construction – north of Griswold Street & east of Main
Street at 131 Griswold Street, Assessors Lot 8E Main Street (rear), 2960/2980 Main Street &
Assessors Lot N2B Griswold Street (rear) – Planned Travel Zone, in accordance with the
following plans:

COVER SHEET "THE SHOPPES AT AVALON PHASE II DEVELOPMENT PROPOSAL
SITE DEVELOPMENT PLANS MAIN STREET & GRISWOLD STREET GLASTONBURY,
CONNECTICUT DATE: 01.14.13 OWNER/DEVELOPER: SAKON DEVELOPMENT, LLC
74 NEW LONDON TURNPIKE GLASTONBURY, CONNECTICUT 06033 T (860) 675-4000
F (860) 675-4600"

"PROJECT TITLE:  THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND
MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 1-051079-LAYOUT
PROJECT NO. 051079 SCALE 1"=60' SHEET TITLE:  PLAN OF DEVELOPMENT
APPROVED BY MDW DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE
2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628
WWW.PHASEZERODESIGN.COM 1 OF 17"

"PROJECT TITLE:  THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND
MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079LZ01 PROJECT NO.
051079 SCALE 1"=40' SHEET TITLE:  LAYOUT & ZONING PLAN APPROVED BY DLS
CHECKED BY ZLB DRAWN BY LPM DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX
STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628
WWW.PHASEZERODESIGN.COM 4 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079GD02 PROJECT NO. 051079 SCALE 1"=40' SHEET TITLE: GRADING & DRAINAGE PLAN APPROVED BY DLS CHECKED BY ZLB DRAWN BY NCG DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 6 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079UT01 PROJECT NO. 051079 SCALE 1"=40' SHEET TITLE: UTILITY PLAN APPROVED BY DLS CHECKED BY ZLB DRAWN BY CA DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 7 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079LS01 PROJECT NO. 051079 SCALE 1"=40' SHEET TITLE: UTILITY PLAN APPROVED BY DLS CHECKED BY ZLB DRAWN BY CA DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 8 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 1109001 PROJECT NO. 1109001 SCALE 1"=40' SHEET TITLE: PLANT SCHEDULE AND DETAILS APPROVED BY MW CHECKED BY MW DRAWN BY LH DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 9 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 14-051079-LT01 PROJECT NO. 051079 SCALE 1"=60' SHEET TITLE: LIGHTING PLAN APPROVED BY MDW DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 10 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079EC01 PROJECT NO. 051079 SCALE 1"=60' SHEET TITLE: EROSION & SEDIMENTATION CONTROL PLAN APPROVED BY DLS CHECKED BY ZLB DRAWN BY CA DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 11 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079DS01 PROJECT NO. 051079BRE SCALE N.T.S. SHEET TITLE: DETAIL SHEET & NOTES APPROVED BY DLS CHECKED BY ZLB DRAWN BY CA DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 12 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079DS01 PROJECT NO. 051079BRE SCALE N.T.S. SHEET TITLE: DETAIL SHEET & NOTES APPROVED BY DLS CHECKED BY ZLB DRAWN BY CA DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 13 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079DS01 PROJECT NO. 051079BRE SCALE N.T.S. SHEET TITLE: DETAIL SHEET APPROVED BY DLS CHECKED BY ZLB DRAWN BY CA DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 14 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079SSM01 PROJECT NO. 051079 SCALE 1"=60' SHEET TITLE: STORM SEWER MAINTENANCE PLAN APPROVED BY DLS CHECKED BY ZLB DRAWN BY CA DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 15 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. 051079AP01 PROJECT NO. 051079 SCALE N.T.S. SHEET TITLE: APPROVALS APPROVED BY DLS CHECKED BY ZLB DRAWN BY CA DATE 01.14.13 PHASE ZERO DESIGN 8 WILCOX STREET, SUITE 2 – SIMSBURY, CT 06070 P 860-264-1624 F 860-264-1628 WWW.PHASEZERODESIGN.COM 16 OF 17"

"PROJECT TITLE: THE SHOPPES AT AVALON PHASE II PROPOSAL GRISWOLD AND MAIN STREETS GLASTONBURY, CONNECTICUT FILE NO. RW12362701.DWG PROJECT NO. 051079BRE SCALE 1"=40' SHEET TITLE: ROADWAY IMPROVEMENT PLAN APPROVED BY MDW CHECKED BY JRK DRAWN BY MSG DATE 01.14.13 PHASE ZERO DESIGN 17 OF 17"

"BUILDING '100' THE SHOPPES AT AVALON GLASTONBURY, CT DATE: 08.04.06 SCALE: 1/8"= 1'0" SAKON DEVELOPMENT, LLC CUBELLIS ASSOCIATES INC. ARCHITECTURE INTERIORS ENGINEERING 711 ATLANTIC AVENUE BOSTON, MA 02111 TEL: 617-338-0009 FAX: 617-338-0088 WWW.CUBELLIS.COM"

"BUILDING '700' THE SHOPPES AT AVALON GLASTONBURY, CT DATE: 08.04.06 SCALE: 1/8"= 1'0" SAKON DEVELOPMENT, LLC CUBELLIS ASSOCIATES INC. ARCHITECTURE INTERIORS ENGINEERING 711 ATLANTIC AVENUE BOSTON, MA 02111 TEL: 617-338-0009 FAX: 617-338-0088 WWW.CUBELLIS.COM"

"BUILDING '800' THE SHOPPES AT AVALON GLASTONBURY, CT DATE: 08.04.06 SCALE: 1/8"= 1'0" SAKON DEVELOPMENT, LLC CUBELLIS ASSOCIATES INC. ARCHITECTURE INTERIORS ENGINEERING 711 ATLANTIC AVENUE BOSTON, MA 02111 TEL: 617-338-0009 FAX: 617-338-0088 WWW.CUBELLIS.COM"

and in compliance with the following conditions:

1. Compliance with conditions 1 – 31 (except for condition 11 regarding parking deferral) from the Shoppes at Avalon re-approval of February 5, 2013.

2. Compliance with the memorandum from the Police Department and Town Engineer dated January 28, 2013.

3. No Certificate of Occupancies shall be issued for buildings that increase the square footage of the entire development above 67,690 square feet until the House Street/Harris Street/Griswold Street intersection improvements as well as the Main Street corridor traffic signal coordination improvements between Welles Street and Putnam Boulevard are operational.

4. Lighting fixtures shall match those from the previously approved Shoppes at Avalon plan, and shall be depicted on final plans for filing.

5. Final plans for filing shall include a corrected data table for parking for Phases I and II indicating that 497 parking spaces are required and 415 spaces would be provided (a deferral of 16.5% or 82 spaces). Parking calculation for the retail and restaurant uses shall be revised to the satisfaction of the Office of Community Development.

6. Final plans for filing shall reflect a revision that does not include 4-foot wide walkway areas for the site in the open space calculations.

This approval is based upon the following findings:

1. The project adheres to the Special Permit requirements of Section 12 of the Building-Zone Regulations.

2. The traffic studies indicate findings that were supported by the Town Engineer and Chief of Police that the project would not adversely impact traffic in the area, provided the House/Harris/Griswold Streets intersection improvements, and the Main Street signalization improvements, are made.

3. Testimony was provided indicating the improvements noted in #2 above are critical to the additional construction associated with this application and justify the inclusion of condition #3 of the approval motion. Furthermore, the Town Attorney has provided an opinion indicating inclusion of said condition is acceptable.

APPROVED: TOWN PLAN AND ZONING COMMISSION
MARCH 6, 2013

_ERIC W. SCHAEFER, ACTING CHAIRMAN

January 28, 2013

MEMORANDUM

To:    Town Plan and Zoning Commission
       Kenith E. Leslie, Community Development Director

From:  Daniel A. Pennington, Town Engineer/Manager of Physical Services
       David A. Caron, Chief of Police, Glastonbury Police Department

Re:    Shoppes at Avalon, Phase II


The Engineering and Police Departments have reviewed the revised plans and Traffic Impact Study for the above-referenced application. The following comments are offered for consideration:

1.  The previous Phase I application/approval included a number of traffic-related conditions and improvements. All of these conditions and improvements remain relevant to the current Phase II application. Items of this nature include, but are not limited to:

    a.  Installation of a new traffic signal at the northerly Main Street entrance to the development. Said signal is to be installed and integrated with the Town's Main Street signal system at the applicant's expense. The signal must include amenities such as video detection capability, battery back-up, and emergency pre-emption. State Traffic Commission approval and integration of the signal into a closed-loop system should also be the applicant's responsibility.

    b.  Construction of a dedicated left-turn lane on the southbound approach to the northerly Main Street drive entrance.

    c.  Construction of a flared raised island with appropriate signage to prohibit left turns into and out of the Griswold Street entrance. Specific design of the island is to be approved by the Town Engineer.

2.  The Town has received Federal Transportation Grant funding for two significant traffic signal projects in the subject area. The first project involves replacement and coordination of all traffic signals in the Main Street corridor between the Welles Street intersection and the Putnam Boulevard intersection. This project is scheduled for bidding and construction this year. Traffic flow throughout the corridor will be greatly enhanced as a result of this improvement.

    The second project involves realignment of the Griswold Street/House Street/Harris Street intersection. The Town owns the parcel located on the southwest corner of the Griswold Street/ House Street intersection. Accordingly, House Street will be modified geometrically, such that it intersects Griswold Street directly opposite Harris Street. This realignment will allow left turns from both side streets to occur concurrently. This phasing is not possible with the current alignment. The resulting condition will allow more green time to be allotted to the Griswold Street through movement, thereby reducing peak-hour queues to a dramatic degree. Additionally, this new signal will be coordinated with the existing traffic signal to the west at the Route 2 off-ramp. Construction of this project is anticipated in 2014, although a 2015 date is also possible.

**Town Plan and Zoning Commission**
Kenith E. Leslie

**January 28, 2013**
**Page 2**

Each project will improve intersectional levels of service as compared to the current condition, even with project-related trip generation factored into the analysis. Thus, I would not anticipate any traffic-related detrimental effect due to the subject application.

3. If this proposal is approved, the applicant will be responsible for obtaining any necessary amendments to the State Traffic Commission certificate issued for Phase I.

4. Despite projected improvements in traffic flow on Griswold Street, Staff continues to recommend that the Griswold Street entrance remain a "right in/right out" only means of egress/ingress. Traffic volumes on Griswold Street are high enough, such that left-turn prohibitions are warranted even with reduced queue lengths.

5. The southerly Main Street entrance should remain as a one-way in entrance. The four-lane section and overall traffic volumes on Main Street are such that left turns in and out of the development should occur at the signalized north drive intersection. The southerly entrance is intended to be a one-way in entrance that allows right turns into the development. Allowance of a two-way drive at this location would result in the undesirable left-turn out movement by motorists.

DAP/DAC/ce

"BUILDING '600' THE SHOPPES AT AVALON GLASTONBURY, CT SAKON DEVELOPMENT, LLC CUBELLIS ASSOCIATES, INC. ARCHITECTURE INTERIORS ENGINEERING 711 ATLANTIC AVENUE BOSTON, MA 02111 TEL: 617-338-0009 FAX: 617-338-0088 WWW.CUBELLIS.COM DATE: 08.04.06 SCALE: 1/8" = 1'0'""

and in compliance with the following conditions:

1. Compliance with standards contained in a report from the Fire Marshal, file #10-082, plans reviewed 10-29-10, **revised file #12-097, plans reviewed 11-27-12**.

2. Compliance with comments 1-8 contained in a memorandum dated October 25, 2010 from the Police Department and the Town Engineer. Additionally, traffic signal improvements shall include time clock based coordination between existing signals at the House, Harris and Griswold Street intersection and the Route 2 off-ramp and Griswold Street intersection.

3. The final design for any ground signs/entryway signs, and lighting for buildings signs, shall be subject to Section 12.9 minor change approval. Building sign illumination shall be consistent throughout the development.

4. Prior to issuance to a Certificate of Occupancy, certification from a professional engineer shall be required to confirm that all aspects of the stormwater management system were installed/constructed in accordance with the approved design.

5. Prior to the issuance of a Certificate of Occupancy, certification from a professional landscape architect shall be required to confirm compliance with the approved landscape design. Upon written agreement from the Brewster Condominium Association, landscaping shall be provided upon their property in accordance with the plan submitted at the November 3, 2010 public hearing. Said landscaping shall be installed in conjunction with landscaping on the project site prior to issuance of a Certificate of Occupancy.

6. Subject to consultation with, and approval by the Police Department, a portion of the site's lighting shall be operated by timers, shutting off after business hours.

7. Details for outdoor site amenities (i.e. benches, chairs, trash receptacles, etc.) shall be subject to Section 12.9 minor change approval.

8. Expansion of restaurant use within the approved retail space shall be permitted contingent upon a supportive parking scenario.

9. Details relative to lighting, dumpster enclosures and planting specifications shall be included on final plans for filing. The construction of refuse disposal/dumpster stations in locations other than as depicted on approved plans, shall be subject to Section 12.9 minor change approval.

10. Internal signage shall be installed in a manner acceptable to the Town Engineer, directing truck traffic to exit the site via Main Street.

11. The most westerly 33 parking spaces shall be deferred. The 38 parking spaces to the north of buildings 300/400 shall be constructed. Final plans for the filing shall reflect this modification. All deferred spaces within the site shall be grassed/landscaped. Parking lot lighting associated with deferred spaces just north of the Brewster Condominiums shall also be deferred.

12. Future construction of deferred parking spaces shall be subject to Section 12.9 minor change approval contingent upon a supportive parking analysis.

13. Final site plans for filing shall indicate: that the proposed catch basins feeding into detention pond #7 be hooded structures with at least 3-foot sumps; that the proposed outlet pipe from pond #7 be redesigned to reduce water conflicts into the existing 33-inch pipe and to provide more head; and that the methods/treatment for permanent stabilization of the stormwater detention structures may be modified in consultation with the Town's Environmental Planner during construction based upon the actual conditions experienced.

14. Prior to holding a pre-construction meeting and the start of construction a caveat, acceptable to the Town's Environmental Planner, shall be placed on the land records relative to the subject parcel(s) that explains the importance and necessity of adherence to the operations, inspection and maintenance plan for the water quality mitigation and stormwater detention structures and that non-adherence to said plan shall constitute a zoning violation with the Town.

15. Qualified individuals, acceptable to the Town's Environmental Planner, shall, at the expense of the Permittee, provide on-site consultations to the site contractor(s) to ensure adherence to the plans during construction of the water quality mitigation and stormwater detention structures and other wetlands mitigation measures, including the planting plans. Such qualified individuals shall certify (providing as-built drawings and statements as requested by the Town's Environmental Planner) that performance has met all designed aspects and goals upon completion.

16. A pre-construction meeting shall be held with the Permittee, his qualified consulting individuals and site contractor(s), and appropriate Town staff in attendance in order to discuss the numerous issues surrounding the construction of this project.

17. Installation of soil erosion and sedimentation control and stabilization measures shall be the Permittee's responsibility. Once installed these measures shall then be inspected by the Environmental Planner prior to land disturbance activities. Afterwards it then shall be the Permittee's responsibility to inspect these control measures during, and immediately following, substantial storm events and maintain and/or replace the control measures, when needed, on a regular basis until the site is vegetatively stabilized. Hay bales shall be replaced every 60 days. The Environmental Planner is hereby authorized to require

additional soil erosion and sediment controls and stabilization measures to address situations that arise on the site.

18. Tree stumps and blasted rock material shall not be buried at the site.

19. Metal waste containers shall be provided at the site to facilitate the collection of refuse material generated from construction activities. Such material shall not be buried or burned at the site.

20. Underground fuel storage tanks shall be prohibited to reduce the potential of contamination to wetlands, watercourses, and groundwater resources.

21. Certain drainage-related structures and final grades critical to water quality mitigation and stormwater management, as determined by the Town's Environmental Planner, shall have "as-built" drawings and/or statements provided to the Town prior to the issuance of any certificate of occupancy.

22. After activation of the project's drainage system, all maintenance items, inspections, and observations relevant to the maintenance plan for the project's drainage system shall be documented by written reports prepared by the appropriate professional (engineer, environmental consultant, property manager) and maintained by Applicant or its successor in interest. At least semiannually the Applicant or its successor in interest shall provide to the Environmental Planner copies of any or all of the written reports required to be maintained by the above maintenance program. Where such reports, or observations made by the Environmental Planner, indicate that additional maintenance or measures are required in order to meet the design specifications and Statement of Purpose set forth above, the Environmental Planner may specify the deficiency observed, such additional maintenance or measures required, and a reasonable time frame for the completion thereof. Any such additional maintenance or measures shall be deemed to form a condition of the Inland Wetlands and Watercourses Permit and shall be enforceable as such. For the purpose of enforcing this Permit, the Environmental Planner shall have reasonable access to the permit premises.

23. There shall be no increase in the wattage of the lighting fixtures proposed for the property until the wildlife impacts of such increase have been evaluated in a written report by a qualified professional and such increase has been approved by the Environmental Planner. There shall be no spotlights aimed at or toward the wetlands or watercourses on the site.

24. Prior to issuance of a Certificate of Occupancy (Certificate of Zoning Compliance) for the use of any building or portion thereof, the Applicant shall submit to the Environmental Planner a list of Hazardous Substances which are to be generated or stored on the subject premises, the method(s) of containment, and the emergency spill response protocol to be employed. No such Hazardous Substances shall be stored outside of a building or covered area. As used in this paragraph, the term "Hazardous Substances" shall be as defined in Conn. Gen. Stats. § 22a-134p, "Regulations re storage of hazardous substances near a watercourse," which defines "Hazardous Substances" by reference to Section 302 of the Emergency Planning and Community Right-to-Know Act,

42 U.S.C. § 11002.  No change in the storage or production of Hazardous Substances shall be made for any premises without the filing of a revised document with the Environmental Planner.

25. Active solar and other alternative energy sources shall be further explored and considered for the design of the buildings.

26. A comprehensive snow removal plan shall be devised and submitted for review and approval by the Office of Community Development.  Said approved snow removal plan shall be filed on the land records for any approval of the project.

27. Written verification shall be provided to the Office of Community Development confirming the legal rights of the Permittee to use the easement along the southerly side of Friendly's for the purpose of an access drive to the project site.  Said verification shall be provided prior to start of construction and issuance of a building permit.

28. Conditions of all tenant leases shall include the requirement that Griswold Street shall not be used by delivery trucks except for those trucks exiting Route 2 Eastbound on to Griswold Street and immediately turning right into the site.  Delivery trucks shall not be allowed to travel easterly on Griswold Street from Main Street.  Signed copies of the lease confirming this requirement shall be provided to the Office of Community Development.  Lease agreements shall also indicate that delivery trucks shall be prohibited from leaving the site from the Griswold Street exit.

29. It is recommended to the State Traffic Commission that directional signage identifying westbound access to Route 2 from Maple Street be installed on Main Street in East Hartford.

30. The second floor of building '600' shall remain unfinished and unoccupied.  Conversion of the second floor to provide for occupancy shall be subject to Section 12 Special Permit with Design Review (SPDR) approval.  Exterior finishes for building '600' shall be consistent with those specified for the remaining buildings in the 11/29/10 Section 12 SPDR approval.

31. Truck traffic routes and hours of restrictions related to site preparation work shall be subject to approval by the Office of Community Development and the Police Department (Legal Traffic Authority).

and based upon the fact that no plans changes have been made and no new development activity has occurred, the following findings remain germane:

1. The professional testimonies of the Town Engineer, Police Department and the applicants Traffic Engineer have concluded that the Town's roadway system will not be overburdened by this development.

2. Proposed restrictions on automobile and truck traffic on Griswold Street will allow for an acceptable level of service during peak hours based upon testimony, evidence and reports provided to the Commission.

3. The proposed site drives function satisfactorily as private roadways.

4. Overall site layout, architectural details, landscaping and site lighting are acceptable and meet the standards of Section 12 of the Building Zone Regulations.

5. All necessary environmental permits have been approved for the project as proposed.

6. The project conforms to policy recommendations of the adopted 2007-2017 Plan of Conservation and Development and is supported by the public hearing record.

APPROVED: TOWN PLAN AND ZONING COMMISSION
FEBRUARY 5, 2013

ERIC W. SCHAEFER, ACTING CHAIRMAN



# *Town of Glastonbury*

**2155 MAIN STREET • P.O. BOX 6523 • GLASTONBURY, CONNECTICUT 06033-6523**

TOWN PLAN AND
ZONING COMMISSION

REAPPROVAL OF SECTION 12
SPECIAL PERMITS WITH DESIGN REVIEW

APPLICANT/
OWNER:    JOHN ALAN SAKON
C/O SAKON, LLC
74 NEW LONDON TPKE
GLASTONBURY, CT  06033

FOR:    THE SHOPPES AT AVALON
PHASES I & II
131 GRISWOLD STREET,
ASSESSOR'S LOT 8E MAIN
STREET (REAR), 2960/2980 MAIN
STREET & ASSESSOR'S LOT
N2B GRISWOLD STREET (REAR)

MOVED, that the Town Plan and Zoning Commission reapproves the following Special Permits with Design Review authorizing the construction and operation of the Shoppes at Avalon Phases I and II – 94,640 square feet of retail and restaurant uses – north of Griswold Street and east of Main Street at 131 Griswold Street, Assessor's Lot 8E Main Street (rear), 2960/2980 Main Street and Assessor's Lot N2B Griswold Street (rear) – Planned Travel Zone, in accordance with all terms and conditions of the existing Special Permits recorded on the Glastonbury Land Records as follows:

Phase I – Volume 3122, Pages 176 – 188
Phase II – Volume 3122, Pages 165 – 170

Additionally, the Fire Marshal memoranda file #15-25, reviewed 10-29-10, revised 11-27-12 and 2-23-15, shall become additional conditions of approval.

APPROVED:  TOWN PLAN AND ZONING COMMISSION
MARCH 17, 2015

SHARON H. PURTILL, CHAIRMAN





## TOWN OF GLASTONBURY
# FIRE MARSHAL'S OFFICE
### SITE PLAN/SUBDIVISION REVIEW

**PROJECT:** The Shoppes at Avalon    Phase I&II Continued Hearing    **LOCATION:** Main & Griswold/Avalon Way

**DEVELOPER:** John Alan Sakon

__xx__ NEW CONSTRUCTION  ____CHANGE OF USE ____SUBDIVISION   __xx__ COMMERCIAL

**OCCUPANCY CLASSIFICATION:** Group M & R    **F.M.O. FILE #** 15–25

**PROPOSED FIRE PROTECTION:** via MDC water main/Full auto fire sprinkler& GVFD

**ENGINEER'S PLAN #** 1-051079-layout    **INITIAL PLAN____**    **REVISED PLAN_1-14-13_**

**ENGINEER:** Phase Zero Design- Dutton Associates

**DATE PLANS RECEIVED:** 2-23-15 **DATE PLANS REVIEWED:** 10-29-10 Revised 11-27-12 2-23-15

**COMMENTS:** The location of hydrants within the complex will need to be at intervals not to exceed five hundred feet and spaced such that the distance from a fire hydrant to any fire department connection that services the automatic sprinkler system(s)  does not exceed 50 feet. Fire lanes will need to be established at locations determined by this office. Fire lane locations will need to be designated on the permanent drawings of record ( mylars ) submitted to the Town of Glastonbury.

Traffic signalization will be required to meet the emergency pre-emption standards of the Town of Glastonbury.

The buildings will require rapid entry vaults.

An exterior mounted flashing device will be required on each building with a fire alarm.

Rear doors of the retail tenant spaces will need to be marked with the address numerals and tenant name.

**SITE CONSTRUCTION:** Any gates to the construction site will require rapid entry locks for fire department access. Fire lanes shall be maintained and provided for fire department access at all times during all phases of construction.

The use of and location of any temporary fuel storage tanks utilized for construction purposes will require review and approvals of this office.

The refueling of construction vehicles will be conducted in areas that have been pre-configured to minimize and capture any spills or leaks. All equipment utilized for refueling shall be listed and approved for such use.

The developer shall inform all contractors and property owners or agents that the disposal of construction debris by open burning is not permitted. This includes any vegetation that might be cleared as part of the proposal.

Portable toilets shall be kept a minimum of ten feet from any structure, job trailers or storage boxes and material stockpiles.



**REVIEWED BY:**

**PAGE** _2_ **OF** _2_    **File**



# Town of Glastonbury

**2155 MAIN STREET • P.O. BOX 6523 • GLASTONBURY, CONNECTICUT 06033-6523**

May 3, 2017

TOWN PLAN AND
ZONING COMMISSION

John Alan Sakon
Sakon LLC
74 New London Turnpike
Glastonbury, Connecticut  06033

Re:    Shoppes at Avalon

Dear Mr. Sakon:

At its meeting of April 4, 2017, the Town Plan and Zoning Commission re-approved your applications for a Section 12 Special Permits with Design Review for Phases I and II of the Shoppes at Avalon, in accordance with the attached Special Permit Motion.

- **The Special Permit Motion must be recorded in the Town Clerk's Office.  This approval is not effective until the motion and mylar plans are filed.**  A building permit may not be issued nor any use activity begun until the above filings have been completed.

- **Additionally, this project is subject to a Major Traffic Generator Permit from the State Traffic Commission, in accordance with Section 14-311 of the Connecticut General Statutes.**

Please note that the mylars for Phase II and the Minor Change for Building 600 are awaiting your filing on the land records.

Please be advised that this Special Permit authorizes new construction/site or building modifications or operation of a new use only in accordance with specified plans and any conditions of approval.  Accordingly, no modifications to specified plans or conditions shall be made unless authorization has been received from the Town Plan and Zoning Commission or their authorized agents within the Community Development Department.

Page 1 of 2

John Alan Sakon
May 3, 2017
Page 2

If substantial construction has not begun on a building or structure, or use established on a lot within one (1) year from the date of approval, the special permit shall become null and void. The Town Plan and Zoning Commission, upon request of the applicant, may extend for an additional one (1) year the period for beginning substantial construction or establishment of a use.

Please contact the Office of Community Development if you have any questions.

Sincerely,

TOWN PLAN AND ZONING COMMISSION
For the Secretary

Khara C. Dodds, AICP
Director of Planning & Land Use Services

Attachment

cc:     Peter R. Carey, Building Official
        Daniel A. Pennington, Town Engineer/Manager of Physical Services
        Nicole Lintereur, Assessor

KD:gfm



# *Town of Glastonbury*

2155 MAIN STREET • P.O. BOX 6523 • GLASTONBURY, CONNECTICUT 06033-6523

TOWN PLAN AND
ZONING COMMISSION

REAPPROVAL OF SECTION 12
SPECIAL PERMIT WITH DESIGN REVIEW

APPLICANT/
OWNER:     JOHN ALAN SAKON
C/O SAKON, LLC
74 NEW LONDON TURNPIKE
GLASTONBURY, CT 06033

FOR:     THE SHOPPES AT AVALON
PHASES I & II
131 GRISWOLD STREET, ASSESSOR'S LOT 8E
MAIN STREET (REAR), 2960/2980 MAIN STREET
& ASSESSOR'S LOT N2B GRISWOLD STREET
(REAR)

MOVED, that the Town Plan and Zoning Commission reapproves the following Special Permit with Design
Review authorizing the construction and operation of the Shoppes at Avalon Phases I and II – 94,640 square
feet of retail and restaurant uses – north of Griswold Street and east of Main Street at 131 Griswold Street,
Assessor's Lot 8E Main Street (rear), 2960/2980 Main Street and Assessor's Lot N2B Griswold Street (rear) –
Planned Travel Zone, in accordance with all terms and conditions of the existing Special Permits recorded on
the Glastonbury Land Records as follows:

Phase I – Volume 3122, Pages 176 – 188
Phase II – Volume 3122, Pages 165 – 170

And

1. In compliance with:
    a. Standards contained in a report from the Fire Marshal, File #17-035R, plans reviewed 03-16-17.
2. In adherence to:
    a. The Town Engineer's memoranda dated March 16, 2017 and March 28, 2017.
    b. The Health Department Director's Memorandum dated March 17, 2017.
    c. The Police Department's memorandum dated March 14, 2017.
3. The applicant shall file a mylar sheet for the Section 12.9 Minor Change to building "600" granted on July
   11, 2011 with the Town Clerk's Office prior to the issuance of any building permits associated with this
   project.
4. The applicant shall file a mylar sheets showing all approvals and staff memoranda regarding the
   reapproval of this project with the Town Clerk's Office prior to the issuance of any building permits
   associated with this project.

APPROVED:     TOWN PLAN AND ZONING COMMISSION
APRIL 4, 2017

RAYMOND HASSETT, ACTING CHAIRMAN



# TOWN OF GLASTONBURY
# FIRE MARSHAL'S OFFICE
## SITE PLAN/SUBDIVISION REVIEW

**PROJECT:** The Shoppes at Avalon-Buildings 101,102,

301,302,303,401,402,403,502,503,504,505,506,507, 601,602, 702, **703,,801,802

803,804

**LOCATION:** Main & Griswold/Avalon Way

**DEVELOPER:-** Sakon ,John Alan

**xx** NEW CONSTRUCTION _____CHANGE OF USE _____SUBDIVISION    **xx** COMMERCIAL

**OCCUPANCY CLASSIFICATION:** Group M & R    **F.M.O. FILE #** 17-035R

**PROPOSED FIRE PROTECTION:** via MDC water main/Full auto fire sprinkler& GVFD

**ENGINEER'S PLAN #** 1113091   **INITIAL PLAN**_____    **REVISED PLAN**xxx_1-14-13/ 3-06-13

**ENGINEER:** Phase Zero Design-

**DATE PLANS RECEIVED:** 3-16-17    **DATE PLANS REVIEWED:** 03-16-17**COMMENTS:** *The location of hydrants within the complex will need to be at intervals not to exceed five hundred feet and spaced such that the distance from a fire hydrant to any fire department connection that services any building's automatic sprinkler system(s) does not exceed 50 feet. Revised engineered drawings depicting the location of utilities and associated devices has not been submitted as of this date.*

*The location of any building's fire department connection(s) will need to be reviewed and approved by this office.*

*Fire lanes will need to be established on the south side of the south 22 foot right of way established in volume # 204 page #175 of the land records on file with the Town Clerk . Signs will need to be posted in accordance with the uniform traffic code.*

*Each building will require a rapid entry vault.*

*An exterior mounted flashing device will be required on each building with a fire alarm.*

*Rear doors of the retail tenant spaces will need to be marked with the address numerals and tenant names*

## CONSTRUCTION SITE COMMENTS

*Security gates if provided will need to be equipped with locking hardware compatible with the Town of Glastonbury Rapid Access Program ( Knox system )*

*The use of , the location of, and the protection of temporary fuel tanks and associated piping and delivery systems utilized for construction purposes will need to be reviewed by this office.*

*Emergency fire department access shall be maintained throughout all construction phases of the entire project*

*Portable toilets will need to be positioned a minimum of ten feet from any structure, fuel tank, combustible storage, staging or material stockpiles.*

REVIEWED BY: _____    PAGE 1 OF1    File

March 16, 2017

MEMORANDUM

To:     Town Plan and Zoning Commission
        Khara Dodds, Director of Planning and Land Use Services

From:  Stephen M. Braun, Assistant Town Engineer

Re:     Shoppes at Avalon – Phase 1 and Phase 2

The Engineering Division has reviewed the previously approved plans and the memoranda from the Town Engineer dated October 25, 2010, January 28, 2013, and February 25, 2015 regarding the above-referenced application. All items described in these memoranda continue to apply to this project. Additional updates and comments for consideration by the Commission are as follows:

1.  The Town has completed improvements to the intersection of Griswold Street with Harris Street and House Street and coordination of this intersection with the Bantle Road and Route 2 off-ramp intersection, which has significantly improved traffic flow on Griswold Street in this area.

2.  Minor adjustments to the timing patterns for the Town's traffic signal system both on Main Street and Griswold Street may be required to best accommodate the site traffic. Timing patterns should be evaluated by the applicant's traffic engineer and revisions implemented by the applicant as part of the system integration for the new traffic signal.

3.  The conceptual roadway improvement plans provided in the application materials appear to depict span poles with span wires for the proposed traffic signal at the site entrance drive on Main Street, which is not consistent with the mast arm configuration utilized by the Town on the Main Street Traffic Signal project and Griswold/House/Harris Intersection improvement project. It is recommended that all new traffic signal equipment for the proposed project be consistent with the equipment recently installed by the Town, as approved by the Town Engineer, including mast arms, emergency vehicle pre-emption, battery back-up, video detection, and fiber-optic communications.

4.  Traffic signal record drawings meeting Department of Transportation and Town standards shall be provided to the Town Engineer for the new signal at the Main Street site driveway. Record drawings meeting Town standards shall also be provided for all improvements within the Main Street and Griswold Street right-of-way.

5. This project requires registration with the Connecticut Department of Energy and Environmental Protection under the General Permit for Stormwater and Dewatering Wastewaters from Construction Activities since the disturbed area exceeds 5 acres.

cc: Daniel A. Pennington, Town Engineer / Director of Physical Services

March 28, 2017

MEMORANDUM

To:     Town Plan and Zoning Commission
        Khara C. Dodds, Director of Planning & Land Use Services

From:   Daniel A. Pennington, Town Engineer/Manager of Physical Services

Re:     Shoppes at Avalon

It is my understanding that Town Plan and Zoning Commission members have posed traffic-related questions concerning the above-referenced application. The following attempts to address questions and concerns voiced at the March 21, 2017 public hearing.

Since the initial approval of the Shoppes at Avalon Development – Phase I and II in 2013, the Commission has approved a 145-unit apartment complex located at the intersection of House Street and Hebron Avenue. Concern was expressed relative to traffic-related impacts of the Shoppes at Avalon when combined with those associated with the Glastonbury Mews Development. The two developments do, in fact, have an overlapping area of influence when considering the trip generation and distribution assumed for each.

That critical area of overlap would be the Griswold Street/House Street/Harris Street intersection. Subsequent to the initial Shoppes at Avalon approval, the Town of Glastonbury dramatically improved the level of service at this intersection by reconstructing and realigning the offset intersection and coordinating the traffic signal controller with the signal to the west of the Griswold Street/Route 2 ramp intersection. Overall intersectional delay and queue lengths on all approaches have significantly decreased during the peak periods. Accordingly, this intersection now possesses capacity to accommodate trip generation associated with both developments without substantive effect.

The Shoppes at Avalon Development would also have an impact to traffic in the Main Street corridor. Previously approved plans and associated approval conditions require the Developer to complete traffic-related improvements to mitigate said impacts. These improvements, in conjunction with the Town's relatively recent Main Street corridor traffic signal coordination and replacement, are sufficient to address congestion/safety issues created by the development. Other large scale commercial/residential developments currently contemplated in the same general area would be required to include Shoppes at Avalon trip generation as background traffic in their analysis if the subject application is approved. The applicant for the Avalon Development is not required to account for trip generation associated with projects that have not received formal regulatory approval.

DAP/ce



# *Town of Glastonbury*
## *Health Department*

# Memo

March 17, 2017

**To:**   Town Plan and Zoning Commission

**Fr:**   Wendy Mis, Director of Health

**Re:**   The Shoppes at Avalon, Griswold and Main Streets
         Reapproval of Phases I & II

---

This office has reviewed the plan package for the above-referenced proposal. A site development plan titled The Shoppes at Avalon Site Development Plans is provided by Phase Zero Design dated 7/7/10, last revised 8/10/10. A plan with the project title The Shoppes at Avalon Phase II Development Proposal Site Development Plans, also by Phase Zero Design, is dated 1/14/13.

The project is served by public sewer and water, and construction of 18 retail shops, 1 coffee shop, and 3 restaurants is proposed. One existing building at 11,600 square feet is shown.

Proposed dumpster locations do not appear to be sufficient for the number of buildings and food service establishments proposed.

Building plans will be required for review prior to approval of building construction. All food service establishments will require detailed layout and equipment plans for Health Department review.

This Department recommends approval with respect to the Public Health Code, with the following conditions:

- Detailed construction plans for all food service establishments will be reviewed by this Department prior to issuance of a building permit.

- Additional dumpster locations must be created to allow proper disposal of refuse for each building, with appropriate grease, rubbish and paper waste.



# GLASTONBURY POLICE DEPARTMENT

### 2108 MAIN ST./P.O. BOX 535/GLASTONBURY, CT  06033-0535/(860)633-8301/FAX (860)652-4290

**MEMORANDUM**

**To:**    Town Plan and Zoning Commission

**From:**    Thomas J Sweeney

**Date:**    March 14, 2017

**Subject:**    The Shoppes at Avalon Phases I & II Re-Approval

Members of the Police Department have reviewed the site re-approval plan as submitted for the Section 12 Special Permit with Design Review.

**Phase I:** The police department reaffirms the memorandum submitted on October 25, 2010.

**Phase II:** The police department reaffirms the memorandum submitted on January 28, 2013.

Thomas J Sweeney
Director of Police Services

JPH:jph



# Town of Glastonbury

**2155 MAIN STREET · P.O. BOX 6523 · GLASTONBURY, CONNECTICUT 06033-6523**

TOWN PLAN AND
ZONING COMMISSION

February 21, 2018

John Alan Sakon
Sakon LLC
74 New London Turnpike
Glastonbury, Connecticut 06033

Re:    Request of John Alan Sakon for a one-year extension to commence construction pursuant
       to Section 12.7 of the Building-Zone Regulations – Special Permit with Design Review
       for The Shoppes at Avalon Phases I and II – easterly side of Main Street, northerly of
       Griswold Street – Planned Travel Zone

Dear Mr. Sakon:

At its meeting of February 6, 2018, the Town Plan and Zoning Commission approved your
request for a one-year extension – until April 4, 2019 for The Shoppes at Avalon Phases I and II
- to commence substantial construction in accordance with Section 12.7 of the Building-Zone
Regulations for the Shoppes at Avalon.

Should you have any questions, please feel free to call (860) 652-7510.

Sincerely,

TOWN PLAN & ZONING COMMISSION
For the Secretary

Khara C. Dodds, AICP
Director of Planning & Land Use Services

KD:gfm

# Exhibit C

# *K.G.A.K. Financial Group, Inc.*

April 17, 2019

<u>VIA ELECTRONIC MAIL</u>

Re:     <u>Proposed Letter of Intent in the amount of $4,800,000</u>

Dear Mr. Sakon ;

K.G.A.K. Financial Group, Inc. ("K.G.A.K.," and or its assignees) is pleased to submit the following Letter of Intent ("L.O.I."), which outlines the general terms and conditions under which "K.G.A.K." and or assignees would underwrite a Refinance loan as set forth herein (the "Loan"). This Letter of Intent is based upon preliminary information and application provided by Applicant(s). Lender has relied upon all the information provided by Applicant(s) as being true and correct in all respects. The Preliminary Terms and Conditions that are stated in this LOI are for discussion purposes only and do not represent a commitment to lend or the underwriting of a note. The proposed rates and terms are preliminary and subject to change per the completion of due diligence, the examination of all requested financial documentation.

This Letter of Intent expires at 5:00 pm Eastern Standard Time on April 23, 2019 unless acceptance is represented by the, countersigning of this document and returned along with the required Underwriting fees (as defined below).

These Preliminary Terms and Conditions are for discussion purposes only and not a commitment to lend or a firm underwriting of the Notes. This Letter of Intent is based upon preliminary information and application provided by Applicant(s). Lender has relied on all the information provided by Borrowing Entity/Applicant(s) as being true and correct in all respects. This Conditional Loan Approval shall be non-binding with the exception of the Due Diligence charges stated herein.

The following is a non-binding expression of interest issued by K.G.A.K. Financial Group, Inc. The Applicant(s) acknowledges and agrees that this expression of interest is not a commitment to lend, either expressed or implied, and does not impose any obligation on K.G.A.K. Financial Group, Inc. or its investors to issue a commitment or to make a mortgage on the preliminary terms stated herein or on any other terms. Any agreement to lend or to make a mortgage will be subject

Page 1 of 10          JAS

Initials_____Initials_____Initials Initials _

to receipt of approval from each of the proposed Lender's and their credit committees and Applicant(s) fulfillment of Lender's closing conditions.

| | |
|---|---|
| **Loan Amount**: | $4,800,000 includes closing costs, interest reserves |
| **Borrowing Entity**: | Sakon Development, LLC |
| **Applicant(s)**: | **John A Sakon**<br>(collectively the "Applicant(s)" |
| **Use of Proceeds**: | The Loan proceeds shall be used for; Consolidate existing debt, provide funds for construction and development of a commercial subdivision of $4,000,000, $700,000 for purchase of a Mobile station, $100,000 for any additional closing cost or working capital related to this Transaction. |
| **Collateral**: | This Loan will be secured as evidenced by a first deed of trust and a security Interest in the subject project. |
| **Name of Project**: | The Shoppes at Avalon Main Street & Griswold Street, Glastonbury, CT |
| **Interest Rate**: | 7% subject to underwriting |
| **Loan Term**: | 24 months interest only |
| **LTV**: | Not to exceed 70% of the appraised value |
| **Interest Reserves**: | Included in the loan amount |
| **Recourse**: | Non-recourse subject to the "Bad Boy" carveouts, which include "fraud or intentional misrepresentation by the applicant, gross negligence or criminal acts of the borrower that result in the forfeiture, seizure or loss of any portion of the mortgaged property; waste, misappropriation, bankruptcy, violation of SPE covenants or incurring subordinate debt without lender's consent. |
| **Pre-Payment Penalty**: | If loan is paid within the 1st 8 months there will be a 1-point exit fee |
| **Closing Date**: | 30-45 days from receipt of full package and 3rd party reports |

JAS

Initials_____Initials_____Initials  Initials _

Offices: New York / Chicago / North Carolina / Colorado / FL
Phone 866-487-8883
Email: info@kgakfinancialgroup.com Website: www.kgakfinancialgroup.com

**K.G.A.K.**
**Origination**
**Points:**            Applicant(s) will pay 1.75% of the original principal amount of the Loan
from Closing Proceeds at the time of Closing.

**Guarantee:**         The Applicant shall be subject to the "bad boy carveouts" which include
"fraud and fraud related incidents committed by the applicant or its
principals and will guaranty payment of 100% of the outstanding Loan plus
any accrued and unpaid interest, fees, costs taxes, and all costs of
enforcement of the Loan.

**Default Interest:**  24% per annum, but not greater than the maximum rate allowed by law in
the State of Delaware.

**Broker Fee:**        One Source Business Capital is the broker of record and will be paid a fee
of 2% of the Loan amount from Closing Proceeds at the time of Closing.

**Governing Law:**  State of Delaware: This Application shall be governed by, construed, and
interpreted in accordance with the internal laws of the State of Delaware,
without regard to principles of conflicts of laws. Applicant(s) submit to the
exclusive jurisdiction of the courts of the State of Delaware for the
resolution of any dispute in connection with this Letter of Intent. Both
parties waive any right to a jury trial.

**Arbitration in the**
**Event of Dispute:**  The Parties shall endeavor to settle any dispute, controversy or claim arising
out of or in relation to this Agreement including the existence, validity,
interpretation, performance, breach, circumvention or disclosure of
confidential information, by Applicant, either directly or indirectly.

K.G.A.K shall be entitled to equitable relief, as well as a legal monetary
penalty equal to the maximum services fees it should realize from such
transactions, including all legal expenses and costs in the recovery of funds,
including attorneys' fees.

In connection with any dispute related to this Agreement, notwithstanding
the foregoing, applicant hereby irrevocably and unconditionally agrees that
any controversy arising out of or relating to this contract, or the breach
thereof, shall be settled by arbitration administered by the American

Page 3 of 10

JAS

Initials_____Initials_____Initials Initials _

Arbitration Association in accordance with the Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction, such as United States District Court or, if such court will not accept jurisdiction, the jurisdiction of any court of competent civil jurisdiction.

Applicant also irrevocably and unconditionally consents to the service of any process, pleadings, notices or any other papers by United States mail to its last known address.

**Other terms and Conditions of the Loan:**

The final Loan documentation will contain standard acknowledgments, representations, warranties, covenants, conditions, releases, reported obligations, and other usual and customary provisions for transactions of this type or reasonably requested by the Lender. Due Diligence of the Applicant(s) background, creditworthiness, personal and real property, structure, management, personnel, and all agreements, inclusive of a Complete review and valuation of the securities portfolio listed on the Applicant(s) Personal Financial Statement.

Non-Binding Letter of Intent:

It is agreed and understood by the parties that the terms and provisions of this Letter of Intent are non-binding, except for the following which shall be binding on the parties and shall survive termination of this Letter of Intent.

1. **Summary of Terms and Conditions**: The following is a summary of the proposed terms and conditions of the loan and does not purport to include or summarize all terms and conditions that would be contained, in definitive documentation, for the proposed Loan and is subject to change, modification, amendment, supplementation, and subject to withdrawal, per the terms outlined, by "K.G.A.K." in whole or in part.

2. **Confidentiality**: The parties acknowledge and agree that this Letter of Intent, its existence and contents and any and all information submitted are confidential and proprietary and may not be disclosed, in whole or in part, without Applicant(s) written consent. The obligations under this Section "2" shall survive any occurrence of the Termination Date or Termination of Discussion (as defined hereunder).

JAS

Initials_____Initials_____Initials  Initials _

Offices: New York / Chicago / North Carolina / Colorado / FL
Phone 866-487-8883
Email: info@kgakfinancialgroup.com Website: www.kgakfinancialgroup.com

3. **Indemnification:** The Applicant(s) shall indemnify and hold harmless the Lender, its affiliates, and their respective officers, directors, employees, agents, advisors, auditors, attorneys, controlling persons, funding sources, and other representative and advisors, from and against all suits, actions, proceedings, claims, damages, losses, liabilities, and expenses (including, without limitation, attorneys' fees and other costs), which may be asserted against or incurred by any of the aforementioned in connection with, or arising out of, this Letter of Intent or any part of the proposed Transaction, if such action arises at the fault of the Applicant(s).

4. **Third Party Fees:** A $5,500.00 fee is to be paid upon the execution of this Letter of Intent which will be considered by the Lender payment for 3rd party appraisal and environmental reports required for the processing of this loan. Applicant(s) understand that the appraisal and environmental reports must be ordered by the Lender. Applicant(s) acknowledge and understand they are responsible for the cost of the appraisal, environmental. Applicant(s) understand and acknowledge that these third-party fees are non-refundable.

5. **Third Party Reports:** Applicant(s) will be responsible for the payment of all 3rd party report(s) appraisal, environmental, prior to close of any loan. The Lender's commissioning of any 3rd party report(s) will be reviewed and quoted to the Applicant(s) prior to the initiation of any report, requiring the wiring funds for this report(s) prior to its commencement.

6. **Additional expenses:** Applicant(s)/Obligor(s) understand that they, the Applicant(s)/Obligor(s), are responsible for any additional fees required for the closing of this loan to be paid at time of closing.

7. **Termination of Discussions:** "K.G.A.K." in its sole discretion, may terminate discussions for reasons provided and without liability. Applicant(s) acknowledges that this Letter of Intent may be cancelled because of the failure, for any reason, of the Applicant(s) ability to satisfy any of the conditions or requirements hereof.
This Letter of Intent may also be cancelled in the event of any inaccuracy of any information provided by the Applicant(s) or its agent(s), or by any material adverse change in the Applicant(s) information, or the property(s) and/or asset(s) or applicants cash flow, prior to the disbursement of funds at closing hereunder. In no event shall Applicant(s) or the Underwriter incur obligations for the proposed Transaction until and unless the Lender

JAS

Initials_____Initials_____Initials  Initials _

Offices: New York / Chicago / North Carolina / Colorado / FL
Phone 866-487-8883
Email: info@kgakfinancialgroup.com Website: www.kgakfinancialgroup.com

executes and delivers definitive documentation reflecting those obligations. Applicant(s) understand that this loan may never close.

The terms and provision of this Letter of Intent are non-binding, except as expressly set forth herein. This Letter of Intent does not represent a commitment to provide financing and should not be relied upon as an indication of a conclusion of the proposed financing. Upon the completion of "K.G.A.K.s" due diligence, and to its sole discretion, Lender may issue a commitment letter related to the proposed Loan and/or commence with preparation of pre-closing documentation.

8.  **Assignment:** "K.G.A.K." reserves the right to assign or syndicate this loan. This Letter of Intent does not represent a commitment from either "K.G.A.K." or its assignee. Any commitment will be subject to credit committee's approval and satisfactory legal documentation provided to "K.G.A.K.," its assignee, if applicable, and their respective counsels, and will expressly identify itself as a "Loan Commitment," "Loan Approval," or "Approval to Lend."

    In addition, the Applicant(s) acknowledges and agrees that "K.G.A.K." may sell, assign, hypothecate, syndicate, pledge or otherwise transfer all or any portion of its interest in the Loan to a third party prior to, upon or after the Loan closing.

    Applicant(s) authorizes the Underwriter to obtain credit reports and references as deemed necessary. "K.G.A.K." will close as a correspondent lender and/or using institutional funds and/or syndicated private equity and/or syndicated institutional conventional funds. Applicant(s) understands that the Applicant(s) is/are responsible for any and all fees due at closing.

9.  **Counterparts:** Electronic Signatures; Governing Law: This Letter of Intent may be executed in counterparts. All counterparts shall collectively constitute a single instrument. An electronic copy of this Letter of Intent shall constitute an original document. This Letter of Intent shall be governed by the laws of the State of Delaware.

    Each party shall be responsible for its own attorneys' fees and costs leading up to an in connection with the execution and performance of this Letter of Intent. However, in the event any Party defaults upon its obligations under this Letter of Intent, and litigation ensues, the non-prevailing Party(ies) shall be required to pay the prevailing Party(ies) the attorney's fees and costs incurred by the prevailing Party(ies), in the trial court, appellate court, and all intermediate court proceedings, including and without limitation, reasonable

JAS

Initials____Initials____Initials  Initials _

Offices: New York / Chicago / North Carolina / Colorado / FL
Phone 866-487-8883
Email: info@kgakfinancialgroup.com Website: www.kgakfinancialgroup.com

attorneys' fees and costs incurred in litigation, entitlements to, the amount of, and recovery of the attorneys' fees and costs due to the prevailing Party(ies).

Applicant(s) acknowledges this Conditional Approval may be cancelled because of the failure for any reason of the Applicant(s) or any additional Applicant(s) to satisfy any of the conditions or requirements hereof. The Conditional Approval may also be cancelled in the event of the any inaccuracy of any information provided by the Applicant(s) and/or its Agent(s), of any material adverse change in the Applicant(s), any additional Applicant(s) or the property or its cash flow prior to disbursement of funds hereunder.

10. **Non-Disparagement:** During the Term of this agreement and thereafter, the Parties to this Indicative Term Sheet agree to take no action which is intended or would reasonably be expected to harm the Applicant(s) or Lender of their reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity.

11. **Escrow Amendment:** This signed agreement may be presented to escrow, and if so deposited, it shall act as your authorization and instructions to the Entity/Applicant(s) and your authorization and instructions to the escrow holder to pay the loan fee from the loan proceeds directly to K.G.A.K. Financial Group, LLC.

Applicant(s) acknowledge and represents that this is a commercial transaction and not subject to any state's consumer protection laws. Applicant(s) understand that Lender will not proceed without this acknowledgment.

12. **No Specified Closing Date:** K.G.A.K. Financial Group, LLC. will work hard and efficient to close your loan in the shortest amount of time possible, however there are several 3rd party reports that need to be provided in a timely fashion, addressing necessary information during the underwriting process.

**A delay in the receipt of any of the requested documents could add additional time in the processing of the requested loan. Applicant(s) acknowledge and understand all required documentation will be supplied to processing within 15 business days. Failure to supply the requested documents within the 15 business days will cause a breach of this agreement.**

Conditions: The closing and funding of the Loan is subject to the satisfaction, and in the Lenders sole discretion, of all condition's precedent deemed necessary or appropriate by the Lender, including, and without limitation of the following:

Page 7 of 10

JAS
Initials_____Initials_____Initials Initials _

- Current Personal Financial Statement not older than 30 days ~~(for all individuals owning 10% and greater interest in borrowing entity or Tiered Entity)~~ (Net Worth must be equal to the loan amount requested)
- 3 Years Personal Tax Returns ~~(for all individuals owning 10% and greater interest in borrowing entity or Tiered Entity)~~
- 3 Years Tax Returns ~~(for all Tiered Entities owning 10% and greater interest in borrowing entity)~~
- 3 Years Corporate/Partnership tax returns of the Applicant(s)
- 3 Years P&L Statements and Year to Date P&L Statement and Balance Sheet of the Corporate/Partnership of the Applicant(s) (Debt Service must be 1.25)
- 3 years Corporate/Partnership tax returns for the Selling Entity in a stock member interest or Asset sale. (if applicable)
- 3 Years P&L statements and Year to Date 2018 P&L Statement and Balance Sheet of the Selling Entity (if applicable)
- Rent Roll (income producing property) (if applicable)
- Lease Payments
- Fully executed Purchase/Sale Contract
- Current 6 months bank statements (personal)
- Current 6 months bank statements (corporate)
- Schedule of Real Estate owned (for all individuals, corporations, partnerships, trusts, ~~owning 10% and greater interest~~ in the borrowing entity)
- General Contractors Construction contract and budget with hard and soft costs outlined
- General Contractors licensure information and bio (for purpose of contractor approval)
- Source and use of funds
- Business Plan / Executive summary with detailed exit strategy
- Photos (inside & outside) of subject property
- Photos (inside & outside) of subject property (of Company or its Assets, being acquired)
- Permits, plans, surveyor and engineering documents
- Bio/Resume on each Applicant(s)
- Fully executed Franchise Agreement
- Pro-forma (3 year) (with specified start-up detail)
- Articles of Incorporation, Certificate of Good Standing, Corporate Resolution, Operating Agreement
- Clear color copy of - Current Driver license or Passport
- 3 Years Star Reports (for Hotel projects)
- History and details on Management entity and contracts
- Fully signed and dated Management Agreement
- Shareholder List showing percentages owned by each

Page 8 of 10

JAS

Initials_____Initials_____Initials Initials _

Offices: New York / Chicago / North Carolina / Colorado / FL
Phone 866-487-8883
Email: info@kgakfinancialgroup.com Website: www.kgakfinancialgroup.com

- Copy of Land Lease (if applicable)

Additional documentation may be required during the Underwriting phase

If the terms and conditions outlined in this Letter of Intent are acceptable, please sign and return an executed copy of this Letter of Intent to "K.G.A.K.," along with the fee of USD $5,500.00 on or before 5:00 P.M. Eastern Time on April 27, 2019, at which time this Letter of Intent shall expire.

K.G.A.K. Financial Group, Inc. looks forward to working with the Applicant(s) on the proposed Transaction.

Very truly yours,

K.G.A.K. Financial Group, Inc.

Page 9 of 10

JAS

Initials_____Initials_____Initials Initials _

AGREED AND ACCEPTED:

SAKON DEVELOPMENT, LLC

By:_____          Date: _____  04/22/2019
John A Sakon
Title:_____ Manager

By:_____          Date: _____  04/22/2019
John A Sakon
Individual

John
Sakon

Digitally signed by John Sakon
DN: cn=John Sakon, o=US, o=Sakon
LLC, ou=Manager,
email=johnsakon@sakon.biz
Reason: I am the author of this
document
Date: 2019.04.22 17:33:37 -04'00'

Initials_____Initials_____Initials  Initials _

Offices: New York / Chicago / North Carolina / Colorado / FL
Phone 866-487-8883
Email: info@kgakfinancialgroup.com Website: www.kgakfinancialgroup.com

<u>Wire Instructions:</u>

Bank Name:           Bank of America
Account Name:        K.G.A.K. Financial Group, Inc.
ABA Bank Number:     026009593
Account Number:      334054698741

Page 11 of 10              **JAS**

Initials_____Initials_____Initials  Initials _

# Exhibit C 1

# KG A K
CUSTOM FINANCIAL SOLUTIONS

**OFFICES: CHICAGO, FLORIDA, COLORADO AND NORTH CAROLINA**

Subject Matter: Shoppes of Avalon

Mr. John Sakon,

This is to inform you, that we ourselves are committed to proceed with the funding of The

Shoppes of Avalon in Glastonbury, Connecticut. Subject to only me receiving my

underwriter's report. Our target date for closing is September 3rd 2019.

If you have any further questions please call me at my office,

Tony Ruggiero
CEO & Co-Founder
Direct: 646 701 5372
Conference Line: 646 457 4535

**40 Wall Street**
**29th Floor**
**New York, New York 10005**

info@kgakfinancialgroup.com
www.kgakfinancialgroup.com

## John Sakon

| | |
|---|---|
| **From:** | Bryan Pereyo <bryan@sjcglobalfusion.com> |
| **Sent:** | Saturday, August 17, 2019 12:06 PM |
| **To:** | John Sakon; johnsakon@yahoo.com |
| **Cc:** | marcus.cardella@outlook.com |
| **Subject:** | Fwd: Shoppes of Avalon |
| **Attachments:** | Shoppes of Avalon-Commitment Letter.pdf |

Get Outlook for iOS

**From:** Tony R <tony.r@kgakfinancialgroup.com>
**Sent:** Saturday, August 17, 2019 11:41:40 AM
**To:** Bryan Pereyo <bryan@sjcglobalfusion.com>
**Cc:** Kathy <kate51@kgakfinancialgroup.com>
**Subject:** Shoppes of Avalon

Bryan,

Please see the attached letter.

Thank you,

Tony Ruggiero

1

# Exhibit D

**MOTION ~~FOR JUDGMENT~~** For
**~~BY~~ STIPULATION** 
JD-HM-13 Rev. 7-14

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
*www.jud.ct.gov*



**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities
Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a
court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA*.



| ☐ Judicial District at  Hartford | ☒ Housing Session at  Hartford | ☐ Geographical Area Number | Docket Number HFH-CV19-6011720-S |

Name of Case

A&F MAIN STREET ASSOCIATES, LLC V. SAKON, JOHN

## Motion

~~The parties move for judgment in accordance with the following stipulation.~~

## Stipulation

By agreement of the parties, ~~judgment for possession will enter in favor of the plaintiff with a stay of execution through _____ based on the following conditions~~ *(The blank space below is to be filled in by the parties):*

1. The defendant agrees to pay the plaintiff $97,500 on or before November 30,2019 in settlement of all claims made by plaintiff through 12/31/2019 and payment of all rents and use and occupancy payments due to and including the use and occupancy due in December 2019 as part consideration for the agreed upon amendments below.
2. The plaintiff and the defendant agree to enter into amendment of the ground lease dated February 11, 1999 as follows:
   A. The ground lease shall be amended to allow for a non-institutional lender to be a permitted mortgagee under Seciton 17 of the lease.
   B. The ground lease shall be amended to provide that the tenant shall pay the real estate taxes on the area of the easement dated Februa 11, 1999 (the portion of the taxes presently paid by Plaintiff) as if it was part of the ground lease. Alll default provisions of the ground lease sh apply to the payment of taxes as additional rent.
3. The amended ground lease shall not be operative or effective and shall be held in escrow by plaintiff's attorney and shall not be released until payment of the $97,500 is tendered. If the payment of monies is not made as agreed herein, the amended ground lease shall be null and void payment is made, the ground lease shall be reinstated as of the date of payment in full.
4. The defendant agrees to waive all the specific counterclaims and special defenses made by defendant in the instant case.
5. The plaintiff shall timely cooperate in any refinancing of the subject property and issue any customary Landlord estoppal letters required by Lender in the normal course of business (subject to and in compliance with this agreement).
6. If the defendant fails to pay the said sums by November 30, 2019, the plaintiff, may upon motion of plaintiff, move for judgment for possession in favor or plaintiff on or after Monday December 2, 2019 and judgment shall enter and  immediate execution shall issue and the defendant waives any right to any stay of execution and hereby waives any rights of appeal.
7. Notwithstanding the language above, if the defendant files for backrupcy in the Federal Court prior to December 2, 2019, then this agreement shall not be construed as a judgment of possession.

| Signed *(Plaintiff/Plaintiff's Attorney)* | Date Signed 8/14/19 |
| Signed *(Defendant/Defendant's Attorney)*  John Alan Sakon. | Date Signed 8 14 19 |

## Order

*FOR COURT USE ONLY*

File Date

☒ The above ~~motion for judgment~~ is granted in accordance with the stipulation above.

| By the Court *(Judge/Assistant Clerk)* | Date 8/14/19 |

**Distribution:**   Original - Court File    Copy 1 - Plaintiff    Copy 2 - Defendant

**MOTION FOR JUDGMENT**
**BY STIPULATION**

# Exhibit E

# LEVINE & ASSOCIATES, P.A.

LITIGATION CONSULTING
FORENSIC ACCOUNTING
FRAUD EXAMINATION

---

# Project Examination Report

TO:  Tony J. Ruggiero

FROM:  Alan Levine

RE:  John A. Sakon, "Shoppes at Avalon"

DATE:  October 1st, 2019

---

This Report is being provided per our examination of the Project file for Shoppes at Avalon.

In our examination of the file for Shoppes at Avalon, we have provided several issues regarding the Project and Funding Analysis which are as follows:

Permitting

Per the review of the Building and Zoning Permits, and Construction Permits for the Shoppes at Avalon, the following determinations have been made due to communications with the Town of Glastonbury, Ct, Planning and Zoning Department, Building Official/Zoning Enforcement Officer Peter R Carey, and City Planner John Mullen.

Building and Zoning "Special Permit" – the City had issued a second renewal effective February 6th, 2018. Per my discussion with both Building Official/Zoning Enforcement Officer Peter R Carey, and City Planner John Mullen, the "Special

John A. Sakon "Shoppes at Avalon"
Project Examination Report
October 1st, 2019
Page 2 of 3

Permit" for the "commencement of substantial construction" expired on April 4th, 2019. The Permit has not ben renewed.

The Borrower, John Sakon, has stated a position, siting Section 12.7 of the Glastonbury Zoning Regulations, regarding "Substantial completion within one year." After referencing this to both the Enforcement Officer Peter R Carey, and City Planner John Mullen, they both stated that the activity that was permitted under the "Special Permit," without the issuance of a Construction Permit in place, was restricted to Site Develop only.

As to the Site Development activity stated by the Borrower and sited as cause for the automatic continuance of the "Special Permit" beyond the April 4th, 2019 expiration date, both Enforcement Officer Peter R Carey, and City Planner John Mullen, stated that the transporting of land fill material to the site does not constitute "Site Development" and thus 12.7 does not apply and was so advised to Mr. Sakon during a discussion between John Sakon and City Planner John Mullen in May/June 2019, as Mr. Mullen advised me in today's call.

"Wetlands Permit" – In addition to the expiration of the "Special Permit" for construction, Mr. Mullen also noted that the required Wetlands Permit has also expired and requires renewal, thus eliminating the ability to facilitate any activity at the project site until this primary permit is renewed. This permit expired due to the non-activity of the site since "the summer of 2017" as stated to me in today's call with City Planner John Mullen. He also stated that this was discussed with Mr. Sakon in May/June 2019.

"Construction Permit" – to-date, a permit for construction has not been submitted for or approved for the construction of the Shoppes at Avalon. The "Special Permit" only allows for preliminary site development and not construction.

John A. Sakon "Shoppes at Avalon"
Project Examination Report
October 1st, 2019
Page 3 of 3

The conclusion of my calls with both Planning and Zoning Department, Building Official/Zoning Enforcement Officer Peter R Carey, and City Planner John Mullen, are that Mr. Sakon had been advised of the Special Permit and Wetlands Permit issues since May/June of 2019, and that both permits would require re-application and that the extension/renewal of both permits not allowed.

This process, as advised by Mr. Mullen, would be somewhere between 3 to 6 months.

In addition to the aforementioned issues, are a handful of missing and inconsistent information regarding, including inconsistent information form Mr. Sakon's Personal Financial Statement. The list below is not conclusive of all missing information:

- Project Insurance – the project insurance policy uploaded to Smartsheet is not for the property known as the Shoppes at Avalon, but insuring the address of Mr. Sakon's personal residence
- Bank balances – the Asset "Cash" on the PFS is not reflected in the bank statements provided.
- The reference to a second mortgage on the proposed property.
- The lack of payoff statements for either the 1st or 2nd mortgages.
- The lack of a Construction Budget from a certified GC, which leaves in question a proper Funding Analysis for the project.
- Inconsistent mortgage balances with the amount stated in Mr. Sakon's PFS.

Preliminary Conclusion

Without the City Permits current and in place, any further examination pertaining to the requirements of Underwriting regarding the verification of Personal Financial Information, funding for the project could not be completed.

# Exhibit F

**John Sakon**

| | |
|---|---|
| **From:** | John Sakon <johnsakon@sakon.biz> |
| **Sent:** | Wednesday, October 2, 2019 10:33 PM |
| **To:** | 'Khara C. Dodds AICP (Khara.Dodds@glastonbury-ct.gov)'; 'Thomas Mocko'; 'jonathan mullen' |
| **Cc:** | Bryan Pereyo (bpereyo@salesantidote.com); alan levine (alevine@levineassociates.com) |
| **Subject:** | The Shoppes at Avalon Wetlands Permits |
| **Attachments:** | 2011PA-00005-R00SB-00859-PA.PDF |



October 2, 2019

Dear Khara, John and Tom,

The following statement was made by Alan Levine in his due diligence report for *The Shoppes at Avalon* Refinancing:

> The Borrower, John Sakon, has stated a position, siting Section 12.7 of the Glastonbury Zoning Regulations, regarding "Substantial ~~completion~~ within one year." After referencing this to both the Enforcement Officer Peter R Carey, and City Planner John Mullen, they both stated that the activity that was permitted under the "Special Permit," without the issuance of a Construction Permit in place, was restricted to Site Develop only.
>
> If substantial construction has not begun
>
> As to the Site Development activity stated by the Borrower and sited as cause for the automatic continuance of the "Special Permit" beyond the April 4th, 2019 expiration date, both Enforcement Officer Peter R Carey, and City Planner John Mullen, stated that the transporting of land fill material to the site does not constitute "Site Development" and thus 12.7 does not apply and was so advised to Mr. Sakon during a discussion between John Sakon and City Planner John Mullen in May/June 2019, as Mr. Mullen advised me in today's call.

1

As to the Site Development activity stated by the Borrower and sited as cause fc the automatic continuance of the "Special Permit" beyond the April 4th, 201 expiration date, both Enforcement Officer Peter R Carey, and City Planner Joh Mullen, stated that the transporting of land fill material to the site does not constitut "Site Development" and thus 12.7 does not apply and was so advised to Mr. Sako during a discussion between John Sakon and City Planner John Mullen in May/Jun 2019, as Mr. Mullen advised me in today's call.

## LEVINE & ASSOCIATES, P.A.

LITIGATION CONSULTING
FORENSIC ACCOUNTING
FRAUD EXAMINATION

3900 Hollywood Blvd. · Suite PH-2 · Hollywood, Florida 33021 · Phone 305-893-2111 · Fax 954-507-9565
E-mail: alevine@levineassociates.com

Let us review your regulations.

### 12.7   Substantial Construction Within One Year

If substantial construction has not begun on a building or structure, or no use established on a lot, for which a building structure or use special permit with design approval was received from the Town Plan and Zoning

154

Commission after (effective date of these Regulations), within one (1) year from the date of issuance of such special permit for said building, structure or use, such special permit shall become null and void.

In its discretion, and for good cause, the Town Plan and Zoning Commission, upon request of the applicant, may extend for an additional one (1) year the period for the beginning of substantial construction or establishment of a use. Such extension shall be granted only once for any particular special permit.

The Town Plan and Zoning Commission may also, in its discretion and for good cause, upon request of the applicant, approve a staging time table for the start of construction or the establishment of a use, provided that such a staging time table shall include all portions of the proposed development.

I would presume that Mr. Levine's misunderstood or misquoted Mr. Mullen when he stated *"the transporting of land fill material to the site does not constitute "Site Development"!* Tens of Thousands of yards of material have been brought to the site, spread, graded and rolled in one foot lifts. Tens of thousands of dollars of invoices support this contention. And the regulations clearly state that fill can only be brought to the property under the auspices of a Special

Permit.  Therefore, the transporting of tens of thousands of yards of fill material certainly constitutes the commencement of substantial construction.

I am concerned that Mr. Mullen and Mr. Carey have improperly made a legal conclusion.  Under the law, ***any*** of the following activities that have occurred at the site constitute the beginning of "substantial construction":

1. Grubbing and Clearing of 14 acres of land;
2. The installation and construction of erosion, sedimentation and site controls.
3. Removal of and trucking of 20,000+ yards of topsoil off-site deemed unsuitable for foundations to parking lots and buildings;
4. The trucking of approximately three thousand yards of asphalt to the site for use as sub-base for roads and parking lots.
5. The trucking of over 25,000+ yards of gravel to the site.  Spread, rolled and layered in one foot lifts.  The going cost of gravel to site is approximately $11/ton.  There are 1.4 tons per cubic yard.  Therefore, this material represents approximately $275,000 yards of material.
6. The trucking of over 1,000 yards of septic sand to the site for underlayment of drainage structures.
7. Construction and installation of over 200 feet of 36" Cast Concrete pipe to redirect the watercourse as authorized by the Wetlands and Special Permits.  Cost $50,000+.
8. The filing of the deregulated wetlands.
9. Contracts with Hartford Materials to bring approximately 40,000 yards of material to the site.  This activity is ongoing from day to day.
10. The application for construction permits to build a foundation for building 800 in the building department.
11. The posting of a $50,000 construction bond with the Town of Glastonbury.

The collective value of these activities exceed $350,000.  The fact that these activities have been ongoing and unchallenged by the Zoning Enforcement Officer at all times relevant lends credence to my position. I will also note, my lawyers have found no sunset provision or required completion date for a Special Permit in the statutes or in the town's Regulations once "substantial construction" has commenced.  While my activity has been continuous, (Hartford Materials brings fill to my site weekly), my lawyers have found no requirement for a continuous activity once substantial construction has taken place.

I would immediately ask for a written retraction of Mr. Mullen's and Mr. Carey's remarks in regards to my Special Permits. I would also request a letter of retraction be issued from your office so that I may present it to my lender.

I believe Mr. Mullen's and Mr. Carey's casual and un-researched remarks may have devastating financial consequences. I believe the facts and law as to my special permits are clear. Therefore, I would ask for your immediate attention to this matter.

I would think the town of Glastonbury would have welcomed the news that the project was receiving its financing, construction would soon accelerate, back taxes would be paid and an increase in tax revenues would soon be had.

However, I am not surprised the town seeks yet another impediment in the way of my project.


Sincerely,


John Sakon
**SAKON LLC**
82 Folly Brook Lane
Manchester, CT 06040

(860) 675-4000
(860) 793-1000 (Cell)
(860) 675-4600 (Fax)

johnsakon@sakon.biz

# Exhibit G

**John Sakon**

| | |
|---|---|
| **From:** | khara dodds <khara.dodds@glastonbury-ct.gov> |
| **Sent:** | Thursday, October 3, 2019 11:31 AM |
| **To:** | John Sakon; Thomas Mocko; jonathan mullen |
| **Cc:** | Bryan Pereyo; alan levine |
| **Subject:** | RE: The Shoppes at Avalon Wetlands Permits |

John,

We will get a legal review of your request and will let you know of the results.

Thank you,

KD

**From:** John Sakon <johnsakon@sakon.biz>
**Sent:** Wednesday, October 2, 2019 10:33 PM
**To:** khara dodds <khara.dodds@glastonbury-ct.gov>; Thomas Mocko <thomas.mocko@glastonbury-ct.gov>; jonathan mullen <jonathan.mullen@glastonbury-ct.gov>
**Cc:** Bryan Pereyo <bpereyo@salesantidote.com>; alan levine <alevine@levineassociates.com>
**Subject:** The Shoppes at Avalon Wetlands Permits



October 2, 2019

Dear Khara, John and Tom,

The following statement was made by Alan Levine in his due diligence report for *The Shoppes at Avalon* Refinancing:

1

The Borrower, John Sakon, has stated a position, siting Section 12.7 of the Glastonbury Zoning Regulations, regarding "Substantial ~~completion~~ within one year." After referencing this to both the Enforcement Officer Peter R Carey, and City Planner John Mullen, they both stated that the activity that was permitted under the "Special Permit," without the issuance of a Construction Permit in place, was restricted to Site Develop only.

If substantial construction has not begun

As to the Site Development activity stated by the Borrower and sited as cause for the automatic continuance of the "Special Permit" beyond the April 4th, 2019 expiration date, both Enforcement Officer Peter R Carey, and City Planner John Mullen, stated that the transporting of land fill material to the site does not constitute "Site Development" and thus 12.7 does not apply and was so advised to Mr. Sakon during a discussion between John Sakon and City Planner John Mullen in May/June 2019, as Mr. Mullen advised me in today's call.

As to the Site Development activity stated by the Borrower and sited as cause fc the automatic continuance of the "Special Permit" beyond the April 4th, 201 expiration date, both Enforcement Officer Peter R Carey, and City Planner Joh Mullen, stated that the transporting of land fill material to the site does not constitut "Site Development" and thus 12.7 does not apply and was so advised to Mr. Sako during a discussion between John Sakon and City Planner John Mullen in May/Jun 2019, as Mr. Mullen advised me in today's call.

# LEVINE & ASSOCIATES, P.A.

LITIGATION CONSULTING
FORENSIC ACCOUNTING
FRAUD EXAMINATION

3900 Hollywood Blvd. · Suite PH-2 · Hollywood, Florida 33021 · Phone 305-893-2111 · Fax 954-507-9565
E-mail: alevine@levineassociates.com

Let us review your regulations.

2

### 12.7   Substantial Construction Within One Year

If substantial construction has not begun on a building or structure, or no use established on a lot, for which a building structure or use special permit with design approval was received from the Town Plan and Zoning

154

Commission after (effective date of these Regulations), within one (1) year from the date of issuance of such special permit for said building, structure or use, such special permit shall become null and void.

In its discretion, and for good cause, the Town Plan and Zoning Commission, upon request of the applicant, may extend for an additional one (1) year the period for the beginning of substantial construction or establishment of a use. Such extension shall be granted only once for any particular special permit.

The Town Plan and Zoning Commission may also, in its discretion and for good cause, upon request of the applicant, approve a staging time table for the start of construction or the establishment of a use, provided that such a staging time table shall include all portions of the proposed development.

I would presume that Mr. Levine's misunderstood or misquoted Mr. Mullen when he stated *"the transporting of land fill material to the site does not constitute "Site Development"!* Tens of Thousands of yards of material have been brought to the site, spread, graded and rolled in one foot lifts. Tens of thousands of dollars of invoices support this contention. And the regulations clearly state that fill can only be brought to the property under the auspices of a Special Permit. Therefore, the transporting of tens of thousands of yards of fill material certainly constitutes the commencement of substantial construction.

I am concerned that Mr. Mullen and Mr. Carey have improperly made a legal conclusion. Under the law, ***any*** of the following activities that have occurred at the site constitute the beginning of "substantial construction":

1.      Grubbing and Clearing of 14 acres of land;

2.      The installation and construction of erosion, sedimentation and site
        controls.

3

3.       Removal of and trucking of 20,000+ yards of topsoil off-site deemed unsuitable for foundations to parking lots and buildings;

4.       The trucking of approximately three thousand yards of asphalt to the site for use as sub-base for roads and parking lots

5.       The trucking of over 25,000+ yards of gravel to the site.  Spread, rolled and layered in one foot lifts.  The going cost of gravel to site is approximately $11/ton.  There are 1.4 tons per cubic yard.  Therefore, this material represents approximately $275,000 yards of material.

6.       The trucking of over 1,000 yards of septic sand to the site for underlayment of drainage structures.

7.       Construction and installation of over 200 feet of 36" Cast Concrete pipe to redirect the watercourse as authorized by the Wetlands and Special Permits.  Cost $50,000+.

8.       The filing of the deregulated wetlands.

9.        Contracts with Hartford Materials to bring approximately 40,000

yards of material to the site.  This activity is ongoing from day to day.

10.      The application for construction permits to build a foundation for building 800 in the building department.

11.      The posting of a $50,000 construction bond with the Town of Glastonbury.

The collective value of these activities exceed $350,000.  The fact that these activities have been ongoing and unchallenged by the Zoning Enforcement Officer at all times relevant lends credence to my position. I will also note, my lawyers have found no sunset provision or required completion date for a Special Permit in the statutes or in the town's Regulations once "substantial construction" has commenced.  While my activity has been continuous, (Hartford Materials brings fill to my site weekly), my lawyers have found no requirement for a continuous activity once substantial construction has taken place.

I would immediately ask for a written retraction of Mr. Mullen's and Mr. Carey's remarks in regards to my Special Permits.  I would also request a letter of retraction be issued from your office so that I may present it to my lender.

I believe Mr. Mullen's and Mr. Carey's casual and un-researched remarks may have devastating financial consequences.  I believe the facts and law as to my special permits are clear.  Therefore, I would ask for your immediate attention to this matter.

I would think the town of Glastonbury would have welcomed the news that the project was receiving its financing, construction would soon accelerate, back taxes would be paid and an increase in tax revenues would soon be had.

However, I am not surprised the town seeks yet another impediment in the way of my project.


Sincerely,


John Sakon
**SAKON LLC**
82 Folly Brook Lane
Manchester, CT 06040

(860) 675-4000
(860) 793-1000 (Cell)
(860) 675-4600 (Fax)

johnsakon@sakon.biz

---

Please consider the environment before printing a copy of this email.

---

"This communication, along with any documents, files, or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of any information contained in or attached to this communications is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing, or saving in any manner."

---

Please consider the environment before printing a copy of this email.

# Exhibit H

**John Sakon**

| | |
|---|---|
| **From:** | Tony T <tony@kgak.fund> |
| **Sent:** | Wednesday, November 27, 2019 7:10 PM |
| **To:** | John Sakon |
| **Cc:** | Tony.r@kgakfinancialgroup.com; alan levine; Bryan Pereyo; David Marcantonio; Kate Scharf |
| **Subject:** | Re: Assignment of Appraisal |

John

Once I have a legal entity, a legal project with all permits in good standing, yes I would be willing to fund your project at the following rates:

███ % interest
███ points

Close in 10 days after receipt of all of the above items mentioned in this email.

Have a Happy Thanksgiving

Tony
Fund Manager
Direct: 646 701 5372
Cell: 646-982-1088
Email: tony@kgak.fund
Website: www.kgakfinancialgroup.com

On Nov 24, 2019, at 10:53 PM, John Sakon <johnsakon@sakon.biz> wrote:

> <image002.jpg>
> <image003.jpg>
> ®

November 24, 2019

Dear Tony,

As I noted before, I never was in timely receipt of your 10/2/2019 letter as claimed in your recent email. Nor have you responded to my last email.

Does KGAK intent to fund the Avalon loan even if the local community rules my zoning permits valid?

1

As noted in our agreement $6,500 was advanced to KGAK for the payment of 3rd party reports

<image007.jpg>

These funds were to be held in escrow pursuant to the terms of the agreement.

<image008.jpg>

Given that Sakon LLC paid for the property appraisal, I would ask KGAK to assign the apprasial to Sakon LLC.  Kindly print and sign the attached form.

In addition, only the appraisal was completed at a cost of $3,400.  Therefore, since KGAK did not order the other reports, kindly order the escrow agent to refund the balance of the funds to Sakon LLC at the address below.

I am sorry we were not able to do business.  However, I think Sakon LLC did everything required of the agreement.

Sincerely,
John Sakon
**SAKON LLC**
82 Folly Brook Lane
Manchester, Connecticut 06040

860-675-4000
860-675-4600 (Fax)

johnsakon@sakon.biz

# Exhibit I

# Western Surety Company

## SITE IMPROVEMENT
### Performance Bond

Bond # ___71795397___

KNOW ALL PERSONS BY THESE PRESENTS: That we_____

___Sakon Development, LLC___
Principal, and WESTERN SURETY COMPANY, a corporation authorized to do surety business in the State of ___Connecticut_____as Surety, are held and firmly bound unto ___Town of Glastonbury___
as Obligee, in the sum of___Fifty Thousand and 00/100_____
Dollars ($ ___$50,000.00_____) lawful money of the United States of America, for which payment well and truly to be made, we bind ourselves, our heirs, executors, administrators, successors, and assigns firmly by these presents.

WHEREAS, the Principal has entered into an agreement with the Obligee, guaranteeing only that the Principal will complete site improvements as per estimate prepared by:_____
_____
_____
_____attached to and made a part hereof at certain land known as ___131 Griswold St., Glastonbury, CT 06033___
_____all of which improvements shall be completed on or before the date set forth in the agreement or any extension thereof, and the Principal provides this bond as security for such agreement.

NOW, THEREFORE, the condition of this obligation is such, that if the Principal shall carry out all the terms of said agreement relating to the site improvements only and perform all such work as set forth in the attached agreement, then this obligation shall be null and void; otherwise, to remain in full force and effect.

No party other than the Obligee shall have any rights hereunder as against the Surety.
The aggregate liability of the Surety on this bond obligation shall not exceed the sum stated above for any reason whatsoever.

SIGNED, SEALED AND DATED THIS___13th___ DAY OF_____June_____, ___2016___.

PRINCIPAL:

Sakon Development, LLC

By: _____

SURETY:

WESTERN SURETY COMPANY

By: _____
Michael J. Smith, Attorney-in-Fact

Form F7485-12-2004

# Exhibit J

DOCKET NO. HHD-CV12-6036889-S       :       SUPERIOR COURT
                                    :
TOWN OF GLASTONBURY                 :       JD OF HARTFORD
                                    :
v.                                  :       AT HARTFORD
                                    :
JOHN ALAN SAKON, ET AL              :

### AFFIDAVIT OF APPRAISER

I, Sean Hagearty of R.F. Hagearty & Associates, Inc., being duly sworn, deposes and says:

1.    I am of legal age and believe in the obligations of an oath.

2.    I make this Affidavit of my own personal knowledge and upon review of all relevant documents.

3.    My business address is R.F. Hagearty & Associates, Inc., P.O. Box 2466, Manchester, CT 06045.

4.    I am a Certified Real Estate Appraiser.  My License Number is RCG.262.  My license expires on April 30, 2019.

5.    I hereby certify that I appraised the following real property of John Alan Sakon, located in the Town of Glastonbury, Connecticut as of as of April 4, 2019: (i) that certain real property more commonly known and at various times designated as "2B Griswold Street,"

"Griswold Street Rear," or "Griswold Street" (the "Griswold Street Property"); and (ii) that certain real property more commonly known and at various times designated as "E8A Main Street," "8E Main Street," "Main Street," or "Main Street Rear" (the "Main Street Property"). The value of the Griswold Street Property as of April 4, 2019 is $370,000. The value of the Main Street Property as of April 4, 2019 is $980,000.

6.    My requested fee for the appraisal dated April 4, 2019 is $1,800 in total.

_____
Sean Hagearty

Subscribed and sworn to before
me this _10th_ day of _April_____, 2019.

_____
Commissioner of Superior Court
Notary Public

EVELYN C. THAYER
NOTARY PUBLIC
CONNECTICUT
MY COMMISSION EXPIRES AUG. 30, 2019

7561707v1

# APPRAISAL REPORT

**Property:**

Commercial Zoned Land
Assessor's Parcel E0008A Main Street and N0002B Griswold Street
Glastonbury, CT 06033
Effective Date: April 4, 2019



**Prepared for:**

Latonia Williams, Esq.
Shipman & Goodwin, LLP
One Constitution Plaza
Hartford, CT 06103-1919

**By:**

R.F. Hagearty & Associates, Inc.
P.O. Box 2466
Manchester, CT 06045

# R. F. Hagearty & Associates, Inc.

*Real Estate Analysis, Consulting and Valuation*

PO Box 2466
Manchester, CT 06045

Tel. (860) 432-4457
info@hagearty.com

April 5, 2019

Latonia Williams, Esq.
Shipman & Goodwin, LLP
One Constitution Plaza
Hartford, CT 06103-1919

Re:        **Property Valuation**
**Commercial Zoned Land**
**Assessor's Parcel E0008A Main Street**
**Assessor's Parcel N0002B Griswold Street**
**Glastonbury, CT 06033**

At your request, we have appraised the above-referenced property to provide an "as is" market value of the fee simple estate.

The appraised property consists of an assemblage of two contiguous tax parcels encompassing a total of 6.74 ± acres of Planned Travel zoned land located on the east side of Main Street, the north side of Griswold Street and the south side of the Route 3 / Route 2 interchange in the northwestern corner of Glastonbury. The subject parcels are part of a larger assemblage which also includes an abutting site controlled by the subject owner on a leasehold basis, and also by an easement over the same which provides access to some of the subject parcels. The assembled site totals 13.55 ± acres and has been approved for development with a two-phase commercial / retail complex with a total building footprint area of 94,240 ± SF. The approvals lapsed on April 4, 2019 per the Glastonbury Planning & Land Use Services office.

Please note that our inspection of the subject was limited to the exterior perimeter of the site as the entrance drive for the abutting 131 Griswold Street is closed off. We were able to walk that site in 2017 and some of the photographs taken at that time have been included in the addenda to this report for visual reference purposes.

The properties being appraised include two of the three parcels that are owned by John Alan Sakon. Mr. Sakon also owns the property known as 131 Griswold Street, which abuts both of the subject parcels and provides access to them. The fourth parcel is identified as 2960-2980 Main Street and is owned by another party. However, most of it is subject to a long-term lease and an access easement in favor of Mr. Sakon and provides access to Main Street for the E8A tax parcel.

*Continued on the following page*

Latonia Williams, Esq.
Shipman & Goodwin, LLP
Re: Parcel E0008A Main Street and Parcel N0002B Griswold Street, Glastonbury, CT
April 5, 2019
Page Two

The highest and best use for the subject parcels is for their assemblage with abutting land to facilitate the maximum commercial development. As will be addressed in the accompanying report, this is no longer the specific plan of retail development, the approvals for which just lapsed and would need to be resubmitted for. However, we have been asked to provide an "as is" market value for just the two tax parcels. Therefore, they have been valued based on their own potential for development. Since they are abutting and combined have sufficient land area to support a variety of potential commercial uses they have been appraised as a single site and the market value will be allocated among the two parcels.

This is an Appraisal Report which complies with the reporting requirements set forth under Standards Rule 2-2 (a) of the Uniform Standards of Professional Appraisal Practice. As such, it presents adequate discussions of the data, reasoning, and analyses that were used in the appraisal process. Additional supporting documentation concerning the data, reasoning, and analyses is retained in our file.

The depth of discussion contained in this report is specific to the needs of the client and for the intended use herein. The appraiser is not responsible for unauthorized use of this report. This appraisal report was prepared solely for your benefit and as such may not be quoted from, relied upon or utilized for any other purpose, by any other individual or entity, without my prior written consent.

*Continued on the following page*

Latonia Williams, Esq.
Shipman & Goodwin, LLP
Re: Parcel E0008A Main Street and Parcel N0002B Griswold Street, Glastonbury, CT
April 5, 2019
Page Three

As a result of our investigation and analysis, it is my opinion that the "as is" market value of the fee simple estate, subject to a 12-month exposure period preceding April 4, 2019, the date of our most recent inspection, is:

**ONE MILLION THREE HUNDRED FIFTY THOUSAND DOLLARS**
**($1,350,000)**

The above market value can be allocated among the two subject parcels as follows:

Parcel E00008A Main Street - $980,000
Parcel N0002B Griswold Street - $370,000

Respectfully submitted,

Sean T. Hagearty, MAI
Vice President
CT Certified General Appraiser
License No. RCG.262 / Expires April 30, 2019

# Exhibit K

| | | |
|---|---|---|
| DOCKET NO. HHD-CV16-6073692-S | : | SUPERIOR COURT |
| TOWN OF GLASTONBURY | : | J.D. OF HARTFORD |
| VS. | : | AT HARTFORD |
| JOHN ALAN SAKON, ET AL | : | MARCH 6, 2019 |

### AFFIDAVIT OF APPRAISER

The undersigned Appraiser, at the direction of the Plaintiff in the above-entitled action, respectfully represents:

1)      THAT My name is Sean T. Hagearty of R.F. Hagearty & Associates, Inc. I hold a certified commercial license, number RCG262 which expires 4/2019;

2)      THAT I have appraised the property known as 131 Griswold Street, Glastonbury, Connecticut, on ____March 3, 2019.__  I would opine the Fair Market Value to be One Million Three Hundred Twenty Thousand Dollars ($1,320,000.00); with $1,270,000_ attributable to the value of the site, and $50,000 attributable to the value of the improvements thereon;

3)      THAT I am requesting a fee for my services in the amount of $1,500.

_____
Sean T. Hagearty

Personally appeared Sean T. Hagearty, who subscribed the foregoing affidavit and swore before me this _6th_ day of March, 2019.

_____
Notary Public
My Commission Expires: 3/6/19

EVELYN C. THAYER
NOTARY PUBLIC
CONNECTICUT
MY COMMISSION EXPIRES AUG. 30, 2019

# APPRAISAL REPORT

**Property:**

Commercial Zoned Redevelopment Site
131 Griswold Street
Glastonbury, CT 06033
Effective Date: March 3, 2019



**Prepared for:**

Christopher J. McCarthy, Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103-1919

**By:**

R.F. Hagearty & Associates, Inc.
P.O. Box 2466
Manchester, CT 06045

# R. F. Hagearty & Associates, Inc.
*Real Estate Analysis, Consulting and Valuation*

PO Box 2466
Manchester, CT 06045

Tel. (860) 432-4457
info@hagearty.com

March 5, 2019

Christopher J. McCarthy, Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103-1919

**Re:**     **Property Valuation**
            **131 Griswold Street**
            **Glastonbury, CT 06033**

At your request, we have appraised the above-referenced property to provide an "as is" market value of the fee simple estate.

The appraised property consists of a 3.40 ± acre parcel of Planned Travel zoned land on the north side of Griswold Street, adjacent to the off-ramp for Route 2 / Route 3 interchange in the northwestern corner of Glastonbury, Connecticut. The site is currently improved with a one-story on slab commercial building that contains 11,610 ± SF of gross building area. The building is presently vacant and appears to have been so for several years. It was most recently leased by a church group. Please note that our inspection of the subject was limited to the exterior perimeter of the site as the entrance drive is closed off. We were able to walk the site in 2017 and some of the photographs taken at that time have been included in the addenda to this report for visual reference purposes.

As will be detailed in the accompanying report the subject is one of four parcels that have been assembled for a proposed retail / commercial development to include the existing building footprint. The most likely plan of development would involve razing the structure and creating new building area new construction over the existing building footprint. Since we have not been asked to appraise the entire assemblage but rather *only* the subject parcel we have considered the potential value of the existing building as part of the highest and best use for the subject as a standalone parcel. Our market value is based on the ***extraordinary assumption*** that the interior condition is consistent with the exterior. If we are granted an opportunity to make an interior inspection of the subject and the inspection reveals issues that warrant revisions to the valuation analysis we reserve the right to amend our market value opinion accordingly.

***Continued on the following page***

Christopher J. McCarthy, Esq.
Halloran & Sage, LLP
Re: 131 Griswold Street, Glastonbury, CT
March 5, 2019
Page Two

As noted the subject is one of four parcels that are either owned by and/or controlled on a
leasehold basis by the subject owner, John Alan Sakon. The assembled site totals 13.55 ±
acres and is approved for development with a two-phase commercial / retail complex
with a total building footprint area of 94,240 ± SF. The footprint area includes the
existing building coverage on the subject parcel, and the subject site provides one means
of access to the other parcels.

The other properties include two vacant sites totaling 6.74 acres that are owned by John
Alan Sakon. The fourth parcel is identified as 2960-2980 Main Street and is owned by
another party. However, most of it is subject to a long-term lease and an access easement
in favor of Mr. Sakon and provides access to Main Street for the E8A tax parcel. The
highest and best use for the subject parcel is for its assemblage with the abutting land to
facilitate the maximum commercial development. As will be addressed in the
accompanying report, this may no longer be the specific plan of retail development
currently approved. However, we have been asked to provide an "as is" market value for
just the 131 Griswold Street parcel. Therefore, it has to be valued based on its own
potential for development or assemblage.

This is an Appraisal Report which complies with the reporting requirements set forth
under Standards Rule 2-2 (a) of the Uniform Standards of Professional Appraisal
Practice. As such, it presents adequate discussions of the data, reasoning, and analyses
that were used in the appraisal process. Additional supporting documentation concerning
the data, reasoning, and analyses is retained in our file.

The depth of discussion contained in this report is specific to the needs of the client and
for the intended use herein. The appraiser is not responsible for unauthorized use of this
report. This appraisal report was prepared solely for your benefit and as such may not be
quoted from, relied upon or utilized for any other purpose, by any other individual or
entity, without my prior written consent.

*Continued on the following page*

Christopher J. McCarthy, Esq.
Halloran & Sage, LLP
Re: 131 Griswold Street, Glastonbury, CT
March 5, 2019
Page Three

As a result of our investigation and analysis, it is my opinion that the "as is" market value of the fee simple estate, subject to a 12-month exposure period preceding March 3, 2019, the date of our most recent inspection, is:

**ONE MILLION THREE HUNDRED TWENTY THOUSAND DOLLARS**
**($1,320,000)**

Respectfully submitted,

Sean T. Hagearty, MAI
Vice President
CT Certified General Appraiser
License No. RCG.262 / Expires April 30, 2019