**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| In Re: | ) | Case No. 19-21619 (JJT) |
| | ) | |
| JOHN ALAN SAKON, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | RE: ECF No: 773 |
| | ) | |

**MEMORANDUM OF DECISION APPROVING**
**TRUSTEE'S SALE PROCEDURES REGARDING**
**MOTION TO SELL REAL PROPERTY UNDER 11 U.S.C. § 363**

The Chapter 7 Trustee, Bonnie C. Mangan (the "Trustee"), has filed a motion (ECF No. 773, the "Sale Motion") seeking the Court's approval to sell three pieces of contiguous commercial real estate (the "Sale") owned by the Debtor, John Alan Sakon, with the goal of liquidating the bankruptcy estate's remaining assets and bringing this case to a close. The Trustee proposes a sale by public auction under 11 U.S.C. § 363(b) and requests that final approval of the sale of property be free and clear of all liens and interests under 11 U.S.C. § 363(f). The Town of Glastonbury (the "Town") has filed a secured claim for over $1.3 million in taxes due on the properties. Main St. Group, LLC ("Main St."), the first priority secured mortgagee and the proposed stalking horse bidder, has filed a claim for over $6.1 million related to its note and mortgage on the properties. To facilitate the Trustee's proposed sale, Main St. has committed to several significant financial undertakings. Main St. also seeks a release of certain alleged claims by the Debtor against Main St. (the "Release") as a condition of proceeding with its proposed purchase and sale agreement should Main St. be the successful bidder at the auction. The Trustee has filed a proposed order setting forth procedures for the Sale (ECF No. 902, the "Sale Procedures Order"), including provisions for Main St.'s stalking horse bid, submission of bids by third parties, as well as the Release sought by Main St. and the released parties. The

Trustee asks the Court to approve her proposed Sale Procedures Order, including the proposed Release, so that she may proceed with the Sale by public auction.

The Debtor opposes the Trustee's Sale Motion and has filed a motion to convert his Chapter 7 case to a case under Chapter 11 of the Bankruptcy Code (ECF No. 694, the "Conversion Motion") in conjunction with his efforts to bring another potential buyer to the table in an extended and conditional sale transaction. The Debtor has proceeded through the entirety of this case as a *pro se* party. He is the only party that objects to the Trustee's proposed Sale. Main St., the Town, and the United States Trustee ("U.S. Trustee") have vigorously opposed the Debtor's Conversion Motion through several objections (*see* ECF No. 697, 790, 853) and have all expressed support for the Trustee's proposed Sale and Sale Procedures Order during hearings before this Court. Main St. and the Town are the two largest creditors of the Debtor. Their collective claims dwarf the unsecured claims in this case, and their proofs of claims are undisputed.

On May 25, 2023, the Court held a hearing on the Trustee's Sale Motion, the Debtor's Conversion Motion, and a variety of other related filings of the Trustee and Debtor, including a collection of motions and objections filed by the Debtor in the week preceding the scheduled hearing.[1] The Court had reserved decision on whether to proceed with an evidentiary hearing and

---

[1] In the week prior to the hearing on May 25, the Debtor filed the following motions:

    a)   Objection to Scheduling Orders Appearance of Preference, Bias and Predetermination (ECF No. 834, filed May 17, 2023);

    b)   Objection to Employ KW Legacy Partners Commercial as Real Estate Broker (ECF No. 816, filed May 19, 2023);

    c)   Motion for Extension of Time to Object to Application to Employ to May 22, 2023, Claim of Prejudice (ECF No. 817, filed May 19, 2023);

    d)   Motion to Strike Appearance of Andrea O'Connor (ECF No. 832, filed May 19, 2023);

    e)   Motion to Strike Objection to Motion to Reconvert and Motion to Sell 2B Griswold Street, 8E Main Street and 131 Griswold Street Free and Clear of Liens and to Approve Sale Procedures (ECF No. 833, filed May 21, 2023);

    f)   Objection to Remote Hearing, Appearance of Pre-Determination, Motion to Recuse (ECF No. 836, filed May 24, 2023); and

    g)   Motion for Accommodation (ECF No. 837, filed May 23, 2023).

scheduled continued hearing dates for the following week. ECF No. 850. On June 1, 2023, the parties appeared for a continued hearing, during which the Court heard further arguments on the Trustee's Sale Motion and the Debtor's Conversion Motion, among other filings. The Court thereafter scheduled an evidentiary hearing on the Trustee's Sale Motion and the Debtor's Conversion Motion for June 7, 2023 and June 8, 2023. ECF No. 862. On June 7, 2023, the parties appeared for a continued hearing on the Sale Motion and the Conversion Motion. The Debtor failed to appear, despite receiving proper notice of the continued hearing date.[2] The Court proceeded with the hearing, as the Trustee, Main St., and the U.S. Trustee were all present. The Court preliminarily approved the Trustee's Sale Procedures Order on the record, subject to review of the Trustee's submission of a revised broker's agreement. By order dated June 8, 2023 (ECF No. 897), the Court also approved the Trustee's Amended Application to Employ Avison Young New England, LLC ("Avison Young") (ECF No. 860) as the real estate broker for the Trustee.

The Court has scheduled a hearing for August 2, 2023 on the Trustee's proposed sale free and clear. After further marketing of the properties, the Trustee will hold her auction the day prior to the hearing on August 1, 2023. In addition, following arguments by Main St., the Town, and the U.S. Trustee, the Court denied the Debtor's Conversion Motion and determined, on the basis of the record in this case and the Debtor's unavailing arguments, that no evidentiary hearing would take place on that Motion.

---

[2] The Debtor was present in the courtroom at the time the Court informed all parties that the continued hearing would take place on June 7, 2023 and June 8, 2023. The Court confirmed those dates with all parties in the courtroom twice to ensure there was no confusion. The Court subsequently issued a notice of hearing reflecting those same dates, which was properly served on the Debtor by email. (ECF No. 862). The Debtor also filed a motion requesting that the Court issue a subpoena (ECF No. 866) and provided a completed subpoena form that commanded the witness to appear on June 7, 2023 to provide testimony, thus evidencing the Debtor's understanding that the continued hearing would begin on June 7, 2023. The Court issued a notice of hearing for this motion for the June 7, 2023 hearing date, which was properly served on the Debtor by email as well. ECF No. 878.

For the reasons that follow, the sale process proposed by the Trustee in her Sale Motion is approved.[3] Any objections by the Debtor (ECF No. 812) are expressly overruled. The Court will enter the Trustee's Sale Procedures Order (ECF No. 901) substantially contemporaneous with this decision.

## I.    JURISDICTION

The United States District Court for the District of Connecticut (the "District Court") has jurisdiction over the instant proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and (b)(1) and the General Order of Reference of District Court dated September 21, 1984. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) concerning the administration of the bankruptcy estate.

## II.    BACKGROUND

The background of this case is derived from the record and several state foreclosure proceedings and associated appeals, of which the Court has taken judicial notice. Each of these cases reflects a docket riddled with delay, frivolous motions and appeals, and endless efforts by the Debtor to reassert arguments without substantive merit, including arguments that were already advanced, waived, or overruled.

### A.  The Properties

The subject assets of the bankruptcy estate are the following three contiguous parcels of real property (collectively, the "Properties") located in Glastonbury, Connecticut:

---

[3] This decision is intended to reaffirm and supplement the Court's rulings on this matter made upon the record of its hearings on the Motion.

    a.   2B Griswold Street, Glastonbury, CT 06033 (now known as 95 Griswold Street) (the "2B Griswold Property");

    b.   8E Main Street, Glastonbury, CT 06033 (now known as 2938 Main Street) (the "8E Main Property"); and

    c.   131 Griswold Street, Glastonbury, CT 06033 (the "131 Griswold Property").

The Debtor acquired the Properties pursuant to a deed dated July 26, 2004 that is recorded in the Glastonbury Land Records in Volume 2088, Page 0050. The Properties, located along Route 2, consist of approximately 10 acres of commercial land improved with an approximately 11,000-square-foot building. As of the date of this decision, the Properties are ostensibly without any permits to build "as of right" under applicable local zoning regulations. The Debtor's efforts to build a commercial facility on the Properties, disputes with the Town over permitting, and unsuccessful financing efforts have spanned decades.

### B. The Liens, Claims, and Encumbrances

The Debtor has not paid any real property taxes on the Properties in over a decade. In 2012, the Town commenced a real property tax lien foreclosure action in the Connecticut Superior Court against the Debtor due to his failure to pay real property taxes for the 2B Griswold Property and the 8E Main Property. That case is captioned *Town of Glastonbury v. Sakon*, Docket No. HHD-CV12-6036889-S (Conn. Super. Ct. filed 2012) (the "2012 Foreclosure Action"). On January 4, 2016, the Superior Court granted summary judgment on the Town's complaint. The Town moved for a judgment of foreclosure and submitted an updated appraisal of the 2B Griswold and 8E Main Properties. On August 8, 2016, after hearing arguments on the Town's motion, the Superior Court entered a judgment of foreclosure by sale and awarded the Town its requested attorney's fees. The Debtor, availing himself of nearly every delay tactic possible, made numerous filings directly challenging the Superior Court's foreclosure judgment

and the award of attorney's fees. When those efforts proved unsuccessful, he appealed the decision to the Connecticut Appellate Court.[4] Nearly two years later, on August 28, 2018, after the Debtor had filed multiple appeals attacking the foreclosure judgment, the Appellate Court affirmed the Superior Court's judgment of foreclosure.

In 2016, the Town commenced a real property tax lien and sewer lien foreclosure action in the Connecticut Superior Court against the Debtor due to his failure to pay real property taxes and sewer use charges for the 131 Griswold Property. That case is captioned *Town of Glastonbury v. Sakon*, Docket No. HHD-CV16-6073692-S (Conn. Super. Ct. filed 2016) (the "2016 Foreclosure Action," and together with the 2012 Foreclosure Action, the "Town Foreclosure Actions"). On November 13, 2017, the Superior Court entered a judgment of strict foreclosure. In January 2018, the Debtor appealed the judgment to the Connecticut Appellate Court and sought a stay of the judgment pending the outcome of the appeal. The Appellate Court denied the Debtor's request for a stay, dismissed the appeal, and denied the Debtor's subsequent

---

[4] The Debtor challenged the foreclosure judgment in various ways, first by filing a motion for reconsideration and then by filing a motion to open the judgment. The Superior Court denied those attempts. The Debtor then appealed the foreclosure judgment to the Connecticut Appellate Court, but then separately sought an appeal of the foreclosure judgment in an amended appeal that remained pending and was related to the Superior Court's prior decision striking his defenses from his answer. *Town of Glastonbury v. Sakon*, Docket No. AC 39907, Connecticut Appellate Court. On October 24, 2016, the Superior Court entered an order finding the Town's attorney's fees in the foreclosure action were reasonable. The Debtor filed a second amended appeal that misleadingly referred to the order awarding attorney's fees as the final judgment of foreclosure. On December 8, 2016, upon motion by the Town, the Appellate Court entered an order dismissing the Debtor's first and second amended appeals related to the foreclosure judgment as untimely and assigned new docket numbers for the portions of the appeals that remained pending.

The Debtor proceeded to file a third and fourth amended appeal that challenged the foreclosure judgment, among other issues. By order dated February 8, 2017, the Appellate Court dismissed the Debtor's appeal of the Superior Court's judgment of foreclosure as untimely. The Debtor's appeal of the attorney's fees remained pending. In his briefing, despite the Appellate Court's prior dismissal order, the Debtor continued to challenge the foreclosure judgment; the Town thus produced extensive briefing arguing that the dismissal order precluded the Debtor's further attempts to appeal that judgment. Finally, on August 28, 2018, after briefing and argument, the Appellate Court affirmed the Superior Court's judgment of foreclosure.

In September 2018, the Debtor made a final attempt to challenge the Appellate Court's order by moving for reconsideration, but the Appellate Court never considered the motion because the Debtor failed to meet certain requirements under the Connecticut Practice Book and never amended his motion to comply with the applicable rules despite having notice of the deficiencies.

motion for reconsideration. *Town of Glastonbury v. Sakon*, Docket No. AC 41285, Connecticut Appellate Court.

In the Town's Foreclosure Actions, the Town's appraisal for the Properties totaled $1,379,800.00. The Superior Court in the Town Foreclosure Actions collectively found and valued the Properties at $2,600,000.00 as of June 20, 2019. The Town's secured debt for the taxes, sewer charges, interest, and lien fees due through March 31, 2023, and its legal fees and costs through February 28, 2023, is $1,361,218.26 (the "Tax Liens"). The Tax Liens are accruing interest at 18% per annum, with further legal fees and costs accruing monthly.

Main St. holds an undisputed Amended, Restated and Consolidated Promissory Note in the original principal amount of $2,720,755.85 (as amended pursuant to an Omnibus Loan Modification Agreement dated October 28, 2013, a further Omnibus Loan Modification Agreement dated December 12, 2013, and a Settlement Agreement dated March 14, 2016 (collectively, the "Note")). Main St.'s Note is secured by a valid and perfected first-priority mortgage on the Properties that is prior in right to all liens other than the Town's Tax Liens and is recorded in the Glastonbury Land Records in Volume 2524, Page 28 (the "Mortgage").

The Note matured in 2014. After the maturity date, on December 29, 2014, Main St.'s predecessor in interest, Cyhani Ventures, Inc., filed its own foreclosure action in Connecticut Superior Court against the Debtor for failure to make timely payments under the terms of the Note. That case is captioned *Cyhani Ventures, Inc. v. Sakon*, HHD-CV14-6056422-S (the "Main St. Foreclosure Action" and together with the Town Foreclosure Actions, the "Foreclosure Actions"). The case has not yet proceeded to a foreclosure judgment. Prepetition, the case was substantially delayed due to the Debtor's extensive motion practice. The automatic stay imposed by the Debtor's bankruptcy filing halted any further activity. As of March 30, 2023, Main St.'s

secured debt was $6,184,020.53, which continues to accrue interest, legal fees, and costs (the "Main St. Claim").

On September 19, 2019 (the "Petition Date"), just days before a foreclosure sale of the Properties pursuant to the Foreclosure Actions, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. On May 31, 2020, upon motion by the Town, notice and hearing, the Court issued a Memorandum of Decision (ECF No. 250, the "Conversion Order") converting the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code. *In re Sakon*, 617 B.R. 7 (Bankr. D. Conn. 2020), *aff'd sub nom. Sakon v. A&F Main St. Assocs., LLC*, No. 3:20-CV-00353 (JAM), 2021 WL 165014 (D. Conn. Jan. 19, 2021). Attorney Bonnie Mangan was subsequently appointed as the Chapter 7 Trustee (the "Trustee"). The Debtor appealed the Conversion Order and sought a stay pending appeal, which this Court denied. ECF No. 377. On January 19, 2021, Judge Jeffrey A. Meyer of the United States District Court for the District of Connecticut affirmed the Court's Conversion Order. ECF No. 422. *Sakon v. A&F Main St. Assocs., LLC*, No. 3:20-CV-00353 (JAM), 2021 WL 165014 (D. Conn. Jan. 19, 2021).

On January 19, 2023, Main St. and the Town filed a Joint Motion for Relief from the Automatic Stay (ECF No. 666), seeking relief from stay under 11 U.S.C. § 362(d) to proceed with the Foreclosure Actions because of a lack of adequate protection, the Town's increasing tax lien, and the Debtor's failure to timely file and produce his federal and state tax returns. This Court granted the motion on February 15, 2023. ECF No. 682 (the "Stay Relief Order").

Consequently, the Town and Main St. are now free to exercise their state law foreclosure rights,[5] which would likely render the Chapter 7 estate without equity.

The following entities and individuals on the record of title to the Properties may have an interest in the Properties:

a. HOC Holdings, LLC ("HOC") may claim an interest in the Properties subordinate to Main St. by virtue of a certificate of lien in the amount of $25,000.00, a Certificate of Lien in favor of Jameel B. Madhani and HOC in the amount of $175,000.00, and an Open-End Mortgage Deed from the Debtor to HOC in the original principal amount of $227,458.00.

b. Red Door Construction, LLC ("Red Door") may claim an interest in the Properties subordinate to Main St. by virtue of a Certificate of Mechanic's Lien in the amount of $8,000.00 dated October 13, 2016.

c. Jameel B. Madhani ("Madhani") may claim an interest in the Properties subordinate to Main St. by virtue of a Certificate of Lien in the amount of $5,000.00 and a Certificate of Lien in favor of Madhani and HOC in the amount of $175,000.00.

d. Superior Products Distributors, Inc. ("Superior Products") may claim an interest in the Properties subordinate to Main St. by virtue of a Mechanic's Lien in the amount of $10,185.23 dated October 24, 2016 and a Judgment Lien in the amount of $21,203.65 dated September 5, 2017.

Collectively, the interests of HOC, Red Door, Madhani, and Superior Products are referred to herein as the ("Junior Liens"). The Debtor may also claim an interest in the Properties by virtue of a Lis Pendens Notice dated January 21, 2023. A summary of the liens, claims, and encumbrances on the Properties is as follows:

---

[5] Although the Debtor appealed the Stay Relief Order, there is no stay pending his appeal. The Debtor's appeal of this order remains pending before Judge Omar A. Williams in the United States District Court for the District of Connecticut. *Sakon v. Main St. Group, LLC*, Docket No. 3:23-cv-00250 (OAW) (D. Conn., filed February 24, 2023).

| Town Tax Liens | $ 1,361,218.26 |
|---|---|
| Main St. Note and Mortgage | $ 6,184,020.53 |
| HOC | $ 427.458.00 |
| Red Door | $ 8,000.00 |
| Madhani | $ 5,000.00[6] |
| Superior Products | $ 21,203.65[7] |
| Total | $ 8,006,900.44 |

### C.  Potential Tax Consequences of the Sale, the Debtor's Tax Returns, and the Court's Entry of Civil Contempt Charges Against the Debtor

Since her appointment, the Trustee has attempted to explore and structure a sale of the Properties to several potential buyers. The Trustee began negotiating with Main St. shortly after it received an assignment of the Note and Mortgage in 2021. With a current combined federal and state long-term capital gains tax rate of approximately 27%, a sale of the Properties could generate a substantial tax liability for the bankruptcy estate. Before the Trustee could entertain an offer to purchase the Properties, she needed to perform a capital gains analysis to determine the tax implications of any sale. Unfortunately, the Debtor had failed to prepare and file his prepetition tax returns for several years, which made it impossible for the Trustee to determine the potential substantial tax consequences of a sale and significantly hindered the Trustee's orderly and strategic efforts to administer the Chapter 7 estate.

On December 9, 2021, after multiple failed attempts to obtain the Debtor's tax returns voluntarily, the Trustee filed a Motion for Order (ECF No. 479) to compel the Debtor to file his

---

[6] The 2017 Certificate of Lien in the amount of $175,000 is included in the HOC claim.

[7] The Trustee asserts that the Judgment includes the 2016 Mechanic's Lien debt.

missing federal and state tax returns for the tax years 2008 and 2014 through 2020. Pursuant to the Court's Order granting the Trustee's motion (ECF No. 490, the "Tax Return Order"), the Debtor was directed and compelled by the Court to file all outstanding federal and state tax returns, as well as any other outstanding tax returns due to the State of Connecticut or any other taxing authority (hereinafter collectively referred to as the "Tax Returns") within forty-five (45) days of the date of the Tax Return Order.

The entry of the Tax Return Order marked the beginning of a sustained and tedious year-long effort by the Court and the parties to compel the Debtor to file his Tax Returns. Despite several orders requiring the Debtor to comply and file his Tax Returns in accordance with his obligations under the Bankruptcy Code and the Internal Revenue Code, the Debtor remained defiant. As time progressed and the Debtor remained in noncompliance with the Tax Return Order, the outstanding Tax Returns grew to include the tax years 2021 and 2022. On August 26, 2022, Main St. filed a Motion for Order (ECF No. 562) directing the Debtor to file and produce copies of his Tax Returns. In connection with the Trustee's and Main St.'s motions, the Court entered a total of twenty-two (22) orders requiring compliance from the Debtor, requiring the Debtor to show cause why sanctions should not issue against him, or addressing the Debtor's unsupported claims of various medical issues which he alleged interfered with his ability to file his Tax Returns.[8]

The Court twice held the Debtor in civil contempt on various grounds related to his recalcitrance, disrespect towards the Court and the other parties, and offensive behavior during court proceedings. ECF No. 613, 655, 656. In its Second Order of Civil Contempt, the Court noted that the Debtor had "shown that he is not afraid to repeatedly obfuscate the truth and

---

[8] The series of orders issued by the Court in connection with achieving the Debtor's compliance are as follows: ECF No. 490–91, 493, 501, 505, 510, 520, 526, 541, 585, 588, 598, 609, 613, 630, 652, 654, 655–56, 716, 719, and 721.

outright lie to get his way or feign compliance with the Court's orders." ECF No. 655 at 2. The Court further noted that "[t]he Debtor's repeated attempts to evade the requirements imposed by the Bankruptcy Code while insisting that his own, constantly changing, set of rules should apply to this proceeding have reached a breaking point such that the administration of this bankruptcy estate has become nearly impossible." ECF No. 655 at 3.

Finally, under the tangible and imminent threat of incarceration connected with the civil contempt charges, and with substantial efforts from the Trustee and legal counsel for the Internal Revenue Service, the Debtor purged his contempt charges by filing his Tax Returns. ECF No. 716, 721. The Trustee, in reliance thereon, has structured this Sale with the assistance of her accountants. The Debtor's Tax Returns remain under review by the appropriate federal and state taxing authorities.

On January 13, 2023, within days of the Court's entry of civil contempt charges, the Debtor commenced a lawsuit raising seemingly unrelated claims in the District Court against the undersigned and the Bankruptcy Court, as well as Main St., the Town, and several other parties.[9] The lawsuit alleges, *inter alia*, that the Court violated the Debtor's constitutional rights under the Fifth and Sixth Amendments "by threatening an illegal incarceration of the [D]ebtor and denying the [D]ebtor the right to counsel while facing incarceration." ECF No. 836 at 1; *see also Sakon v. Town of Glastonbury*, 3:23-cv-00053 (AWT). The Debtor's remaining claims against Main St. and the Town pertain to the Properties. The Debtor alleges that the Properties have no uses as of right under the Town's zoning regulations and that any use of the Properties requires a Special Permit issued by Town authorities, which he argues the Town has no legal obligation to issue.

---

[9] To the extent the suit against Main St. and the Town is founded upon prepetition wrongs or rights, it is property of the Chapter 7 estate and the claims do not belong to the Debtor.

The Debtor asserts that his inability to pay the taxes on the Properties is the direct consequence of the Town's "inverse condemnation" of the Properties.

The Debtor also asserts a claim against the Town under 42 U.S.C. § 1983 and the Racketeering Influence and Corrupt Organizations Act of 1970 pertaining to the Town's Special Permit process. He alleges that the Town engaged in a long-standing racketeering scheme where Town officials would deny permits for a commercial property, place the property into tax foreclosure, and then acquire the property before selling it to insiders with zoning approvals for a considerable profit. He alleges the Town carried out this scheme in communities comprised of racial minorities and alleges that the Town successfully applied the scheme to over 100 acres of commercial land, which allegedly resulted in hundreds of millions of dollars in profit to the Town.

The Debtor further alleges that the Town used this scheme to create a local monopoly of supermarkets in favor of Stop & Shop Supermarkets. This aspect of the scheme involves allegations that the Town denied a Special Permit for the Debtor's Properties while allowing Stop & Shop to build a supermarket on a piece of property without the necessary permits. In addition, the Debtor alleges that the Town created and funded a group called The Glastonbury Coalition for Sensible Growth for the sole purpose of derailing the Debtor's development efforts and giving Stop & Shop a monopoly. The Debtor makes surprising allegations that the Town sent people to harass the Debtor and stop his investigation into the coalition and even murdered an attorney to keep the coalition's source of funding a secret.

The United States Attorney filed a motion to dismiss the claims against the undersigned and the Bankruptcy Court based upon absolute judicial immunity. The Debtor thereafter agreed

to voluntarily withdraw his claims against the undersigned and the Bankruptcy Court. The rest of the action remains pending before Judge Alvin W. Thompson in the District Court.

In the days leading up to the May 25 hearing on the Sale Motion and Conversion Motion, the Debtor filed a motion for the Court to recuse itself (ECF No. 836, the "Recusal Motion") premised on similar allegations to his federal lawsuit, with the additional argument that the Court had violated Canon 3 of the Code of Conduct for United States Judges. After several hours of argument during the May 25 hearing, in the absence of good cause, the Court denied the Debtor's Recusal Motion for the reasons stated on the record. ECF No. 851.

### D.  The Proposed Sale

#### 1.  The Stalking Horse Bid

The Trustee proposes a public auction of the Properties under 11 U.S.C. § 363. Main St. has offered to purchase the Properties by paying the Town's Tax Liens, credit bidding a portion of its mortgage debt, paying cash to the bankruptcy estate, and voluntarily subordinating any unpaid portion of its debt to all other creditors of the bankruptcy estate (the "Stalking Horse Bid"). The Trustee has negotiated a Purchase and Sale Agreement with Main St. memorializing the Stalking Horse Bid, which is subject to the Court's approval (the "Stalking Horse PSA"). The terms of the Stalking Horse PSA provide that Main St. will pay a total of $2,600,000.00 (the "Purchase Price") for the purchase of the Properties free and clear of all liens, claims, encumbrances, and other interests except for permitted encumbrances expressly set forth in the Stalking Horse PSA. The Stalking Horse PSA provides that the Purchase Price will be paid as follows:

a. Main St. will immediately advance the sum of $10,000.00 (the "Up-Front Expenses") to the Trustee to allow the Trustee to fund initial Sale-related expenses, including obtaining liability insurance on the Properties pending a sale. Main St.'s payment of Up-Front Expenses will be credited to its Purchase Price.

b. At closing, Main St. shall pay $290,000.00 cash to the Bankruptcy Estate (the "Cash Consideration"). The Cash Consideration shall be credited toward the total Purchase Price.

c. At closing, Main St. shall pay the amount of the Town's Tax Liens due as of the date of closing (the "Closing Date"), which is estimated to be approximately $1,361,218.26 (as of March 31, 2023, including legal fees and expenses as of February 28, 2023), to satisfy any outstanding taxes, sewer charges, interest, and attorneys' fees and costs due to the Town.

d. At closing, Main St. will credit bid the balance of the Purchase Price (the "Credit Bid"), which is estimated to be approximately $956,701.53.

Upon closing, Main St. will deduct its Credit Bid from its claim against the bankruptcy estate and will consensually subordinate any remaining amount of its debt to all other allowed claims against the bankruptcy estate. As a result of Main St.'s funding a portion of its Purchase Price in cash and its agreement to subordinate its remaining unsecured debt, the Trustee estimates that there will be approximately $300,000.00 in funds available for distribution to unsecured creditors.[10] Based upon Main St.'s credit bid, its agreement to pay the tax debt on the Properties as well as the Up-Front Expenses and the Cash Consideration, along with its voluntary agreement to subordinate its debt, Main St.'s total bid is an equivalent bid of at least $7.9 to 8 million to the Chapter 7 estate. The Properties will be sold to Main St. in "As Is" "Where Is" and "How Is" condition. The Stalking Horse Bid, however, is contingent upon the taxing authorities' acceptance of the Debtor's Tax Returns.

If the Sale is consummated with a buyer other than Main St., the bankruptcy estate will be required to repay Main St. the Up-Front Expenses upon the closing of such sale as an advance

---

[10] These benefits will be garnered by the estate regardless of who prevails at an auction of the Properties.

of a Chapter 7 administrative expense. In the event another potential buyer does not submit a better offer, the Trustee will proceed with the Stalking Horse PSA with Main St. The Debtor's pending personal injury claim in the Connecticut Superior Court under the caption *Sakon v. Roberts*, HHD-CV20-6130471-S will remain as a potential residual asset of the bankruptcy estate to fund additional creditor recoveries.

　　　　　2.　*The Released Claims*

　　　　In his Schedule A/B belatedly disclosing his assets, the Debtor attached an addendum titled "33. Schedule of Potential and Pending Claims Against Third Parties" describing potential claims that he believed were assets of the bankruptcy estate. ECF No. 40 at 12–18. Approximately three years after filing his bankruptcy petition, the Debtor amended this list of claims by filing a Revised and Amended Schedule of Potential and Pending Claims against Third Parties (ECF No. 689) and a Second Revised and Amended Schedule of Potential and Pending Claims Against Third Parties (ECF No. 690) (ECF No. 689 and 690 are collectively referred to as the "Schedule of Potential Claims"). In the Schedule of Potential Claims, the Debtor has alleged certain claims against Main St. and its owners arising from an unspecified real estate transaction that appears to have occurred prepetition. The Debtor references a one-page confidentiality agreement dated October 13, 2015 related to a refinancing, purchase, and/or joint venture agreement for The Shoppes at Avalon in Farmington, Connecticut. ECF No. 690 at 7 (the "Confidentiality Agreement"). The Confidentiality Agreement is signed by the Debtor and Domenic Carpionato (the owner of CARP Realty, LLC) and the Carpionato Real Estate Group. The Debtor asserts that he agreed to furnish confidential information to Domenic Carpionato and John Cafasso, a real estate broker, under the terms of the Confidentiality Agreement. Paragraph 5 of the Confidentiality Agreement states "[t]he undersigned agrees not to present or make any offer to do business with the parties and/or current lenders concerning the items noted above

without doing so thru [sic] the offices of the Company." The Debtor asserts that Domenic

Carpionato and John Cafasso violated this provision of the Confidentiality Agreement by "doing

business with the creditor Cyhani Ventures, Inc. without doing so thru [sic] the offices of

Sakon." ECF No. 690 at 3. The Debtor further asserts similar claims against several owners of

Main St. for violating the Confidentiality Agreement, including JCJ Realty1 LLC, Millennium

Trust Company, Griswold-Main LLC, Mithos LLC, Consoli Bortolan Law Group LLC, Louis

Proto, and John Gagliardi.

      The potential claims asserted by the Debtor against Main St., described in the Schedule of

Potential Claims, lack sufficient particularity for the Court to meaningfully assess the merits of

these claims. The Court asked the Debtor to explain, with greater particularity, the nature of

these claims during hearings but the Debtor was unable to provide any clarity on this issue. The

Trustee has investigated and evaluated the potential claims and causes of action against Main St.

and does not believe them to be of significant value or have a meaningful prospect of success.

She believes the associated litigation expenses would exceed the value of any such claims and

causes of action.[11] Her counsel has dutifully surveyed for the Court the material and practical

considerations on the record that militate in favor of resolving these claims in connection with

the assurances achieved from Main St. in the sale process.

      As consideration for the substantial value and benefit Main St. has agreed to provide to

the Chapter 7 bankruptcy estate through the Stalking Horse PSA, upon the approval of the Sale

Procedures Order, the Trustee (on behalf of the bankruptcy estate) has proposed to release Main

St. (and any individuals and entities affiliated with Main St. Group including Griswold-Main

---

[11] The Trustee is otherwise without resources to obtain legal counsel for such purposes and the existence of significant issues on liability, causation, and damages suggests that she refrain from speculative litigation and endorse the approach in the sale order to monetize Main St.'s desire for closure.

LLC, Mithos LLC, Millennium Trust Company LLC, JCJ Realty 1 LLC, Consoli Bortolan Law

Group LLC, Domenic Carpionato, Louis Proto and John Gagliardi) from any and all claims or

causes of action arising from the Properties, the Note, the Main St. Foreclosure Action and the

Sale, including but not limited to all claims scheduled by the Debtor in his Schedule of Potential

Claims.

## III.    DISCUSSION

### A.  The Sale

Section 704(a)(1) of the Bankruptcy Code directs that a Chapter 7 trustee shall "collect

and reduce to money the property of the estate for which such trustee serves, and close such

estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. §

704(a)(1). This provision gives the trustee extensive authority over the debtor's assets.

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate . . . ." 11 U.S.C. § 363(b). Thus, although there is no requirement for the trustee to seek

court approval before selling assets under section 704(a)(1), the trustee must comply with the

"notice and a hearing" requirement under section 363(b)(1) when selling assets outside the

ordinary course of the debtor's business.

Court approval of the trustee's motion to sell is appropriate where the trustee has

demonstrated a sound business justification for the proposed transaction. *See In re Chrysler LLC*,

576 F.3d 108, 117–18 (2d Cir. 2009), citing *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d

Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the

'judge determining [the] § 363(b) application expressly find[s] from the evidence presented

before [him or her] at the hearing [that there is] a good business reason to grant such an

application.'") (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir. 1983)); *In re Gen. Motors Corp.*, 407 B.R. 463, 491 (Bankr. S.D.N.Y. 2009); *see also In re Bertsos*, No. 97-34158, 2022 WL 469033, at *8 (Bankr. D. Conn. Sept. 30, 2022). "In considering whether a sale can be conducted pursuant to § 363(b), courts must consider the following factors: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided." *In re Barnes*, 615 B.R. 514, 524–25 (Bankr. D. Conn. 2020) (citing *Lionel*)). "While these factors are not exhaustive, they bear heavily on whether a sale under § 363(b) is appropriate." *Id.* "Courts should not generally interfere with business decisions absent a showing of bad faith, self-interest, or gross-negligence." *In re Borders Grp., Inc.*, 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011) (internal quotations marks omitted).

In addition, Bankruptcy Code § 105(a) grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case." *In re Flores*, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003); *see also In re Casse*, 198 F. 3d 327, 336 (2d Cir. 1999).

The Trustee's proposed sale process falls squarely within her mandate to liquidate property of the Chapter 7 bankruptcy estate, is a sound and prudent exercise of her reasonable business judgment, and reflects the best interest of the estate and creditors. The proposed Sale is the result of years of hard work by the Trustee and other constituents involved in this case. Despite being in a high-traffic area seemingly amenable to commercial activity, the Properties remain derelict and without permits to develop as of right. The prospect of a successful sale at a

substantially enhanced price in the near term following a buyer's due diligence and permitting remains difficult, unpredictable, and several months — if not years — away. The Trustee, Main St., and the Town have represented during hearings that the cost of delaying the Sale continues to run at approximately $41,000 per month based on the accrual of real property taxes and monthly maintenance costs on the Properties. No party objected to or challenged this representation. The Debtor has no resources or prospects to offset these costs and is unable to preserve, maintain, or insure the Properties. Faced with these same difficulties, the Trustee has spent considerable effort negotiating with Main St. to present an opportune sale structure that guarantees a method of maximizing value for the Debtor's creditors where none ostensibly existed.

The Debtor has made broad arguments assailing virtually every action the Trustee has taken during her efforts to negotiate the terms of the Sale. He argues that the Trustee is incapable of properly marketing the Properties and is attempting to prematurely sell the Properties for a lesser purchase price than what the Debtor believes he could achieve with additional time, funding, and permits to develop the Properties.[12] The Debtor also wildly asserts that the Trustee and opposing parties are collusive, corrupt, and conspiratorial.

The Debtor further argues that the Sale should not proceed because he believes he has found a better offer for the Properties. The Debtor has alleged that there is a potential purchaser, Lyman Development Corp. ("Lyman"), that *may* offer to purchase the Properties for a total purchase price of $8.5 million (the "Lyman Option"). ECF No. 756 at 4, Debtor's Mem. of Law in Support of Mot. to Convert Chapter 7 to Chapter 11 ("Debtor's Mem."). This offer is contingent on Lyman's due diligence and procurement of permits to develop the Properties. The

---

[12] The Court notes that it has already approved Avison Young as the real estate broker, a firm recommended by the Debtor himself and one who previously marketed the Properties for the Debtor. Avison Young is knowledgeable of the Properties and their history and possesses a national marketing network conducive to successful sales of commercial real property.

Debtor further alleges, seemingly as an alternative to the Lyman Option, that he will somehow obtain "an operating loan in the amount of $150,000" to fund the Debtor's own efforts to obtain permits to develop the Properties and then sell the Properties for an enhanced fair market value, which the Debtor — without proof or meaningful prospects of a sale — speculates is $11,430,000.00. Debtor's Mem. at 4.

Although Lyman has appeared at recent hearings, it is clear that Lyman is merely seeking a potential option to purchase the Properties that may or may not result in a sale. Lyman has suggested during hearings that it would require time to conduct surveys and obtain various permits prior to any sale of the Properties, during which time the debt of Main St. and the Town would continue to accrue interest, fees, and costs. ECF No. 714, audio file of March 14, 2023 hearing at 1:49:20–1:55:33 (clarifying that while the potential purchaser would be willing to pay taxes as they come due during permitting contingency period, back taxes would not be made current, and any payments made would be deducted from the $8.5 million total purchase price). The Trustee's proposed Sale invites potential buyers such as Lyman to participate in the auction and submit a competing bid higher and better than Main St.'s Stalking Horse Bid. In any event, however, Lyman's proposed purchase price of $8.5 million is facially insufficient to pay all creditor's claims in full and therefore the Lyman Option as presently structured is not competitive with Main St.'s Stalking Horse Bid because it would not result in any dividend to unsecured creditors.

The Debtor's arguments — that he is in the best position to sell or market the Properties and that he can achieve a better purchase price by waiting to optimally time the Sale with the real estate market — are not well founded. The Debtor's prepetition efforts to sell the Properties over the years have been unavailing. *See* ECF No. 98-14, 98-15 (describing Debtor's claim for alleged

financing in 2016 for $3.4 million, which failed to materialize); ECF No. 98-16 (describing

Debtor's May 2019 claim of a letter of intent with lender to pay off debts, which failed to

materialize); ECF No. 98-17, 98-18 (describing Debtor's September 2019 claim of $4.8 million

in financing to close within weeks, which failed to materialize). The Debtor's claims of an

imminent sale during his Chapter 11 case likewise failed to produce a letter of intent or firm

offer from any potential buyer. At the initial case management conference on October 4, 2019,

the Debtor stated that: (i) he has mortgage companies interested in refinancing the Properties; (ii)

he had a letter of intent from a lender with a preliminary commitment for $4.8 million; and (iii)

he hoped to close the refinancing within sixty days. ECF No. 26 at 25:39–25:46; 27:54–28:26;

29:03–29:11. No financing ever materialized. In its Conversion Order, the Court stated that

"[t]here is simply no indication that the Debtor is able to secure reliable, credible funding and

there are no ostensible resources in the Chapter 11 estate to support the administration of this

case" and "the Debtor's pleas and insistence that the Court just wait and see what materializes

from his heretofore failed fundraising has proven to be unavailing and unconvincing."

Conversion Order at 12–13.

The Debtor has not alleged or shown any change in his circumstances or capabilities that

would suggest a higher likelihood of success with his efforts to sell the Properties at this time.

Further, the Debtor has undercut his claims that the Properties are worth $11,430,000.00 by

alleging in his papers that the Properties require "remediation of potential pollutants," that

"[g]ates must be erected" around the Properties, that a "12,000 SF building needs to be cleaned

up, boarded up and secured," that "[s]ecurity measures must be taken" to keep people off the

Properties, and that "the lands need to be mowed to prevent further contamination of the sand

and gravel deposits from organic intrusion rendering close to a million dollars of imported

material to be compromised." Debtor's Mem. at 12. His glib, goal-driven, conclusory valuations of the Properties simply have no consistency, credibility, or practical nexus with the realities of failed bankruptcy reorganization efforts.

In the case of *In re Milford Connecticut Assocs., L.P.*, 389 B.R. 303, 308 (Bankr. D. Conn. 2008), *aff'd*, 404 B.R. 699 (D. Conn. 2009), Judge Dabrowski encountered a similar fact pattern and determined that the debtor had filed bankruptcy in an apparent attempt to avoid a foreclosure sale and "park" itself in bankruptcy until such time as market conditions were optimal for a sale or development of the commercial property at issue. Judge Dabrowski held that this type of "dilatory agenda is not a luxury the Bankruptcy Code affords." Although Judge Dabrowski reached this decision in the context of a motion seeking conversion of a Chapter 11 bankruptcy case to one under Chapter 7, it is aptly applied in this context. The record of this case likewise supports a determination that the Debtor has had the intention of "parking" the Properties in bankruptcy, not only to avoid a foreclosure sale, but to frustrate the efforts of the Trustee and his creditors as he attempts to obtain financing, development opportunities, or potential buyers that he otherwise has failed to attract in the last ten years. The record of the Foreclosure Actions and the Debtor's related appeals to the Connecticut Appellate Court substantiate the Debtor's pattern of obfuscation, delay, frivolous pleadings, and unperformed or unrealized strategies to hold onto the Properties and frustrate legal proceedings.

The Debtor has proven his inability to function as a fiduciary to the bankruptcy estate during the course of his Chapter 11 bankruptcy case. He never proposed a plan of reorganization and never presented a feasible proposal or process for an imminent sale of the Properties in a case that is administratively insolvent and without any resources to defray the monthly $41,000 tax and maintenance costs or accrual of debt and associated interest, fees, and costs. Even in the

unlikely event that a successful due diligence process could occur within the next six months to one year (a process that has not been accomplished in more than a decade), there is no substantial likelihood of a net recovery for this estate. The Court has exercised considerable patience in allowing the Debtor ample time and opportunity to voice his objections, but it has become clear that the Debtor's actions are more indicative of intentional delay and frustration of the rule of law designed to impose barriers and costs upon third parties and the Chapter 7 estate.

The Debtor has failed to provide a valid reason to challenge the reasonableness of the Trustee's business judgment and has failed to show that the Trustee has otherwise abused her discretion. On the contrary, her discretion, experience, strategic acumen, and patience will likely yield a tangible financial outcome. In the absence of any objection supported by cognizable legal theories or sufficient evidence, the Court must show deference to the Trustee's decision-making. *See In re Scimeca Found., Inc.*, 497 B.R. 753, 779 (Bankr. E.D. Pa. 2013) (holding that Chapter 7 trustee's decision to accept lower all-cash offer with no contingency fell within trustee's sound business judgment because trustee reasonably could have believed that debtor's claimed financing arrangement would never be consummated and the lower cash offer was the only reasonable prospect of the prompt liquidation of real property); *In re JL Bldg., LLC,* 452 B.R. 854, 859 (Bankr. D. Utah 2011) (approving proposed sale and deferring to Chapter 7 trustee's decision-making where no party put forth sufficient evidence or reasons to challenge the trustee's business judgment).

The Trustee's Sale Procedures Order proposes a sale process that is reasonably calculated to test the market, maximize the value of the Chapter 7 bankruptcy estate, and fulfill the mandate of the Trustee to liquidate property of the estate under Chapter 7 of the Bankruptcy Code. Further, the Trustee's Sale Procedures Order conforms to the requirements set forth in 11 U.S.C.

§ 363, as well as Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure and Rules 6004-1 and 6004-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court of the District of Connecticut.

### B. Main St.'s Release

Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate before it may approve it. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S. Ct. 1157, 20 L.Ed.2d 1 (1968); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (holding that settlements are important in bankruptcy because they "help clear a path for the efficient administration of the bankrupt estate").

The Second Circuit has identified seven factors for courts to consider when evaluating a settlement or compromise under this rule. *See Iridium*, 478 F.3d at 462. Those factors are (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and

(7) "the extent to which the settlement is the product of arm's length bargaining." *Id*. The Trustee has manifestly satisfied these standards.

The Trustee has surveyed these factors upon the record and has demonstrated that the resolution of these claims in tandem with the Sale is fair, appropriate, and reasonable. On that basis, the Court finds that the Release requested by Main St., which is described in the Sale Procedures Order, is appropriate under the proposed sale process and the facts and circumstances of this case. The Release meets the requirements of Bankruptcy Rule 9019(a) and the Second Circuit's *Iridium* factors. Under the *Iridium* test, the proposed Release of the Debtor's claims against Main St. is well above the lowest point in the range of reasonableness and is fair, equitable, and in the best interests of creditors. Main St. is providing valuable consideration to the bankruptcy estate under the proposed sale process and the Stalking Horse PSA by assuring a cash distribution for unsecured creditors as part of its Stalking Horse Bid. This is significant given that Main St. is the largest undisputed secured creditor who would otherwise swallow any proceeds from the Sale.

Main St. has demonstrated its good faith by constructively and voluntarily participating in a sale of the Properties with the goal of maximizing the value of the bankruptcy estate when it otherwise has the right to pursue its prepetition foreclosure action under the Court's Stay Relief Order. Main St. is providing significant consideration to the bankruptcy estate by entering into the Stalking Horse PSA, facilitating a bidding process by which the bankruptcy estate can market the Properties, funding the Up-Front Expenses, and centrally participating in the sale process, notwithstanding that it has relief from the automatic stay to independently proceed with its foreclosure action.[13]

---

[13] Notably, Main St. is not requesting any breakup fee or residual rights of recovery. Break-up fees are often provided as incentives to encourage an initial purchase to invest the appropriate due diligence in terms of time,

Aside from the highly uncertain nature and outcome of the Debtor's purported claims described in the Schedule of Potential Claims, the Debtor has failed to articulate how he will overcome these challenges when he is unemployed and financially unable to support litigation or retain competent legal counsel to advise him. The Court affords deference to the Trustee's judgment that the claims against Main St. are deeply uncertain and are unlikely to lead to any meaningful recovery in any time certain for the bankruptcy estate and its creditors.

Finally, Main St. has argued that the Release is here warranted because the Debtor is simply overly litigious. The record demonstrates he is. Main St. believes the Debtor will predictably attempt to appeal any orders entered by this Court related to the Sale.[14] Regardless of whether his arguments have merit, the Debtor will assuredly engage in further dilatory tactics similar to his unavailing strategies in the Foreclosure Actions and related appeals. The Debtor's conduct throughout this case has done nothing but confirm Main St.'s assertion. The Debtor has provided no reason for the Court to reach a different conclusion, and instead has given it endless reasons to approve a sale process and structure for a sale transaction that will afford closure for Main St. and this Chapter 7 estate after years of wasteful litigation and appeals.

## IV.   CONCLUSION

For the foregoing reasons, the sale process proposed by the Trustee in her Sale Motion is hereby **APPROVED**. The Debtor's objections thereto are **OVERRULED**. The Court will enter the Trustee's Sale Procedures Order substantially contemporaneous with this decision.

Dated at Hartford, Connecticut this 16th day of June 2023.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut

---

money, and effort with respect to a sale, despite the risk of subsequent higher and better offers. *In re Integrated Res., Inc.*, 147 B.R. 650, 659–60 (S.D.N.Y. 1992). A break-up fee may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *Id.* at 660.
[14] As of the date of this decision, the Debtor has already filed two motions (ECF No. 911, 912) seeking reconsideration of the Court's bench rulings regarding preliminary approval of the Sale Procedures Order (ECF No. 886) and the Court's denial of the Debtor's Motion to Compel Abandonment related to the Schedule of Potential Claims (ECF No. 885). These motions will be considered in due course.